ACCEPTED
15-24-00083-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
1/10/2025 11:45 AM
CHRISTOPHER A. PRINE
CLERK

No. 15-24-00083-CV

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
1/10/2025 11:45:54 AM
CHRISTOPHER A. PRINE
Clerk

# In the

# Fifteenth Court of Appeals

ASI Lloyds Insurance Company,

*Appellant*

v.

Texas Windstorm Insurance Association and Hon. Cassie Brown in her Official Capacity as Commissioner, Texas Department of Insurance,

*Appellees*

## APPELLEE TEXAS WINDSTORM INSURANCE ASSOCIATION'S BRIEF

Michael S. Wilson
State Bar No. 21704810
mwilson@perkinslawtx.com
Adrienne L. Barclay
State Bar No. 24065955
abarclay@perkinslawtx.com
PERKINS LAW GROUP PLLC
One Far West Plaza, Suite 200
3410 Far West Boulevard
Austin, Texas 78731
Telephone: (512) 717-3467
Fax: (512) 551-9895
**Counsel for Appellee Texas Windstorm Insurance Association**

# IDENTITY OF PARTIES AND COUNSEL

Appellant/Plaintiff:   ASI Lloyds Insurance Company

Appellate Counsel:   Wade C. Crosnoe
THOMPSON, COE, COUSINS & IRONS, L.L.P.
2801 Via Fortuna, Suite 300
Austin, Texas 78746
(512) 703-5060 Telephone
(512) 708-8777 Facsimile
wcrosnoe@thompsoncoe.com

Trial and Appellate Counsel:
Jay A. Thompson
MITCHELL, WILLIAMS, SELIG, GATES &
WOODYARD, P.L.L.C.
500 W. 5th St., Suite 1150
Austin, Texas 78701
(512) 480-5104 Telephone
jthompson@mwlaw.com

Appellee/Defendant:   Texas Windstorm Insurance Association

Trial and Appellate Counsel:

Michael S. Wilson
State Bar No. 21704810
mwilson@perkinslawtx.com
Adrienne L. Barclay
State Bar No. 24065955
abarclay@perkinslawtx.com
PERKINS LAW GROUP PLLC
One Far West Plaza, Suite 200
3410 Far West Boulevard
Austin, Texas 78731
(512) 717-3467 Telephone
(512) 551-9895 Facsimile

Appellee/Defendant:    Hon. Cassie Brown, in her official capacity as
                       Commissioner, Texas Department of Insurance

                       c/o Texas Department of Insurance
                       Chief Clerk Office
                       ChiefClerk@tdi.texas.gov
                       Mail code GC-CCO
                       P.O. Box 12030
                       Austin, Texas 78711-2030

Appellate Commissioner Counsel:

                       Ken Paxton
                       Attorney General

                       Brent Webster
                       First Assistant Attorney General

                       Aaron L. Nielson
                       Solicitor General

                       Cory A. Scanlon
                       Assistant Solicitor General
                       Office of the Attorney General of Texas
                       P.O. Box 12548 (MC 059)
                       Austin, Texas 78711-2548
                       (512) 936-1820 Telephone
                       cory.scanlon@oag.texas.gov

Commissioner Trial Counsel:
                       Terry M. Abernathy, Assistant Attorney General
                       State Bar No. 24062894
                       terri.abernathy@oag.texas.gov
                       General Litigation Division
                       P.O. Box 12548
                       Austin, Texas 78711
                       (512) 936-0562 Telephone

Rosalind Hunt, Assistant Attorney General
State Bar No. 24067108
rosalind.hunt@oag.texas.gov
Administrative Law Division
P.O. Box 12548
Austin, Texas 78711
(512) 475-4166 Telephone

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL .............................................ii

TABLE OF CONTENTS .................................................................. v

INDEX OF AUTHORITIES ............................................................ vi

STATEMENT REGARDING ORAL ARGUMENT………………….…..ix

RESPONSIVE ISSUES PRESENTED.........................................................ix

INTRODUCTION ........................................................................ 1

STATEMENT OF FACTS ............................................................. 1

SUMMARY OF ARGUMENT .......................................................... 6

ARGUMENT ............................................................................ 8

  I.   Rule 5.4162(b) Is A Valid Administrative Rule ...........................8

      A. The Governing Statute…………………………………………..8
      B. The Governing Rules……………………………………………14
      C. ASI Was Assessed In Compliance With The TWIA Act…………16
      D. Rule 5.4162(b) Remains Valid……………………………………18

  II.   The Trial Court's Jurisdiction…………………………………….33

CONCLUSION AND PRAYER………………………………………......39

CERTIFICATE OF COMPLIANCE…………………………………….41

CERTIFICATE OF SERVICE…………………………………………..42

APPENDIX………………………………………………………………44

  1. Index of Exhibits in the Administrative Record……………………44
  2. Glossary of Terms……………………………………………………45
  3. 2011 Adopted Rule 5.4162, 36 Tex. Reg. 786-809………………..…46
  4. 2010 Proposed Rule 5.4162, 35 Tex. Reg. 6611-6630…………….…47

# INDEX OF AUTHORITIES

**Cases**                                                      **Page(s)**

*Graff Chevrolet, Inc. v. Tex. Motor Vehicle Bd.*, 60 S.W.3d 154, 159 (Tex. App.—Austin 2001 pet. denied) ...................................................18

*R.R. Comm'n of Tex. v. Torch Operating Co.*, 912 S.W.2d 790 (Tex. 1995) ...........................................................................................18

*TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011) ...........................................................................................13

*Heritage on San Gabriel Homeowners Ass'n v. Tex. Comm'n on Env't Quality*, 393 S.W.3d 417, 424-35 (Tex. App.—Austin 2012, pet. den'd.) ...........................................................................................13

*Railroad Comm'n of Tex. v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011) .........................................20

*Tex. Catastrophe Prop. Ins. Ass'n v. Council of Co-Owners of Saida II Towers Condo. Ass'n*, 706 S.W2d 644, 645-66 (Tex. 1986) ...........................................................................................35

*Dubai Petroleum Co. v. Kazi*, 12 S.W. 3d.71, 76-77 (Tex. 2000) ......35, 36

*Mingus v. Wadley*, 285 S.W. 1084 (Tex. 1926) ...................................37

*Mosely v. Texas Health and Human Services Commission*, 593 S.W.3d 250, 261 fn.3 (Tex. 2019) .........................................................................37

*Tex. Windstorm Ins. Ass'n. v. Boys & Girls Club of Coastal Bend, Inc.*, 2020 WL 6072624 at *5 (Tex. App.—Corpus Christi-Edinburg, 9/24/2020) .................................................................................37

*Housing & Comm. Servs., Inc. v. Tex. Windstorm Ins. Ass'n.*, 515 S.W.3d 906, (Tex. App.—Corpus Christi-Edinburg 2017, no pet.) .................37

*Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747-48 (Tex. 2006)............21

*First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008).......21

*Rowden v. Tex. Catastrophe Prop. Ins. Ass'n*, 677 S.W.2d 83, 87 (Tex. App. – Corpus Christi 1984, writ ref'd n.r.e.)....................................36

**Statutes**

Tex. Govt. Code Chapter 2001...................................................31, 36
Tex. Govt. Code §§ 2001.0225 - .034 .............................................31
Tex. Govt. Code § 2001.035 .......................................................31
Tex. Govt. Code § 2001.038 .............................................31, 33, 34
Tex. Govt. Code § 2001.039 .......................................................31
Tex. Govt. Code § 2001.040 .......................................................31
Tex. Govt. Code § 2001.051 .........................................................5
Tex. Govt. Code § 2001.171 .............................................33, 34, 35
Tex. Govt. Code § 2001.174 .......................................................18
Tex. Govt. Code Chap. 2001.........................................................5
Tex. Govt. Code §§ 311.021 - .022.............................................11, 13
Tex. Ins. Code § 36.202..............................................33, 34, 35, 36
Tex. Ins. Code § 36.203..............................................33, 34, 35, 36
Tex. Ins. Code § 40.002..............................................................5
Tex. Ins. Code Chapter 2210.................................................*passim*
Tex. Ins. Code § 2210.001......................................................2, 28
Tex. Ins. Code § 2210.003.........................................................11
Tex. Ins. Code § 2210.051(a).......................................................2
Tex. Ins. Code § 2210.551..............................5, 8, 9, 32, 33, 34, 35
Tex. Ins. Code § 2210.572.........................................................37
Tex. Ins. Code § 2210.573(a).....................................................38
Tex. Ins. Code § 2210.574.........................................................37
Tex. Ins. Code Chap. 2210...........................................................1
Tex. Ins. Code § 2210.009(b)...............................................7, 8, 29
Tex. Ins. Code § 2210.052.................................................
.............1, 3, 4, 6, 7, 8, 9, 10, 11, 12, 14, 16, 17, 18, 19, 20, 21, 22, 24, 26
Tex. Ins. Code § 2210.052(a)............................7, 11, 12, 19, 20, 23

Tex. Ins. Code § 2210.052(b)…………………………………………………..30
Tex. Ins. Code § 2210.052(c)……………………………………………12, 18, 19
Tex. Ins. Code § 2210.052(d)………………………………………….…7, 8, 27
Tex. Ins. Code § 2210.053(b)……………………………………….…7, 8, 29
Tex. Ins. Code § 2210.071(b)……………………………………………….12
Tex. Ins. Code §§ 2210.071 – 2210.075………………………………3, 11, 12
Tex. Ins. Code §§ 2210.601 – 2210.620……………………………………3
Tex. Ins. Code § 2210.701………………………………………….…7, 8, 29
Tex. Ins. Code § 2210.074………………………………………………….3
Tex. Ins. Code § 2210.0725…………………………….…..3, 7, 8, 9, 13, 19, 21, 22
Tex. Ins. Code § 2210.0725(b)………………………………..……7, 11, 12
Tex. Ins. Code § 2210.0742………………………………………..…….3

## Rules

1 Tex. Admin. Code §155.505……………………………………………….5
28 Tex. Admin. Code § 5.4001(c)(2)(B)…………………………23, 25, 29, 39
28 Tex. Admin. Code Sec. 5.4161 – 5.4167……………………………14, 23
28 Tex. Admin. Code § 5.4162…………………………………………..
……………………….v, ix, 6, 7, 8, 10, 14, 21, 22, 23, 24, 25, 26, 38, 46, 47
28 Tex. Admin. Code § 5.4162(b)&(c)……..……………………..7, 8, 14, 16, 17
28 Tex. Admin. Code § 5.4162(b)……………………………………………
…………………………………v., 1, 8, 12, 14, 18, 19, 20, 21, 22, 24, 33, 34

## Orders

Official Order No. 2023-7903 ……………………………………….…..5
Official Order No. 2023-8073……………………………………………..5

## Texas Register

35 Tex. Reg. 6621…………………………………………………………22
35 Tex. Reg. 6611-6630………………………………………………v., 6, 47
36 Tex. Reg. 786-809………………………………………………v., 6, 46
46 Tex. Reg. 3740-3742……………………………………..…………….31

## STATEMENT REGARDING ORAL ARGUMENT

The appeal involves questions of law, not fact. Appellee believes this case can be decided on the briefs based on clear statutory authority, and oral argument is not warranted. To the extent the Court feels oral argument would aid in its resolution of this appeal, Appellee would appreciate the opportunity to present its case.

## RESPONSIVE ISSUES PRESENTED

I. Is Rule 5.4162 a valid rule of the Texas Department of Insurance (the "Department") and a reasonable construction that does not contradict the plain language of the TWIA Act, specifically Tex. Ins. Code §§ 2210.052, 2210.0725.

II. Does ASI's cause of action go beyond subject matter jurisdiction and exclusive remedies of the TWIA Act, Tex. Ins. Code § 2210.551(b), by seeking declaration of a money judgment against TWIA as a "refund" of assessment.

## INTRODUCTION

Texas Insurance Code Section 2210.052 remains the primary authority requiring use of "preceding calendar year premiums" to determine each member's percentage of participation (POP) for assessments, annually in the manner provided in the TWIA plan of operation. The funding scheme for member assessments has changed multiple times from 2007 to present; however, every formulation, including 2011 and 2015 amendments, has expressly incorporated Section 2210.052 as the method of determining each insurer's participation in assessments using "preceding calendar year premiums", not statically set to "catastrophe year" premiums as urged by Appellant ASI. Annually variable participation based on preceding calendar year premiums is statutorily required and properly reflected in Rule 5.4162(b).

## STATEMENT OF FACTS

### TWIA

The Association is a quasi-governmental entity that exists under Tex. Ins. Code Chap. 2210, the Texas Windstorm Insurance Association Act. (AR 0384-0437, Exh. 69) By legislative mandate, TWIA is an insurer

1

of last resort for the "seacoast territory". Tex. Ins. Code §§ 2210.001, .003. The Association was originally created in the form of the Texas Catastrophe Property Insurance Association ("TCPIA") in 1971 (AR 0955, 0964, 1014, 1028, 1093, 1107, 1230, 0384, Exhs. 59, 60, 62, 63, 65, 65A, 67A, 69) and has existed under rules of the Texas Department of Insurance, including the Plan of Operation. (AR 0993, 1051, 1129, 1300, Exhs. 61, 64, 66, 68)

The Association is composed of all insurers authorized to engage in the business of property insurance in this state, with few exceptions. Tex. Ins. Code § 2210.051(a). ASI is a member. (AR 464-475, Exh. 1)

*Assessments*

TWIA writes windstorm and hail insurance in the "catastrophe area", which consists of designated counties along the Texas Gulf Coast and parts of Harris County, where policyholders are unable to obtain that coverage in the private market. Tex. Ins. Code § 2210.001. If TWIA incurs insured losses and operating expenses in excess of premium and other revenue, member insurers are required to participate in those excess losses within the funding scheme set up by the TWIA Act, generally in the following order:

2

- TWIA premiums and other revenue
- The Catastrophe Reserve Trust Fund (CRTF), an account held by the Comptroller containing the net gains from TWIA operations from prior years
- $500 million in Class 1 public securities
- $500 million in Class 1 company assessments
- $250 million in Class 2 public securities
- $250 million in Class 2 company assessments
- $250 million in Class 3 public securities
- $250 million in Class 3 company assessments

Tex. Ins. Code §§ 2210.052, 2210.071 – 2210.075, 2210.601 – 2210.620 (AR 0476, 0384, Exhs. 2, 69)

Members participate in excess losses through Class 1, Class 2, and Class 3 assessments. Tex. Ins. Code §§ 2210.052, 2210.0725, 2210.074, 2210.0742 (AR 0384, Exh. 69) ASI's appeal involves a Class 1 assessment made by TWIA with Commissioner approval under §§ 2210.0725 and 2210.052. (AR 0727, 0700, Exhs. 49, 45) It was a third assessment totaling $90,000,000 to members for excess losses from 2017 Hurricane Harvey that ASI appealed. (AR 0464, Exh. 1) The first and second assessments issued to members on 6/05/2018 (AR 0554, Exh. 15) and 8/29/2018 (AR 0582, Exh. 19) were not appealed. (AR 0465-0467, TWIA Exh. 1)

ASI does not appeal any aspect of the assessment other than the use of 2019 or 2020 participation percentages in the computation, as opposed to ASI's 2017 participation percentage. If TWIA had used ASI's 2017 participation percentages, ASI's proportionate share of the $90,000,000

3

assessment would have been less than what it paid using the 2019 participation percentage. (AR 0465-0467, Exh. 1; compare Exh. 11 to Exhs. 41 and 45, AR 0538 to AR 0684, 0700)

*Funding History*

Appellant's Statement of Facts focuses largely on legislative changes to the sources and order of funding over 50 years but obscures the most important facet that remained the same. From 1971 through present each member's percentage of participation in assessments has been determined annually based on the member's proportionate share of prior calendar year premiums, regardless of when the assessment is made. (AR 0958, Exh. 59; AR 1016-1017, Exh. 62; AR 1033, Exh. 63; AR 1097, 1105, Exh. 65; AR 1114, 1125, Exh. 65A; AR 1238, 1241-1242, Exh. 67A; AR 0392, 0395-0396, Exh. 69) Variable participation in assessments based on preceding calendar year premiums was codified in 2005 under Texas Insurance Code § 2210.052 and remains the law. (AR 0392, 0395-0396, Exh. 69)

*Appeal*

Notices of assessment are an "act, ruling, or decision of the association." Following a contested case hearing and proposal for

4

decision in the State Office of Administrative Proceedings, the Commissioner is required to "affirm, reverse, or modify … the act, ruling, or decision appealed to the commissioner." Tex. Ins. Code § 2210.551(f); Tex. Govt. Code Chap. 2001, Subchapter C., §§ 2001.051 *et. seq.*, 2003; Tex. Ins. Code §§ 40.002, 2210.551.

The Administrative Law Judge issued a Proposal for Decision granting summary disposition in favor of the Association under Rules 155.505, .507, SOAH Rules of Procedure. (AR 1969) The Commissioner's order adopted the ALJ's Findings of Fact and Conclusions of Law, denied ASI's appeal in Order No. 2023-7903, and denied ASI's motion for rehearing in Order No. 2023-8073. (AR 2018, 2108)

The Hon. Jan Soifer, Presiding Judge of the 345th Judicial District Court of Travis County, Texas conducted judicial review and signed an order on 6/18/2024 affirming the Commissioner's Order, denying jurisdictional pleas, and denying all relief not expressly granted. (CR 534-35; Appellant Appx. A)

### *Administrative Record*

The Administrative Record is in Joint Exhibit 1 and includes the parties' stipulations (AR 0464-467, 470-473, TWIA Exh. 1), the admitted

5

exhibits (AR 0476 - 0704, 0745, Exhs. 2 through 46, 51), the additional documentary exhibits (AR 1443 – 1865, Exhs. 74 through 80), and SOAH filings, which include legal authorities (AR 0955-1150, 0203-0246, 1195-1413, 0361-0450, 0872-0954, 1443-1613, 1719-1781, 1838-1865, TWIA Exhs. 59-73, and 75)   The Administrative Record was forwarded to this court on a thumb drive as part of the Reporter's Record.  (RR 6-7, CR 534-537)

An **Index of Exhibits in the Administrative Record** (CR 409-410), a **Glossary of Terms** (CR 411), **2011 Adopted Rule 5.4162**, 36 Tex. Reg. 786-809 (AR 203-226), and **2010 Proposed Rule 5.4162**, 35 Tex. Reg. 6611-6630 (AR 227-246) are included in TWIA's Appendix at the end of this brief.

## SUMMARY OF ARGUMENT

The District Court's final judgment against Appellant ASI is compliant with applicable law and supported by substantial evidence in the Administrative Record.   While the Legislature has repeatedly changed the usage and attachment points of member assessments among the mix of other funding sources, member participation percentages continue to be specified "for the year under Section 2210.052" based on

6

"preceding calendar year" premiums. Tex. Ins. Code §§ 2210.052(a), .0725(b). (AR 1233, 1238, 1241-1242, Exh. 67A)

The subject rule, 28 Tex. Admin. Code § 5.4162, is valid and stated in the Department's adoption order to be based on Tex. Ins. Code § 2210.052. (AR 0220, Exh. 66A) The rule was justified as a redesignation of the already existing Rule 5.4001(c)(2) of the plan of operation to make the Association's assessment procedure more accessible. (AR 0203-204, Exh. 66A)

Rule 5.4162(b),(c) is a reasonable interpretation of Tex. Ins. Code § 2210.052 which the Legislature stipulated as the method of allocating assessments under Tex. Ins. Code § 2210.0725(b). The rule and code further a long-standing comprehensive and unified scheme of incentivizing members to voluntarily write wind and hail insurance in the catastrophe area. Tex. Ins. Code §§ 2210.009(b), 2210.052(d), 2210.053(b), 2210.701.

Member participation percentages in assessments vary annually based on the member's "preceding calendar year" premiums, not statically set to the "catastrophe year." Tex. Ins. Code §§ 2210.052(d), 2210.0725. Because members receive credit for premiums voluntarily

7

written in the catastrophe area, members like ASI can reduce their assessments after a major storm by increasing their voluntary writings of windstorm and hail insurance. 28 TAC § 5.4162; Tex. Ins. Code §§ 2210.009(b), 2210.052(d), 2210.0725, 2210.053(b), 2210.701. (AR 1347-50, Exh. 68; AR 390, 392, 395, 396, 436, Exh. 69)

The trial court correctly affirmed the Commissioner's order upholding Rule 5.4162(b) and the assessment as a matter of law. If the court were to find otherwise, Appellant's request for declaration of a money judgment against TWIA as a "refund" of the assessment was abandoned in the trial court (CR 203) and, in any event, beyond subject matter jurisdiction and exclusive remedies of appeal of TWIA's "act, ruling, or decision" under Tex. Ins. Code § 2210.551(b).

## ARGUMENT

### I. Rule 5.4162(b) Is A Valid Administrative Rule

28 Tex. Admin. Code Sec. 5.4162(b)&(c) is a valid rule, consistent with the TWIA Act.

#### A. The Governing Statute

The governing law at the time of assessment includes Tex. Ins. Code §§ 2210.052, .0725, .071, and .003(3-b):

§ 2210.003. General Definitions

In this chapter, unless the context clearly indicates otherwise:

...

(3–b) "Catastrophe year" means a calendar year in which an occurrence or a series of occurrences results in insured losses, regardless of when the insured losses are ultimately paid.

...

SUBCHAPTER B–1. PAYMENT OF LOSSES

§ 2210.071. Payment of Excess Losses

If, in a catastrophe year, an occurrence or series of occurrences in a catastrophe area results in insured losses and operating expenses of the association in excess of premium and other revenue of the association, the excess losses and operating expenses shall be paid as provided by this subchapter.

...

§ 2210.0725. Payment from Class 1 Assessments

(a) Losses in a catastrophe year not paid under Sections 2210.0715 and 2210.072 shall be paid as provided by this section from Class 1 member assessments not to exceed $500 million for that catastrophe year.

(b) The association, with the approval of the commissioner, shall notify each member of the amount of the member's assessment under this section. The proportion of the losses allocable to each insurer under this section shall be determined in the manner used to determine each insurer's participation in the association for the year under Section 2210.052.

...

§ 2210.052. Member Participation in Association

(a) Each member of the association shall participate in insured losses and operating expenses of the association, in excess of premium and other revenue of the association, in the proportion that the net direct premiums of that member during the preceding calendar year bears to the aggregate net direct premiums by all members of the association, as determined using the information provided under Subsection (b).

(b) The department shall review annual statements, other reports, and other statistics that the department considers necessary to obtain the information required under Subsection (a) and shall provide that information to the association. The department is entitled to obtain the annual statements, other reports, and other statistics from any member of the association.

(c) Each member's participation in the association shall be determined annually in the manner provided by the plan of operation. For purposes of determining participation in the association, two or more members that are subject to common ownership or that operate in this state under common management or control shall be treated as a single member. The determination shall also include the net direct premiums of an affiliate that is under that common management or control, including an affiliate that is not authorized to engage in the business of property insurance in this state.

(d) Notwithstanding Subsection (a), a member, in accordance with the plan of operation, is entitled to receive credit for similar insurance voluntarily written in areas designated by the commissioner. The member's participation in the insured losses and operating expenses of the association in excess of premium and other revenue of the association shall be reduced in accordance with the plan of operation.

...

(AR 0387, 0392, 0394-0396, Exh. 69)

After the 2015 adoption of assessments under Section 2210.0725, the TWIA Act continued to employ "preceding calendar year" premiums to allocate percentages of participation in losses by reference to § 2210.052. (AR 1233, 1238, 1241-1242, Exh. 67A)

9

The same statutory method of allocating member participation by reference to § 2210.052 was also in place when Rule 5.4162 was adopted in February 2011, even though the sources and order of funding were different:

SUBCHAPTER B-1. PAYMENT OF LOSSES

§ 2210.071. Payment Of Excess Losses; Payment From Reserves And Trust Fund

(a) If an occurrence or series of occurrences in a catastrophe area results in insured losses and operating expenses of the association in excess of premium and other revenue of the association, the excess losses and operating expenses shall be paid as provided by this subchapter.

§ 2210.073. Payment From Class 2 Public Securities

(a) Losses not paid under Sections 2210.071 and 2210.072 shall be paid as provided by this section from proceeds from Class 2 public securities authorized to be issued in accordance with Subchapter M on or after the date of any occurrence that results in insured losses under this subsection. Public securities issued under this section must be repaid within a period not to exceed 10 years, and may be repaid sooner if the board of directors elects to do so and the commissioner approves.

§ 2210.613. Payment Of Class 2 Public Securities

(a) The association shall pay Class 2 public securities issued under Section 2210.073 as provided by this section. Thirty percent of the cost of the public securities shall be paid through member assessments as provided by this section. The association shall notify each member of the association of the amount of the member's assessment under this section. The proportion of the losses allocable to each insurer under this section shall be determined in the manner used to determine each insurer's participation in the association for the year under Section 2210.052. A member of the association may not recoup an assessment paid under this subsection through a premium surcharge or tax credit.

§ 2210.052. Member Participation in Association

(a) Each member of the association shall participate in insured losses and operating expenses of the association, in excess of premium and other revenue of the association, in the proportion that the net direct premiums of that member during the preceding calendar year bears to the aggregate net direct premiums by all members of the association, as determined using the information provided under Subsection (b).

(b) The department shall review annual statements, other reports, and other statistics that the department considers necessary to obtain the information required under Subsection (a) and shall provide that information to the association. The department is entitled to obtain the annual statements, other reports, and other statistics from any member of the association.

(c) Each member's participation in the association shall be determined annually in the manner provided by the plan of operation. For purposes of determining participation in the association, two or more members that are subject to common ownership or that operate in this state under common management or control shall be treated as a single member. The determination shall also include the net direct premiums of an affiliate that is under that common management or control, including an affiliate that is not authorized to engage in the business of property insurance in this state.

(d) Notwithstanding Subsection (a), a member, in accordance with the plan of operation, is entitled to receive credit for similar insurance voluntarily written in areas designated by the commissioner. The member's participation in the insured losses and operating expenses of the association in excess of premium and other revenue of the association shall be reduced in accordance with the plan of operation.

...

(AR 1097, 1099, 1105, Exh. 65)

10

**Code Construction Act.** If the Legislature intended to allocate member participation percentage based on premiums in the "catastrophe year," it would have used that defined term in place of the phrase "preceding calendar year" in Tex. Ins. Code § 2210.052(a). See Tex. Govt. Code §§ 311.011, .021.

ASI's argument that participation percentages should be fixed in the "catastrophe year" conflates the terms "catastrophe year" and "calendar year". However, the Legislature clearly distinguished the two, each having technical meaning. In the TWIA Act, the phrase "catastrophe year" is used for aggregation of losses under Section 2210.071 and the phrase "preceding calendar year" is used for allocating member percentages of participation in losses based on premiums in Section 2210.052(a). Tex. Ins. Code §§ 2210.003(3-b); 2210.052, .071, .0725 (AR 1233, 1238, 1241-1242, Exh. 67A)

ASI's construction is contrary to the Code Construction Act. Tex. Govt. Code § 311.011 requires words and phrases to be read in context, and that words and phrases having acquired a technical or particular meaning be construed accordingly. Tex. Ins. Code § 2210.0725(b) expressly requires that the proportion of losses allocable to each insurer

11

"shall be determined in the manner used to determine each insurer's participation in the association for the year under Section 2210.052". Section 2210.052(a) specifies percentage of participation based on each member's "preceding calendar year" premiums, determined annually under § 2210.052(c). Both sections use the term "shall", which imposes a duty under Tex. Govt. Code § 311.016.

A plain, unstrained reading of the TWIA Act shows that Section 2210.052 sets participation percentages annually based on "preceding calendar year" premiums, not the "catastrophe year". There is no ambiguity when Tex. Ins. Code § 2210.0725(b) is read, as expressly required, in connection with § 2210.052(a) and (c). Rule 5.4162(b) is consistent with the plain meaning of § 2210.052.

Texas Insurance Code § 2210.071(b) prohibits paying insured losses and operating expenses in a catastrophe year with "premium and other revenue earned in a subsequent year". However, assessments are not "premium and other revenue earned". Assessments, public securities, the catastrophe reserve trust fund, and reinsurance are funding sources provided in Subchapter B-1 (Tex. Ins. Code §§ 2210.071 - .075) when there are losses *in excess of* "premium and other revenue". The definition

12

of "catastrophe year" contemplates that excess losses allocated to the catastrophe year may be paid in subsequent calendar years. Assessments in 2018, 2019 and 2020 were all for excess losses of the 2017 "catastrophe year", consistent with Section 2210.0725. (AR 0395, 0548-0592, 0690-0708, Exhs. 69, 13-20, 43-46)

For purposes of determining ambiguity, statutes and administrative rules are construed in the same manner, using traditional principles of statutory construction. *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011); *Heritage on San Gabriel Homeowners Ass'n v. Tex. Comm'n on Env't Quality*, 393 S.W.3d 417, 424-35 (Tex. App.—Austin 2012, pet. denied.); *see* Tex. Govt Code §§ 311.021-.022. In *TGS-NOPEC*, the Supreme Court summarized the law,

> When construing a statute, our primary objective is to ascertain and give effect to the Legislature's intent. To discern that intent, we begin with the statute's words. If a statute uses a term with a particular meaning or assigns a particular meaning to a term, we are bound by the statutory usage. Undefined terms in a statute are typically given their ordinary meaning, but if a different or more precise definition is apparent from the term's use in the context of the statute, we apply that meaning. And if a statute is unambiguous, we adopt the interpretation supported by its plain language unless such an interpretation would lead to absurd results. We further consider statutes as a whole rather than their isolated provisions. We presume that the Legislature chooses a statute's language with

13

care, including each word chosen for a purpose, while purposefully omitting words not chosen. (citations omitted)

*Id.* at 439.

## B. The Governing Rules

At the time of the assessment, the Department's Rule 5.4162 remained part of the plan of operation and authorized by Tex. Ins. Code §§ 2210.052, .0725. The Rule states, in relevant part: [1]

*§5.4161. Member Assessments.*

(a) The association, with the approval of the commissioner, must assess members as provided by Insurance Code Chapter 2210.

…

(j) This section and §§5.4162 - 5.4167 of this division (relating to Amount of Assessment; Notice of Assessment; Payment of Assessment; Failure to Pay Assessment; Contest After Payment of Assessment; and Inability to Pay Assessment by Reason of Insolvency, respectively) are a part of the association's plan of operation and will control over any conflicting provision in §5.4001 of this subchapter (relating to Plan of Operation).

*§5.4162. Amount of Assessment.*

…

(b) This determination shall be computed on a calendar year basis for the year in which the assessment is made. This determination shall not be based on the year in which the catastrophic event occurred, except for an assessment made during that year. Net direct premiums shall be determined as provided under §5.4001 of this subchapter (relating to Plan of Operation).

(c) The designated members of the Association shall participate in any assessment levied in the proportion that the net direct premiums of such member written in this state during the preceding calendar year bears to the aggregate net direct premiums written in this

---

[1] TWIA is citing to the rules in effect at the time of the assessment. 28 Tex. Admin Code Sec. 5.4162(b) and (c) were amended in December 2020 with "nonsubstantive stylistic edits" and "to aid in readability". Section 5.4161(j) was moved to Section 5.4160. (AR 1731, 1732, 1768, 1772, Exh. 75)

state by all members of the Association as furnished to the Association by the department after review of annual statements, other reports, and required statistics; provided, however, that if at the time of such assessment the department has not furnished to the Association information necessary to compute a member's participation during the preceding calendar year, then each member's participation shall be based upon information furnished to the Association from the last calendar year in which such information is available and, upon obtaining the necessary information from the department, the Association shall reassess or refund to each member such amounts as are necessary to properly reflect such member's participation; provided, further, that a member shall be entitled to receive the following credit for insurance, similar to catastrophe insurance, written in such catastrophe areas.

...

§ 5.4001. **Plan of Operation**

...

(c) Financial Operation of the Association.

...

(2) Assessment of members.

...

(B) Amount of assessment. The board of directors shall determine which members of the association shall participate in any assessment for operating expenses and/or catastrophe losses. This determination shall be computed on a calendar year basis. The designated members of the association shall participate in any assessment levied in the proportion that the net direct premiums of such member written in this state during the preceding calendar year bears to the aggregate net direct premiums written in this state by all members of the association as furnished to the association by the Department after review of annual statements, other reports, and required statistics; provided, however, that if at the time of such assessment the Department has not furnished to the association information necessary to compute a member's participation during the preceding calendar year, then each member's participation shall be based upon information furnished to the association from the last calendar year in which such information is available and, upon obtaining the necessary information from the Department, the association shall reassess or refund to each member such amounts as are necessary to properly reflect such member's participation; provided, further, that a member shall be entitled to receive the following credit for insurance, similar to catastrophe insurance. written in such catastrophe areas.

(AR 1410-1411, Exh. 68A; AR 0221-0222, Exh. 66A; AR 1131-1132, Exh. 66)

**C. ASI Was Assessed in Compliance With The TWIA Act**

**2020 Assessment.** In accordance with the Tex. Ins. Code §§ 2210.052, .0725, and Rule 5.4162(b)&(c), TWIA used the "catastrophe year" for aggregation of losses and used "preceding calendar year" premiums for allocating member percentages of participation in losses on the 2020 assessment. (AR 1233, 1238, 1241-1242, Exh. 67A)

The rule and code unambiguously require TWIA to compute assessments on a *calendar year basis* for the year in which the assessment is made using each member's *participation percentage* for that year. The participation percentage is based on each member's net direct premiums for the *preceding calendar year*. If the preceding calendar year's premium information has not been furnished, TWIA is required to compute each member's participation percentage from the last year in which premium information is available. Upon receiving the preceding year's premium information, TWIA is required to reassess or refund to each member such amounts necessary to properly reflect the member's participation for the year of assessment. (AR 0392, 395-396, Exhs. 68A, 69) At the time that the third assessment was issued to ASI in February 2020, calendar year 2018 was the last year for which

16

premium information was provided by the Department. (AR 0673, Exh. 37)

Accordingly, TWIA calculated 2019 participation percentages using 2018 premium information (AR 0684, Exh. 41) and assessed members using the 2019 participation percentages. (AR 0700, Exh. 45) Members were notified that when 2020 participation percentages were available using 2019 premium information, TWIA would recalculate and either reassess or refund to members the amounts necessary to reflect each member's 2020 participation. (AR 0700, Exh. 45)

ASI conceded that TWIA has issued the assessment using the 2019 participation percentage in accordance with Rule 5.4162(b)&(c), and that a reassessment using the 2020 participation percentage also complies with the rule. (AR 0465-467, 470-473, Exh. 1) Its appeal is based on the contention that the rule itself is not authorized due to 2015 funding changes through SB 900. (AR 1195, Exh. 67) However, nothing in Tex. Ins. Code § 2210.052 changed since 2009. (AR 0392, Exh. 69) The TWIA Act still requires annual determination of member participation in excess losses on a proportionate basis using the "preceding calendar year" premiums.

17

### D. Rule 5.4162(b) Remains Valid

Judicial review is based on the record as a whole and applicable law. *Graff Chevrolet, Inc. v. Tex. Motor Vehicle Bd.*, 60 S.W.3d 154, 159 (Tex. App.—Austin 2001 pet. denied) (reviewing court determines whether agency's findings, inferences, conclusions, and decisions are supported by substantial evidence considering the reliable and probative evidence in the record as a whole under Tex. Govt. Code § 2001.174); see also *R.R. Comm'n of Tex. v. Torch Operating Co.*, 912 S.W.2d 790 (Tex. 1995). Based on a deferential standard of review, the Commissioner's decision must be upheld if there is some reasonable basis in the record for the decision.

**Plan of Operation.** The Association does not believe Tex. Ins. Code § 2210.052 is ambiguous. However, if Section 2210.052 is subject to multiple understandings, the Department's construction in Rule 5.4162(b) resolves any ambiguity by requiring the determination of member participation in an assessment to be computed on a calendar year basis. In Section 2210.052(c), the Legislature authorized participation to be "determined annually in the manner provided by the

plan of operation". The Legislature expressly deferred to the Department to determine the manner of participation, and the ALJ properly recognized this in the Proposal for Decision, which was adopted by the Commissioner. (CR 32, 45) Rule 5.4162(b) does not contradict the plain language of Tex. Ins. Code §§ 2210.052, 2210.0725, or any other provision of the TWIA Act. (AR 1347-1348, Exh. 68)

The ALJ wrote in the "Analysis" section of the Proposal for Decision that the "Code does not state which calendar year POP should be used if an assessment is necessary". (CR 44) This was immediately followed with quotes from Section 2210.052(a) which require participation "in the proportion that the net direct premiums of that member during the preceding calendar year bears to the aggregate net direct premiums by all members … determined annually in the manner provided by the Plan of Operation". (CR 44) The ALJ did not issue findings of fact or conclusions of law that the Code was ambiguous (AR 46-54) and did not need to because § 2210.052(c) requires that "participation in the association shall be determined annually in the manner provided by the

plan of operation".[2]  (CR 44)  The ALJ wrote that "the Code does delegate POP determination to the Department to establish in the Plan of Operation. Therefore, deference to Department's interpretation in enacting Rule 5.41652(b) is appropriate so long as it is not "inconsistent with the expression of the lawmakers' intent". (CR 45-46)  The ALJ disagreed that the funding language of Chapter 2210 is inconsistent with Rule 5.4162(b) and explained that "Code § 2210.052(a) requires members to participate in insured losses using the POP for the calendar year.  Rule 5.4162(b) is a reasonable interpretation of the statutory funding scheme set forth in Code §§ 2210.052 and .0725." (CR 46)  This analysis is reflected in the ALJ's Conclusions of Law and adopted by the Commissioner. (CR 53-54, 32)

In *Railroad Comm'n of Tex. v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011), the Texas Supreme Court recognized deference to an agency's formal regulation containing a reasonable interpretation of an *ambiguous* statute.  The Department's construction is reasonable, in harmony with the statute,

---

[2] The Commissioner's rule-making authority for implementation of the TWIA Act is further expressed in Tex. Ins. Code Secs. 2210.008 and 2210.151. (AR 0389, 0401, Exh. 69)

20

and is entitled to deference even if the statute in question could reasonably be understood otherwise.

> "The greater deficit in Texas Citizens' arguments, though, is that while Texas Citizens' position has some merit, the Commission's interpretation does too. It is precisely when a statutory term is subject to multiple understandings that we should defer to an agency's reasonable interpretation. … Because we only require an agency's interpretation of a statute it is charged with administering to be reasonable and in accord with the statute's plain language, we need not consider whether the Commission's construction is the only - or the best - interpretation in order to warrant our deference."
>
> *Id.* (citing *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747-48 (Tex. 2006)).

The Code Construction Act authorizes the court to consider the Department's "administrative construction of the statute", whether or not the statute is considered ambiguous on its face. Tex. Govt. Code § 311.023(6). The Department's interpretation of the statute within Rule 5.4162 is entitled to "serious consideration." *Id.* at 626 (citing *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008)).

Rule 5.4162(b) is in accord with Tex. Ins. Code § 2210.052, 2210.0725, as highlighted above. However, Appellant argues a red herring that the 2011 adopted Rule 5.4162(b) could not have been an interpretation of Code § 2210.0725 which was only adopted in 2015. This ignores the fact

21

that the 2011 Rule 5.4162(b) is an interpretation of Section 2210.052, and the Legislature chose to incorporate Section 2210.052 into Section 2210.0725 as the method of apportioning assessments in 2015. (AR 1241-1242, Exh. 67A)

**Reasoned Justification:** Appellant incorrectly asserts that nothing shows Rule 5.4162(b) is interpreting Code § 2210.052. The 2010 proposed rule expressly cites to § 2210.052 as statutory authority for the rule and provides an explanation as follows:

STATUTORY AUTHORITY. The sections are proposed under the Insurance Code §§2210.008, 2210.052, 2210.053, 2210.071, 2210.072, 2210.073, 2210.074, 2210.151, 2210.152, 2210.609, 2210.613, 2210.6135, and 36.001. Section 2210.008(b) authorizes the Commissioner to adopt reasonable and necessary rules in the manner prescribed in Subchapter A, Chapter 36, Insurance Code. The Insurance Code §2210.052(a) requires that a member company share in the losses and/or expenses of the Association based on the proportion that the net direct premiums of that member during the preceding calendar year bears to the aggregate net direct premiums by all members of the Association. Under the Insurance Code §2210.052(c), a member company's share of the losses and/or expenses of the Association is required to be determined annually and in the manner provided by the plan of operation. In the determination of a member company's share of the losses and/or expenses of the Association, the Insurance Code §2210.052(d) specifies that members are entitled to a credit for insurance voluntarily written in the catastrophe areas. The Insurance Code §2210.052(d)

(AR 0237, Exh. 66B, 35 Tex. Reg. 6621)

The 2011 adoption order for Rule 5.4162 similarly cites to Code § 2210.052. (AR 0220, 0205, Exh. 66A)

In its "Reasoned Justification" for Rule 5.4162, the Department explained that it redesignated the existing § 5.4001(c)(2) of the Plan of

22

Operation to make the Association's assessment procedure more accessible. (AR 0203-204, Exh. 66A; AR 0228, Exh. 66B) The Department wrote that the "[p]roposed Rule 5.4162 reflects existing §5.4001(c)(2)(B) of this subchapter, which it would control over", and that Sections 5.4161 – 5.4167 will continue to be considered part of the Plan of Operation. (AR 0229, Exh. 66B) The adoption order states § 5.4162 becomes part of the Association's plan of operation. (AR 0204, Exh. 66A)

Appellant included excerpts of the proposed and adopted rules in its Appendix; however, ASI's highlighting in Appendices E and F focuses on public securities while missing the Department's further justification based on redesignation of already existing § 5.4001(c)(2) of the Plan of Operation, non-substantive updates, making the rule more accessible, incentivizing insurers to voluntarily write wind and hail insurance in the catastrophe area, and discussing the role of Tex. Ins. Code § 2210.052(a),(c) in statutory authority for the Rule. These justifications and authorities are highlighted in a complete copy of the adopted and proposed rules in TWIA's Appendices 3 and 4 (AR 203-226, 227-246, Exhs. 66A, 66B)

Like Rule 5.4162, 28 Tex. Admin. Code Section 5.4001(c)(2) requires

all members to participate in any assessment "in the proportion that the net direct premiums of such member written in this state during the preceding calendar year bears to the aggregate net direct premium written in this state by all members of the association"; to compute a member's participation based on the last calendar year in which such information is available; and to reassess or refund to the member upon obtaining the preceding calendar year's information from the Department. (AR 1056, Exh. 64)

The 2008 adoption order for Section 5.4001(c)(2) discusses the basis for the rule in Tex. Ins. Code § 2210.052, the relationship to calendar year premiums and the incentives for voluntary writings in the catastrophe area. (AR 1065, Exh. 64A)

The Department's Reasoned Justification for variable participation percentages in 2008 are not negated by the Department restating the existing provisions of § 5.4001(c)(2) in Rule 5.4162(b), (c) in 2011 with non-substantive updates. (AR 0203-204, 206, Exh. 66A)

The 2011 adoption order explains why Rule 5.4162 is consistent with implementation of 2009 funding for public securities, but it does not obviate the original justification for variable participation that existed

24

before and after 2009's HB4409 and 2015's SB900 (AR 1195, Exh. 67) through plan of operation Sections 5.4001(c)(2)(B) and 5.4162. That is, incentivizing voluntary writings in the catastrophe area. (Compare AR 1065, Exh. 64A with AR 0204-0206, Exh. 66A)

The Department also highlighted the goal of incentivizing voluntary writings through assessment procedures in 2008:

> need for refunds or further assessments. Under the adopted amendments, all of an assessment will be determined using the current assessment percentage, which reflects member companies' most recent voluntary writings in the catastrophe areas. Eliminating the delay in the effect of member companies' increased or decreased voluntary writings in the catastrophe areas will provide an incentive to all member companies to maintain or provide similar insurance in the catastrophe areas, which may reduce property owners' reliance on the Association to provide windstorm and hail insurance coverage.

(AR 1065, Exh. 64A)

In the 2011 adoption order, the Department did not alter the existing variable participation scheme of Section 5.4001(c)(2)(B) but restated it in Section 5.4162 after determining that the Rule was also consistent with implementation of 2009 public securities funding. (AR 0204, 0206, Exh. 66A)

Rule 5.4001(c)(2)(B) remains in the plan of operation and authorizes the same variable participation scheme on which Rule 5.4162 was adopted, with few differences not relevant to ASI's appeal. (Compare AR 1056, Exh. 64 with AR 0221, Exh. 66A)

25

**Incentivizing Voluntary Writings:** The Code Construction Act authorizes the court to consider the "object sought to be attained", "former statutory provisions", and "consequences of a particular construction". Tex. Govt. Code § 311.023. The Department recognized in the 2011 adoption order that by computing participation on a calendar year basis for the year in which the assessment is made, "this method may encourage insurers to reduce their participation level by writing in the catastrophe area after a catastrophic event." (AR 0204-0205, Exh. 66A; AR 0229, Exh. 66B)

The variable participation scheme in § 2210.052 (one that is determined each calendar year) encourages members to write voluntarily in the catastrophe area in that voluntary writings are a credit against net direct premiums and enable members to achieve a lower percentage of participation each calendar year. If participation percentages were static (that is set at the time of the catastrophe year), members would lose an incentive for increasing voluntary writings after a catastrophe. In proposing and adopting 28 TAC § 5.4162, the Department expressly recognized the encouragement of voluntary writings as a justification for

26

annually variable participation percentages, as evidenced in highlighted part:

> A systemic concern was that the insurers may determine that under a variable participation scheme it is best to stop writing wind and hail insurance coverage in the catastrophe area now and then return after the event to lower their participation percentage. The Department disagrees that insurers would reduce writings based on this requirement as a general course of action. Since Hurricane Rita, insurers have reduced writing wind
>
> …
>
> Code §2210.058(a)(1). Therefore, the Department does not believe that this provision will affect insurer's decisions to write in the catastrophe area prior to a storm event. Further, this method may encourage insurers to reduce their participation level by writing in the catastrophe area after a catastrophic event. That would be consistent with the Legislature's expressed intent in the Insurance Code §2210.009(b) and §2210.053(b). Further, even
>
> …
>
> For these reasons the Department has determined that the calendar year formula for determining participation levels currently used by the Association is most consistent with the requirements of the Insurance Code Chapter 2210.
>
> …

(AR 0205, Exh. 66A; see also AR 0227, Exh. 66B)

A variable participation percentage encourages voluntary writings because members can achieve a reduction in their participation percentages for assessments made in the years following a catastrophic storm. (AR 0203, Exh. 66A; AR 0227, Exh. 66B)  The credit for voluntary writings is written into § 2210.052(d) of the TWIA Act:

> (d) Notwithstanding Subsection (a), a member, in accordance with the plan of operation, is entitled to receive credit for similar insurance voluntarily written in areas designated by the commissioner.  The member's participation in the insured losses and operating expenses of the association in excess of premium and other revenue of the association shall be reduced in accordance with the plan of operation.

(AR 0392, Exh. 69)

ASI increased its voluntary catastrophe area writings between 2016 and 2018, the years before and after Hurricane Harvey. ASI's voluntary writings increased $47,428 from $559,687 in 2016 premiums to $607,115 in 2018 premiums, which may have depopulated TWIA by 100 residential policies.[3] (Compare AR 0540, Exh. 11 with AR 0686, Exh. 41)

Following Hurricane Harvey, TWIA's residential policy count dropped from 189,126 in 2019 to 179,114 in 2020, a 5.29% decrease in population representing a $1.76 Billion decrease in residential direct liability exposure of the Association.[4] (AR 1460, Exh. 74)

The Association is intended to "serve as a residual insurer of last resort for windstorm and hail insurance in the seacoast territory" and to provide such insurance to "those who are unable to obtain that coverage in the private market." Tex. Ins. Code § 2210.001. The TWIA Act expressly states a public policy of incentivizing members to voluntarily

---

[3] Based on an average of $482 in residential premiums per policy as of 2020; that is, 2020 residential written premiums of $86,252,128 divided by 179,114 residential policies in force. See table at AR 1460, Exh. 74.

[4] 2019 residential direct liability of $50,777,106.319 less 2020 residential direct liability of $49,017,458,552. AR 1460, Exh. 74.

28

write windstorm and hail insurance in the catastrophe area and thereby depopulate TWIA. Tex. Ins. Code §§ 2210.009(b), 2210.053(b), 2210.701) (AR 0384, Exh. 69)

**Roots of Variable Participation.** The same annually variable participation scheme existed in 28 TAC Sec. 5.4001(c)(2)(B) before the Legislature chose assessments to repay public securities. (AR 1056, Exh. 64; AR 1131, Exh. 66) This was recognized by the Department in its 2011 adoption order:

> To effect these necessary amendments, adopted §§5.4161 - 5.4167 and 5.4173 become part of the Association's plan of operation. While §5.4161 and §5.4162 include new provisions related to the implementation of HB 4409, §§5.4161 - 5.4167 also redesignate existing provisions concerning member assessments that are currently in §5.4001(c)(2) of the plan of operation into this division. The sections are being redesignated because including the Association's assessment procedure with other loss funding provisions will make it more accessible to interested persons. Further, because §5.4001 will be addressed at a later time, the existing provisions in §5.4001(c)(2) will not be repealed at this time. Rather, as provided in §5.4161(c), the redesignated sections will control over any conflicting provisions in §5.4001. Finally, the redesignated sections include nonsub-

> …

> §5.4162. Amount of Assessment. Section 5.4162 substantially restates existing §5.4001(c)(2)(B) of this chapter. As addressed in existing §5.4001(c)(2)(B), this section establishes member participation in the assessment and thus the proportionate amount each member shall be required to pay to the Association.

> …

> Section 5.4162(c) incorporates the remainder of existing §5.4001(c)(2)(B) concerning member participation in the assessment. Section 5.4162(d) incorporates the Association's existing calendar year formula for determining participation levels that are set out in existing §5.4001(c)(2)(B)(i). Section

(AR 0203-0204, 0206, Exh. 66A)

29

Variable participation similar to § 2210.052(b) existed when Texas Catastrophe Property Insurance Association was created[5] and continued through Texas Windstorm Insurance Association in one form or other from 1971 to present. (AR 0958, Exh. 59; AR 1016, Exh. 62; AR 1033, Exh. 63; AR 1097, Exh. 65; AR 1114, Exh. 65A; AR 1238, Exh. 67A; AR 0392 Exh. 69)

As ASI recognized, 2009's HB 4409 created a further justification for annually variable participation because assessments could be issued annually over a 10-year term of securities used to fund losses. However, long-term securities repayment was not the first or foremost reason for annually variable participation. (AR 0204-0205, Exh. 66A) Variable participation was always about incentivizing voluntary writings year-over-year from 1971 to present. (AR 955, 0964, 1014, 1028, 1093, 1107, 1230, 0384, Exhs. 59, 60, 62, 63, 65, 65A, 67A, 69)

The Department's regulatory scheme for annually variable participation did not begin with HB4409 (2009) or end with SB900

---

[5] S.B. 31 in 1971 tied participation in losses to each member's proportionate share of aggregate premiums written in "the preceding calendar year …", with a "credit for similar insurance voluntarily written in the area designated …" (AR 0958, Exh. 59)

(2015).  The same annually variable participation scheme has existed for decades. (AR 0993, 1051, 1129, 0203, 1300, Exhs. 61, 64, 66, 66A, 68)

**Rule Review.**   Appellant points out in footnote 12 that the Department did not conduct rule reviews on the schedule required by the Administrative Procedure Act (APA), Tex. Govt. Code § 2001.039.  Texas Register shows rule reviews in 2011 and 2021.[6]  While rule reviews are required every four years, the APA does not provide for invalidation of a rule based on failure to conduct a timely review.  Tex. Govt. Code Chapter 2001.   APA § 2001.035 makes a rule voidable unless a state agency adopts it in substantial compliance with §§ 2001.0225 through 2001.034, but this does not apply to rule review under § 2001.039.  (AR 888, Exh. 71)  APA § 2001.040 provides for a court order invalidating an agency rule that is not in substantial compliance with §§ 2001.0225 through 2001.034, but it does not apply to rule review under § 2001.039.  (AR 0891, Exh. 71)

APA § 2001.035 provides a 2-year time limit to file an action based on noncompliance with procedural requirements for a reasoned

---

[6] There were Rule Reviews of Chapter 5 by the Department on 1/14/2011 and 6/08/2021.   (AR 0946, Exh. 73)  The 2021 Rule Review is at 46 Tex. Reg. 3740-3742 (CR 413-416).

justification, and it prohibits invalidation based on a mere technical defect that does not result in prejudice to a person's right or privileges. (AR 888-889, Exh. 71)

During the pendency of ASI's administrative appeal, the Department adopted an amended Plan of Operation including "nonsubstantive stylistic edits" to "aid readability" in § 5.4162(b),(c), and made no substantive change even though ASI's counsel submitted their arguments as comments to the proposed rule. (AR 1732, 1735, 1749-1751, 1771-1773, Exh. 75) ASI seeks rule invalidation here that it could not achieve in a direct rule challenge under the APA or before the Department of Insurance.

## II.    The Trial Court's Jurisdiction

ASI's appeal of TWIA's February 2020 assessment decision is authorized exclusively by Section 2210.551(b) of the TWIA Act. (AR 0421, Exh. 69) That is, after hearing, the commissioner "shall affirm, reverse, or modify … the act, ruling, or decision appealed to the commissioner." Tex. Ins. Code § 2210.551(f). A person or entity "aggrieved by the order decision of the commissioner, may appeal to a

32

district court in the county in which the coverage property is located or a district court in Travis County." Tex. Ins. Code § 2210.551(g).

ASI's right of action is an administrative appeal of TWIA's "act, ruling, or decision" to the commissioner of insurance under § 2210.551(b), judicial review of the commissioner's contested case order on the appeal under Tex. Govt. Code § 2001.171, and action for declaratory judgment over the validity or applicability of the subject rule, 28 Tex. Admin. Code Sec. 5.4162(b), under Tex. Govt. Code § 2001.038. *See also* Tex. Ins. Code §§ 36.202, 36.203, 2210.551(h).

Because ASI's petition appears to request a money judgment for the amount of the assessment (CR 24-26), Defendant TWIA moved for dismissal of ASI's request for money judgment due to lack of subject matter jurisdiction, or alternatively, exclusive remedies under Tex. Ins. Code § 2210.551(b). ASI stipulated in the trial court that they were not seeking a money judgment against TWIA under the Uniform Declaratory Judgment Act or Tex. Govt. Code § 2001.038. [7] On this basis, the trial court acted within its discretion to deny TWIA's jurisdictional challenge.

---

[7] Plaintiff's Trial Brief at p. 24. "Plaintiff agrees that a district court lacks jurisdiction to award monetary damages for ASI's claims brought under the UDJA or under §2001.038." (CR 203)

Appellant has now reasserted its pursuit of a money judgment by requesting a declaration that ASI is entitled to a refund of $438,000 for the third Hurricane Harvey assessment. In the event the court of appeals is inclined to take up ASI's request for declaration of a refund, Appellee TWIA reasserts its jurisdictional plea and exclusive remedies defense as follows.

ASI's appeal of TWIA's February 2020 assessment decision is authorized exclusively by § 2210.551(b) of the TWIA Act. (AR 0421, Exh. 69) ASI's right of action is an administrative appeal of TWIA's "act, ruling, or decision" to the commissioner of insurance under Tex. Ins. Code § 2210.551(b), judicial review of the commissioner's contested case order under Tex. Govt. Code § 2001.171, and action for declaratory judgment over the validity or application of the subject rule, 28 Tex. Admin. Code § 5.4162(b), under Tex. Govt. Code § 2001.038. Tex. Ins. Code §§ 36.202, 36.203, 2210.551(h).

ASI's request for a declaration of entitlement to refund goes beyond an appeal of TWIA's "act, ruling, or decision" under Tex. Ins. Code § 2210.551(b). The District Court and Court of Appeals have jurisdiction

34

for judicial review of the commissioner's order but lack subject matter jurisdiction to award a declaration of money judgment against TWIA.

The rights to administrative appeal and judicial review are mandatory and exclusive remedies by virtue of Tex. Ins. Code §§ 2210.551(b), 36.202, 36.203 and Tex. Govt. Code § 2001.171. *See Tex. Catastrophe Prop. Ins. Ass'n v. Council of Co-Owners of Saida II Towers Condo. Ass'n*, 706 S.W2d 644, 645-66 (Tex. 1986), *abrogated on other grounds by Dubai Petroleum Co. v. Kazi*, 12 S.W. 3d. 71 (Tex. 2000).

In *Saida II*, the court stated "When the Legislature creates an administrative agency, it may also prescribe rules and regulations governing the administrative body and the method by which the rights determined by such body will be enforced, including the procedures for obtaining judicial review of final agency decisions. ... The Legislature has done precisely this with regard to the State Board of Insurance's supervision of the TCPIA ...We have long recognized that if a cause of action and remedy for its enforcement are derived not from the common law but from a statute, the statutory provisions are mandatory and exclusive, and must be complied with in all respects or the action is not maintainable. ... The APTRA sets forth the procedure for the institution

35

of an administrative appeal, which controls unless otherwise provided by statute. … Because the Legislature has prescribed the method for review of administrative action, that method must be followed to invoke the trial court's jurisdiction…" *Id.* at 645; *citing Rowden v. Tex. Catastrophe Prop. Ins. Ass'n*, 677 S.W.2d 83, 87 (Tex. App. – Corpus Christi 1984, writ ref'd n.r.e.).

Texas Insurance Code § 2210.551 permits a district court appeal of the commissioner's order affirming TWIA's assessment decision. However, such an action is explicitly subject to the procedures of Subchapter D, Chapter 36. Tex. Ins. Code § 36.202 permits an insurance company to file a petition for judicial review against the commissioner as defendant. Section 36.203 states that judicial review "is under the substantial evidence standard and shall be conducted under Chapter 2001, Government Code."

Since the time of the *Saida II* decision, the Texas Supreme Court reframed pleas to subject matter jurisdiction in a case of failure to meet statutory requisites to a wrongful death suit. *Dubai Petroleum Co. v. Kazi*, 12 S.W. 3d.71, 76-77 (Tex. 2000). In *Dubai*, the court recognized, "The right of a plaintiff to maintain a suit, while frequently treated as

going to the question of jurisdiction, has been said to go in reality to the right of the plaintiff to relief rather than to the jurisdiction of the court to afford it." *Dubai* abrogated the law of jurisdictional challenge decided in *Mingus v. Wadley*, 285 S.W. 1084 (Tex. 1926) and underpinning *Saida II*. However, in *Mosely v. Texas Health and Human Services Commission*, 593 S.W.3d 250, 261 fn.3 (Tex. 2019), the court declined to extend *Dubai* to a jurisdictional plea under the Administrative Procedure Act.

If applied here, *Dubai* does not provide a pathway to declaration of money judgment against TWIA. At most, *Dubai* would have the court dismiss ASI's request for monetary relief under the exclusive remedies of Tex. Ins. Code § 2210.551 rather than under TWIA's jurisdictional plea. *See e.g., Tex. Windstorm Ins. Ass'n. v. Boys & Girls Club of Coastal Bend, Inc.*, 2020 WL 6072624 at *5 (Tex. App.—Corpus Christi-Edinburg, 9/24/2020) (not designated for publication) (court erred in denying TWIA's motion for partial summary judgment on claims for which coverage was accepted due to exclusive remedies of Tex. Ins. Code §§ 2210.572, .574); *Housing & Comm. Servs., Inc. v. Tex. Windstorm Ins. Ass'n.*, 515 S.W.3d 906, (Tex. App.—Corpus Christi-Edinburg 2017, no

37

pet.) (affirming summary judgment for TWIA where claimant failed to file claim within one-year limitations period of § 2210.573(a), citing *Saida II* exclusive remedies).

TWIA's jurisdictional and exclusive remedies challenge does not leave Appellant without remedy if the court were to declare Rule 5.4162 invalid. ASI acknowledged in its Trial Brief that the district court lacks jurisdiction to award monetary damages for ASI's claim, and that it is within the Commissioner's authority to order a reassessment by TWIA.[8]

In February 2021, TWIA informed ASI and all other members that the third assessment of 2020 would be recalculated and reassessed to all members based on 2020 percentages of participation and adjustments required by administrative appeals. (AR 1852, Exh. 79) There were 375 insurers in the Department's 2018 premium call. (AR 0655-0666, Exh. 34) ASI's group percentage of participation for the third assessment was 3.223%. Other member insurers account for 96.777% of participation. (AR 0466, Stipulations para. 38, Exh. 1)

In the event of a final judgment that invalidates Rule 5.4162, the Commissioner should order TWIA to reassess all members consistent

---

[8] Plaintiff's Trial Brief at p. 24. (CR 203)

with a final judgment, which may necessitate a rulemaking proceeding, use of participation rules that remain authorized by Rule 5.4001(c)(2)(B)[9], or other agency action that applies to all members. Even if the court were to find that ASI is entitled to a refund on the third assessment (AR 0700, Exh. 45), the computation will likely change in a reassessment for the reasons discussed in the 2020 notice of POP (AR 1852, Exh. 79), and it will necessarily involve all member insurers.

## CONCLUSION AND PRAYER

BASED ON THE FOREGOING, Appellee Texas Windstorm Insurance Association requests that the Court affirm the Trial Court's Final Judgment and deny Appellant ASI's request for declaratory relief.

Appellee further requests that Appellant ASI Lloyds Insurance Company take nothing from Texas Windstorm Insurance Association, and that Texas Windstorm Insurance Association have judgment for costs, and such further relief to which it is justly entitled.

---

[9] AR 1056, 0228, Exhs. 64, 66B.

Respectfully submitted,

*Michael Wilson*

Michael S. Wilson
State Bar No. 21704810
mwilson@perkinslawtx.com
Adrienne L. Barclay
State Bar No. 24065955
abarclay@perkinslawtx.com
PERKINS LAW GROUP PLLC
One Far West Plaza, Suite 200
3410 Far West Boulevard
Austin, Texas 78731
Telephone: (512) 717-3467
Fax: (512) 551-9895
**ATTORNEYS FOR APPELLEE**
**TEXAS WINDSTORM INSURANCE**
**ASSOCIATION**

40

# CERTIFICATE OF COMPLIANCE

In accordance with Texas Rule of Appellate Procedure 9.4, I hereby certify that this Brief complies with the length limitations of Texas Rule Appellate Procedure 9.4 and the typeface requirements of Texas Rule Appellate Procedure 9.4.(e).

Exclusive of contents excluded under Texas Rule Appellate Procedure 9.4(i)(1), this Brief contains <u>8,699</u> words (including textboxes, footnotes, and endnotes) as counted by the word count function of Microsoft Word for Microsoft 365 and hand-counted text boxes.

This Brief has been prepared in proportionally spaced typeface using:

Software Name and Version: Microsoft Word for Microsoft 365

Typeface Name: Century Schoolbook

Font Size: 14 point (14 point footnotes)

*Michael Wilson*

Michael S. Wilson

**CERTIFICATE OF SERVICE**

I hereby certify that on the  10th  day of January 2025, a true and correct copy of the above and foregoing has been sent to the following counsel of record and TDI Chief Clerk:

Wade C. Crosnoe                                    (via electronic filing service)
THOMPSON, COE, COUSINS & IRONS, L.L.P.
2801 Via Fortuna, Suite 300
Austin, Texas 78746
(512) 703-5060 Telephone
(512) 708-8777 Facsimile
wcrosnoe@thompsoncoe.com

Jay A. Thompson
MITCHELL, WILLIAMS, SELIG, GATES &
WOODYARD, P.L.L.C.
500 W. 5th St., Suite 1150
Austin, Texas 78701
(512) 480-5104 Telephone
jthompson@mwlaw.com
*Attorneys for Appellant*

Ken Paxton                                    (via electronic filing service)
Attorney General

Brent Webster
First Assistant Attorney General

Aaron L. Nielson
Solicitor General

Cory A. Scanlon
Assistant Solicitor General
Office of the Attorney General of Texas
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1820 Telephone
cory.scanlon@oag.texas.gov

*Counsel for Appellee Cassie Brown, Commissioner*
*Texas Department of Insurance*

Texas Department of Insurance              (by email)
Chief Clerk Office
ChiefClerk@tdi.texas.gov
Mail code GC-CCO
P.O. Box 12030
Austin, Texas 78711-2030

*Michael Wilson*
_____
Michael S. Wilson

43

# APPENDIX

## APPENDIX 1.  Index of Exhibits in the Administrative Record
(CR 410)

# INDEX TO THE ADMINISTRATIVE RECORD

| TDI CC | TWIA EXH. NO. | CATEGORY | DATE | DOCUMENT | ORIGINATOR |
|---|---|---|---|---|---|
| TDI CC 0464-475 | 1 | | | **Stipulations** | **JOINT** |
| TDI CC 0476 | 2 | | | **Order of Payment of Losses ("Li Exh. 32")** | Li Depo |
| | | | | | |
| TDI CC 0477-511 | 3 | 2017 POP | 6/28/2017 | **TDI Email re 2016 premium data to calculate 2017 POP** | TDI |
| TDI CC 0512-522 | 4 | 2017 POP | 9/8/2017 | **TDI Email re 2016 updated premium data to calculate 2017 POP** | TDI |
| | | | | | |
| TDI CC 0523-524 | 5 | 2017 POP | 9/27/2017 | **Ltr 1 - 2016 Net Direct Premium to Acuity** | TWIA |
| TDI CC 0525-527 | 6 | 2017 POP | 9/27/2017 | **Ltr 1 - 2016 Net Direct Premium to Allstate** | TWIA |
| TDI CC 0528-529 | 7 | 2017 POP | 9/27/2017 | **Ltr 1 - 2016 Net Direct Premium to ASI Lloyds** | TWIA |
| TDI CC 0530-531 | 8 | 2017 POP | 9/27/2017 | **Ltr 1 - 2016 Net Direct Premium to United Fire** | TWIA |
| | | | | | |
| TDI CC 0532-534 | 9 | 2017 POP | 1/24/2018 | **Ltr 2 - 2017 Percentage of Participation to Acuity** | TWIA |
| TDI CC 0535-537 | 10 | 2017 POP | 1/24/2018 | **Ltr 2 - 2017 Percentage of Participation to Allstate** | TWIA |
| TDI CC 0538-540 | 11 | 2017 POP | 1/24/2018 | **Ltr 2 - 2017 Percentage of Participation to ASI Lloyds** | TWIA |
| TDI CC 0541-543 | 12 | 2017 POP | 1/24/2018 | **Ltr 2 - 2017 Percentage of Participation to United Fire** | TWIA |
| | | | | | |
| TDI CC 0544-548 | 13 | 2017 POP | 6/5/2018 | **Ltr 3 - 1st Assessment Notice to Acuity** | TWIA |
| TDI CC 0549-553 | 14 | 2017 POP | 6/5/2018 | **Ltr 3 - 1st Assessment Notice to Allstate** | TWIA |
| TDI CC 0554-559 | 15 | 2017 POP | 6/5/2018 | **Ltr 3 - 1st Assessment Notice to ASI Lloyds** | TWIA |
| TDI CC 0560-570 | 16 | 2017 POP | 6/5/2018 | **Ltr 3 - 1st Assessment Notice to United Fire** | TWIA |
| | | | | | |
| TDI CC 0571-575 | 17 | 2017 POP | 8/29/2018 | **Ltr 4 - 2nd Assessment Notice to Acuity** | TWIA |
| TDI CC 0576-581 | 18 | 2017 POP | 8/29/2018 | **Ltr 4 - 2nd Assessment Notice to Allstate** | TWIA |
| TDI CC 0582-587 | 19 | 2017 POP | 8/29/2018 | **Ltr 4 - 2nd Assessment Notice to ASI Lloyds** | TWIA |
| TDI CC 0588-592 | 20 | 2017 POP | 8/29/2018 | **Ltr 4 - 2nd Assessment Notice to United Fire** | TWIA |
| TDI CC 0593-622 | 21 | 2018 POP | 7/23/2018 | **TDI Email re 2017 voluntary premium to caculate 2018 POP** | TDI |
| TDI CC 0623-624 | 22 | | 7/10/2018 | **Comm. Order 2018-5567 suspending 1st Assessment to RFMIC** | TDI |
| | BLANK | | | | |
| TDI CC 0625-626 | 24 | 2018 POP | 11/29/2018 | **Ltr 1 - 2017 Net Direct Premium to Acuity** | TWIA |
| TDI CC 0627-630 | 25 | 2018 POP | 11/29/2018 | **Ltr 1 - 2017 Net Direct Premium to Allstate** | TWIA |
| TDI CC 0631-633 | 26 | 2018 POP | 11/29/2018 | **Ltr 1 - 2017 Net Direct Premium to Progressive (ASI Lloyds)** | TWIA |
| TDI CC 0634-635 | 27 | 2018 POP | 11/29/2018 | **Ltr 1 - 2017 Net Direct Premium to United Fire** | TWIA |
| | | | | | |
| TDI CC 0636-638 | 28 | | 10/1/2018 | **Comm. Order 2018-5648 suspending 2nd Assessment to RFMIC** | TDI |
| TDI CC 0639-642 | 29 | 2018 POP | 6/18/2020 | **Ltr 2 - 2018 Percentage of Participation to Acuity** | TWIA |
| TDI CC 0643-646 | 30 | 2018 POP | 6/18/2020 | **Ltr 2 - 2018 Percentage of Participation to Allstate** | TWIA |
| TDI CC 0647-650 | 31 | 2018 POP | 6/18/2020 | **Ltr 2 - 2018 Percentage of Participation to Progressive (ASI)** | TWIA |
| TDI CC 0651-654 | 32 | 2018 POP | 6/18/2020 | **Ltr 2 - 2018 Percentage of Participation to United Fire** | TWIA |
| | BLANK | | | | |
| TDI CC 0655-666 | 34 | 2019 POP | 9/24/2019 | TDI Email re 2018 premium data to calculate 2019 POP | TDI |
| TDI CC 0667-668 | 35 | 2019 POP | 10/31/2019 | **Ltr 1 - 2018 Net Direct Premium to Acuity** | TWIA |
| TDI CC 0669-672 | 36 | 2019 POP | 10/31/2019 | **Ltr 1 - 2018 Net Direct Premium to Allstate** | TWIA |
| TDI CC 0673-675 | 37 | 2019 POP | 10/31/2019 | **Ltr 1 - 2018 Net Direct Premium to Progressive (ASI)** | TWIA |
| TDI CC 0676-677 | 38 | 2019 POP | 10/31/2019 | **Ltr 1 - 2018 Net Direct Premium to United Fire** | TWIA |
| | | | | | |
| TDI CC 0678-680 | 39 | 2019 POP | 1/17/2020 | **Ltr 2 - 2019 Percentage of Participation to Acuity** | TWIA |
| TDI CC 0681-683 | 40 | 2019 POP | 1/17/2020 | **Ltr 2 - 2019 Percentage of Participation to Allstate** | TWIA |
| TDI CC 0684-686 | 41 | 2019 POP | 1/17/2020 | **Ltr 2 - 2019 Percentage of Participation to Progressive (ASI)** | TWIA |
| TDI CC 0687-689 | 42 | 2019 POP | 1/17/2020 | **Ltr 2 - 2019 Percentage of Participation to United Fire** | TWIA |
| | | | | | |
| TDI CC 0690-694 | 43 | 2019 POP | 2/13/2020 | **Ltr 3 - 3rd Assessment Notice to Acuity** | TWIA |
| TDI CC 0695-699 | 44 | 2019 POP | 2/13/2020 | **Ltr 3 - 3rd Assessment Notice to Allstate** | TWIA |
| TDI CC 0700-703 | 45 | 2019 POP | 2/13/2020 | **Ltr 3 - 3rd Assessment Notice to Progressive (ASI)** | TWIA |
| TDI CC 0704-708 | 46 | 2019 POP | 2/13/2020 | **Ltr 3 - 3rd Assessment Notice to United Fire** | TWIA |
| | | | | | |
| TDI CC 0709-717 | 47 | 2019 POP | 3/12/2020 | **Notice of Appeal of 3rd Assessment - Acuity** | PETITIONER |
| TDI CC 0032-40 | 48 | 2019 POP | 3/13/2020 | **Notice of Appeal of 3rd Assessment - Allstate** | PETITIONER |
| TDI CC 0727-735 | 49 | 2019 POP | 3/13/2020 | **Notice of Appeal of 3rd Assessment - Progressive (ASI)** | PETITIONER |
| TDI CC 0049-57 | 50 | 2019 POP | 3/12/2020 | **Notice of Appeal of 3rd Assessment - United Fire** | PETITIONER |
| TDI CC 0745-781 | 51 | | 3/20/2020 | **Comm. Order 2020-6291 on RFMIC appeal** | TDI |
| | BLANK | | | | |



# INDEX TO THE ADMINISTRATIVE RECORD

| TDI CC | TWIA EXH. NO. | CATEGORY | DATE | | DOCUMENT | ORIGINATOR |
|---|---|---|---|---|---|---|
| TDI CC 0955-963 | 59 | LAW | 4/29/1971 | | TCPIPA, Art. 21.49 (S.B. 31, Ch. 100) | |
| TDI CC 0964-992 | 60 | LAW | 6/6/1991 | | TCPIPA, Art. 21.49 (H.B. 2, Ch. 242)) | |
| TDI CC 0993-1013 | 61 | LAW | 7/21/1995 | | 28 TAC 5.4001 Plan of Operation | |
| TDI CC 1014-1027 | 62 | LAW | 9/1/1997 | | TIC Chap. 2210 | |
| | | | | | | |
| TDI CC 1028-1050 | 63 | LAW | 4/1/2007 | | TIC Chap. 2210 | |
| TDI CC 1051-1061 | 64 | LAW | 9/2/2008 | | 28 TAC 5.4001 Plan of Operation | |
| TDI CC 1062-1080 | 64A | LAW | 9/2/2008 | | 5.4001 Adopted, 33 Tex Reg 7245 | |
| TDI CC 1081-1092 | 64B | LAW | 7/4/2008 | | 5.4001 Proposed, 33 Tex Reg 5225 | |
| | | | | | | |
| TDI CC 1093-1106 | 65 | LAW | 6/19/2009 | | TIC Chap 2210 (HB4409) | |
| TDI CC 1107-1128 | 65A | LAW | 9/28/2011 | | TIC Chap 2210 (HB3) | |
| TDI CC 1129-1150 | 66 | LAW | 2/16/2011 | | 28 TAC 5.4001 Plan of Operation | |
| TDI CC 0203-226 | 66A | LAW | 2/16/2011 | | 5.4162 Adopted, 36 Tex Reg 786 | |
| TDI CC 0227-246 | 66B | LAW | 7/30/2010 | | 5.4162 Proposed, 35 Tex Reg 6611 | |
| | | | | | | |
| TDI CC 1195-1229 | 67 | LAW | 9/1/2015 | | SB 900 | |
| TDI CC 1230-1276 | 67A | LAW | 9/1/2015 | | TIC Chap. 2210 | |
| TDI CC 1277-1292 | 67B | LAW | 7/6/2015 | | SB 900 SRC Bill Analysis | |
| TDI CC 1293-1299 | 67C | LAW | 5/24/2015 | | SB 900 HRC Bill Analysis | |
| TDI CC 1300-1398 | 68 | LAW | 1/18/2017 | | 28 TAC 5.4001 Plan of Operation | |
| TDI CC 1399-1413 | 68A | LAW | 3/9/2016 | | 5.4161 Adopted, 41 Tex Reg 1679 | |
| TDI CC 0361-383 | 68B | LAW | 9/28/2015 | | 5.4161 Proposed, 40 Tex Reg 7020 | |
| | | | | | | |
| TDI CC 0384-437 | 69 | LAW | 6/10/2019 | | TIC Chap. 2210 | |
| TDI CC 0438-450 | 70 | LAW | 6/19/2020 | | 5.4162 et al Proposed, 45 Tex Reg 4138 | |
| | | | | | | |
| TDI CC 0872-928 | 71 | LAW | 9/1/2019 | | Govt Code Chap. 2001 | |
| TDI CC 0929-945 | 72 | LAW | 7/10/2020 | | TX Register - Search Results TDI Rule Reviews 1/2011 - 7/10/2020 | |
| TDI CC 0946-954 | 73 | LAW | 7/10/2020 | | TX Register - TDI Rule Reviews 1/2011 - 7/10/2020 | |
| | | | | | | |
| TDI CC 1443-1613 | 74 | | 6/1/2020 | | TWIA Annual Report | TWIA |
| TDI CC 1719-1781 | 75 | LAW | 12/16/2020 | | **Commissioner's Order 2020-6617 amending Plan of Operation** | TDI |
| | | | | | | |
| TDI CC 1838-1844 | 77 | 2020 POP | 2/26/2021 | | **Ltr 2 - 2020 Percentage of Participation to Acuity** | TWIA |
| TDI CC 1845-1851 | 78 | 2020 POP | 2/26/2021 | | **Ltr 2 - 2020 Percentage of Participation to Allstate** | TWIA |
| TDI CC 1852-1858 | 79 | 2020 POP | 2/26/2021 | | **Ltr 2 - 2020 Percentage of Participation to Progressive (ASI)** | TWIA |
| TDI CC 1859-1865 | 80 | 2020 POP | 2/26/2021 | | **Ltr 2 - 2020 Percentage of Participation to United Fire** | TWIA |
| | | | | | | |
| TDI CC 0141-187 | | | 6/24/2020 | | **Petitioners' Motion for Continuance** | PETITIONER |
| TDI CC 0188-450 | | | 6/26/2020 | | **TWIA Response to Motion for Continuance** | TWIA |
| TDI CC 1414-1415 | | | 7/16/2020 | | **Order Granting Petitioners' Motion for Continuance** | TDI |
| TDI CC 1416-1442 | | | 7/16/2020 | | **TWIA Motion for Summary Disposition** | TWIA |
| TDI CC 1614-1640 | | | 7/21/2020 | | **TWIA First Amended Motion for Summary Disposition** | TWIA |
| TDI CC 1641-1642 | | | 9/1/2020 | | **Joint Status Report** | Joint |
| TDI CC 1653-1681 | | | 6/11/2021 | | **TWIA Second Amended Motion for Summary Disposition** | TWIA |
| TDI CC 1682 | | | 6/11/2021 | | **Declaration of Jerome Fadden** | TWIA |
| TDI CC 1782-1805 | | | 6/14/2021 | | **Petitioners' Motion for Summary Disposition** | PETITIONER |
| TDI CC 1835-1837 | | | 6/16/2021 | | **TWIA's First Amended Exhibit List and Witnesses** | TWIA |
| TDI CC 1866-1893 | | | 6/17/2021 | | **TWIA's Third Amended Motion for Summary Disposition** | TWIA |
| TDI CC 1897-1901 | | | 6/21/2021 | | **TWIA's Response to Petitioners' Motion for Summary Disposition** | TWIA |
| TWIA APPENDIX 3 | | LAW | 6/18/2021 | | **TDI Rule Review, 46 TexReg 3740-3743** | TDI |
| TDI CC 1920-1968 | | | 7/9/2021 | | **TDI Hearing Transcript** | TDI |
| TDI CC 1969-1990 | | PFD | 9/2/2021 | | **Proposal for Decision** | SOAH |
| TDI CC 1991-2002 | | | 9/17/2021 | | **Petitioners' Exceptions to Proposal for Decision** | PETITIONER |
| TDI CC 2003-2014 | | | 9/29/2021 | | **TWIA's Reply to Petitioners' Exceptions to Proposal for Decision** | TWIA |
| TDI CC 2018-2048 | | ORDER | 4/25/2023 | | **Commissioner Order** | TDI |
| TDI CC 2055-2057 | | ORDER | 5/30/2023 | | **Commissioner Order on Motion for Rehearing** | TDI |
| TDI CC 2062-2093 | | | 6/16/2023 | | **Petitioners' Motion for Rehearing** | PETITIONER |
| TDI CC 2094-2107 | | | 6/26/2023 | | **TWIA Reply to Petitioners' Motion for Rehearing** | TWIA |
| TDI CC 2108-2113 | | ORDER | 7/11/2023 | | **Commisioner Order Denying Motion for Rehearing** | TDI |



# **APPENDIX 2.  Glossary of Terms**
(CR 411)

Assessments:

Members are assessed to pay for "excess losses" of Texas Windstorm Insurance Association; that is, insured catastrophe losses in excess of TWIA's premium revenue, reserves, and other sources of funding. Ins. Code Secs. 2210.0725, .074, .0742.

Calendar Year:

The preceding calendar year premiums of each member are used to determine the member's percentage of participation for the year of an assessment.  Ins. Code Sec. 2210.052

Catastrophe Area:

First and second tier coastal counties designated by the commissioner of insurance where TWIA writes windstorm and hail insurance that is not reasonably available in the voluntary market. Ins. Code Secs. 2210.003(3), .005.

Catastrophe Year:

A calendar year in which an occurrence or series of occurrences results in insured losses, regardless of when the insured losses are ultimately paid; used to determine the period of losses that triggers an assessment.  Ins. Code Secs. 2210.003, .725(a).

Participation Percentage

(POP):

Each member participates in a percentage of an assessment based on the member's preceding calendar year premium writings, with a credit for premiums voluntarily written in the catastrophe area. Ins. Code Sec. 2210.052



47

**APPENDIX 3.  2011 Adopted Rule 5.4162, 36 Tex. Reg. 786-809**
(AR 203-226, Exh. 66A, highlights added)

ACCEPTED
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
6/26/2020 2:22 PM
STATE OFFICE OF
ADMINISTRATIVE HEARINGS
Donnie Roland, CLERK

FILED
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
6/26/2020 2:16 PM
STATE OFFICE OF
ADMINISTRATIVE HEARINGS
Donnie Roland, CLERK

Filed with the Office of the Secretary of State on January 25, 2011.

TRD-201100311

Michael Gerber

Executive Director

Texas Department of Housing and Community Affairs

Effective date: February 14, 2011

Proposal publication date: November 26, 2010

For further information, please call: (512) 475-3916

♦     ♦     ♦

# TITLE 28. INSURANCE

# PART 1.   TEXAS DEPARTMENT OF INSURANCE

## CHAPTER 5.   PROPERTY AND CASUALTY INSURANCE
## SUBCHAPTER E.   TEXAS WINDSTORM INSURANCE ASSOCIATION
## DIVISION 3.   LOSS FUNDING, INCLUDING CATASTROPHE RESERVE TRUST FUND, FINANCING ARRANGEMENTS, AND PUBLIC SECURITIES

### 28 TAC §§5.4161 - 5.4167, 5.4171 - 5.4173, 5.4181 - 5.4192

The Commissioner of Insurance (Commissioner) adopts new §§5.4161 - 5.4167, 5.4171 - 5.4173, and 5.4181 - 5.4192 to implement legislative changes to the Insurance Code Chapter 2210 under House Bill (HB) 4409, 81st Legislature, 2009 Regular Session, and amend the plan of operation of the Texas Windstorm Insurance Association (Association). These sections set forth procedures for making and collecting member assessments and procedures for making and assessing premium surcharges under Chapter 2210, Insurance Code.

Sections 5.4161, 5.4162, 5.4167, 5.4171, 5.4172, 5.4181 - 5.4184, 5.4186, 5.4187, and 5.4189 - 5.4192 are adopted with changes to the proposed text published in the July 30, 2010, issue of the *Texas Register* (35 TexReg 6611). Sections 5.4163 - 5.4166, 5.4173, 5.4185, and 5.4188 are adopted without changes. This adoption does not address proposed new 28 TAC §§5.4101, 5.4102, 5.4111 - 5.4114, 5.4121, 5.4131 - 5.4134, and 5.4141 - 5.4147, which were published in the July 23, 2010, issue of the *Texas Register* (35 TexReg 6476) and were also considered at the August 24, 2010 hearing and are the subject of a separate adoption order.

REASONED JUSTIFICATION. The adopted sections are necessary to implement legislative changes to the Insurance Code Chapter 2210 under HB 4409, 81st Legislature, 2009 Regular Session and create a more efficient rule structure by grouping Association loss funding mechanisms in this division. The adopted sections establish the procedures and requirements for determining and collecting member assessments and premium surcharges for the payment of class 2 public security obligations and class 3 public security obligations under the Insurance Code §2210.613 and §2210.6135. Compliance with these requirements is essential to assure the availability of Association insurance coverage for all eligible persons and properties.

Under §2210.001 of the Insurance Code, the Legislature has determined that the provision of windstorm and hail insurance is necessary for the economic welfare of the state and its inhabitants; and that the lack of such insurance in the state's seacoast territories would severely impede the orderly growth and development of the state. The Association was created by the Legislature and is intended to serve as a residual insurer of last resort for windstorm and hail insurance coverage (insurance coverage) in the catastrophe area designated by the Commissioner under the Insurance Code §2210.005. The catastrophe area is underserved for insurance coverage and consists of the 14 Texas coastal counties and parts of Harris County. The Association's purpose is to provide insurance coverage to those persons who are unable to obtain comparable insurance coverage in the voluntary insurance market. The ability to obtain insurance coverage that will provide coverage for losses resulting from windstorm and hail is crucial to the financial welfare of persons living and working in the designated catastrophe area. The absence of such coverage providing for the payment of losses results in the lack of an important element for economic stability in the region.

House Bill 4409 substantially amended how Association losses and operating expenses in excess of premium and other revenue are funded in new Subchapters B-1 and M, Chapter 2210, Insurance Code. Compliance with these requirements is essential to assure the availability of Association insurance coverage for all eligible persons and properties. The adopted sections implement the means to repay the public security obligations necessary to fund the new loss funding scheme. Thus, adoption of these sections will affect the economic welfare of the state and its inhabitants, and positively impact the orderly growth and development of the state.

The Association operates under a plan of operation which is adopted by rule. The Insurance Code §2210.151 provides that the Commissioner shall adopt by rule the Association's plan of operation to provide Texas windstorm and hail insurance in the catastrophe area. The Insurance Code §2210.152(a)(1) sets out the requirements of the plan of operation and specifies that the plan of operation must provide for the efficient, economical, fair and nondiscriminatory administration of the Association. Further, the Insurance Code §2210.152(a)(2)(G) provides that the plan of operation may include other provisions considered necessary by the Department to implement the purposes of Chapter 2210.

Historically, the Association's plan of operation has been specified in §5.4001 of this chapter (relating to Plan of Operation). Neither the Insurance Code §2210.151 nor §2210.152 require the Association's plan of operation to be in a single section of the Administrative Code. With the adoption of HB 4409 related requirements in §§5.4902 - 5.4908 and 5.4911 of this chapter (relating to Additional Requirements; Declination of Coverage; Flood Insurance; Minimum Retained Premium; Certificate of Compliance Approval Program; Certificate of Compliance Transition Program; Alter and Alteration; and Insurance Policy Forms, Endorsements, Manual Rules, Application Forms, and Underwriting Guidelines; respectively) the Department began to revise the format of the plan of operation into sections related to specific topics. Sections 5.4902 - 5.4908 and §5.4911 were adopted to control over conflicting provisions in §5.4001. The sections in this adoption have similar language with respect to control over §5.4001. However, references in this adoption

TWIA EXH. 56A"     TDI CCH 0203     (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.E) TWIA 0503

to the plan of operation incorporate both §§5.4001, 5.4902 - 5.4908, and 5.4911, unless specified otherwise.

As stated, HB 4409 substantially amended how Association losses and operating expenses in excess of premium and other revenue are funded. It is necessary that these new requirements, which amend or augment the Association's existing plan of operation, be integrated into the plan of operation. The adopted sections integrate these requirements into the plan of operation.

Thus, it is necessary to amend the plan of operation to address the following: (i) Association member assessments under the Insurance Code §2210.613 and §2210.6135; and (ii) the procedure for determining a policyholder surcharge under the Insurance Code §2210.613. It is further necessary to establish the procedures and requirements for collecting premium surcharges for the payment of class 2 public securities under the Insurance Code §2210.613.

To effect these necessary amendments, adopted §§5.4161 - 5.4167 and 5.4173 become part of the Association's plan of operation. While §5.4161 and §5.4162 include new provisions related to the implementation of HB 4409, §§5.4161 - 5.4167 also redesignate existing provisions concerning member assessments that are currently in §5.4001(c)(2) of the plan of operation into this division. The sections are being redesignated because including the Association's assessment procedure with other loss funding provisions will make it more accessible to interested persons. Further, because §5.4001 will be addressed at a later time, the existing provisions in §5.4001(c)(2) will not be repealed at this time. Rather, as provided in §5.4161(c), the redesignated sections will control over any conflicting provisions in §5.4001. Finally, the redesignated sections include nonsubstantive updates and use terminology more consistent with this adoption and current statutes and rules. Section 5.4173 is designated as part of the Association's plan of operation because it establishes the Association's procedure for determining the need for a premium surcharge and the amount of the premium surcharge.

Section 5.4171 and §5.4172 and §§5.4181 - 5.4192 are adopted to establish the procedures and requirements the insurance industry shall use for determining and collecting premium surcharges for the payment of class 2 public securities under the Insurance Code §2210.613.

The Department further recognizes that the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111 - 203, H. R. 4173, July 21, 2010) (Dodd-Frank Act) was enacted by Congress after the submission of the proposal to the *Texas Register*. The Dodd-Frank Act affects the regulation of surplus lines insurance and may be determined to prohibit the inclusion of certain surplus lines premiums in the determination of assessment and premium surcharges. Therefore, §5.4162 and §5.4171 have been changed to exclude such premium and policies that a federal agency or court of competent jurisdiction determines to be exempt from inclusion in the assessment formula or subject to premium surcharge under the Insurance Code Chapter 2210.

The following explains adopted §§5.4161 - 5.4167, 5.4171 - 5.4173, and 5.4181 - 5.4192 in greater detail.

§5.4161. Member Assessments. Section 5.4161 restates existing §5.4001(c)(2)(A) of this chapter, which §5.4161 will control over. Section 5.4161 does not significantly alter existing procedural requirements, but it differs from the existing procedural requirements because the statutory funding scheme for excess

losses was amended by HB 4409 and no longer relies on direct assessments to fund certain amounts. Rather, the Insurance Code, Chapter 2210, Subchapter B-1, now requires that losses in excess of the Association's premium and other revenue, the Catastrophe Reserve Trust Fund (CRTF), and available reinsurance proceeds, must be paid with the proceeds of class 1, class 2, and class 3 public securities. The Insurance Code §2210.613 and §2210.6135, provide that, if other funds are not available, up to 30 percent of the class 2 public security obligations and all of the class 3 public security obligations are payable from Association member company assessments. The Insurance Code §2210.608 requires the Texas Public Finance Authority (TPFA) to annually inform the Association of the amounts required to fund these public security obligations.

The adopted section also does not include the requirement that the Association's board of directors determine the Assessment amount. The Association's board of directors may still desire to perform this function; however, this phrasing directing the Association to determine this amount is more consistent with other sections in this division.

Also as previously discussed, §§5.4161 - 5.4167 redesignate the existing requirements in §5.4001 and incorporate them into this division. As provided in §5.4161(c), these sections will be considered part of the Association's plan of operation and shall control over any conflicting provision in §5.4001 of this subchapter. Section 5.4161(c) is adopted with a nonsubstantive change to the section references.

§5.4162. Amount of Assessment. Section 5.4162 substantially restates existing §5.4001(c)(2)(B) of this chapter. As addressed in existing §5.4001(c)(2)(B), this section establishes member participation in the assessment and thus the proportionate amount each member shall be required to pay to the Association.

Section 5.4162(a) also incorporates the HB 4409 amendments to the Insurance Code §2210.052(e), which provides that the Association may not include in the assessment an insurer that became a member of the Association after September 1, 2009, and had not previously been a member of the Association, until after the second anniversary of the date on which the insurer first becomes a member of the Association. Because the term of the class 2 or class 3 public securities issued under the Insurance Code §2210.073 or §2210.074 can be up to 10 years with a corresponding assessment period, §5.4162(a)(2) clarifies that the new member would be eligible for assessment after its second anniversary "without regard as to whether the catastrophic event that gave rise to the class of public securities occurred prior to the second anniversary of the date on which the insurer first became a member of the Association." This provision is consistent with the language of the Insurance Code §§2210.052, 2210.073, 2210.074, 2210.613, and 2210.6135 that provides the members share the loss based on their participation in the Association.

Section 5.4162(b) provides that the participation level shall be computed on a calendar year basis for the year in which the assessment is made. The participation level may thus vary over the term of the public security and will not be fixed in the year that the catastrophic event occurred.

As previously discussed, §5.4162(a)(3) has been added to this section due to the changes in federal law. This change is intended to exclude net direct written premium arising from the transaction of surplus lines business that a federal agency or court of competent jurisdiction determines to be exempt from

TDI CC 0204 (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.E) TWIA 0504

inclusion in the assessment formula under the Insurance Code Chapter 2210.

A systemic concern was that the insurers may determine that under a variable participation scheme it is best to stop writing wind and hail insurance coverage in the catastrophe area now and then return after the event to lower their participation percentage. The Department disagrees that insurers would reduce writings based on this requirement as a general course of action. Since Hurricane Rita, insurers have reduced writing wind and hail insurance coverage in the catastrophe area to avoid exposure to catastrophic events without regard to the effect or even the potential of an unlimited assessment under former Insurance Code §2210.058. Assessments under the HB 4409 loss funding scheme set out in the Insurance Code §2210.613 and §2210.6135 would amount to an approximate maximum of $800 million, plus interest and administrative expenses, over an eight to eleven year period following a catastrophic event depending on the date of issuance, term, covenants, and potential early repayment of the public securities. Thus, the annual assessment requirements necessary under Insurance Code §2210.613 and §2210.6135 would approximate, albeit probably be greater than, the former $100 million assessment provision in the Insurance Code §2210.058(a)(1). Therefore, the Department does not believe that this provision will affect insurer's decisions to write in the catastrophe area prior to a storm event. Further, this method may encourage insurers to reduce their participation level by writing in the catastrophe area after a catastrophic event. That would be consistent with the Legislature's expressed intent in the Insurance Code §2210.009(b) and §2210.053(b). Further, even under a fixed participation level due to the need to provide broad based funding support for the public securities, participation levels would vary due to insolvencies and carriers leaving the Texas market. This includes the entry and exit of market participants and changes in company writing practices. Under no situation would the formula be truly fixed for the entire term of the public security obligation, because the formula must consider that over the course of time some members will leave the Texas market or fail financially.

The plan of operation already provides for reallocating an assessment based on insolvency. As for insurers leaving the Texas market, the Department notes that the Insurance Code Chapter 2210 does not have a provision such as in the Insurance Code §2211.209(e), relating to the FAIR Plan Association. Barring the departure of a large market share insurer, these variances should be slight, but under either the fixed or annual basis they may be unavoidable. Also, new members are only exempt from participating in assessments for the first two years. Additionally, members could also seek to decrease their assessment by increasing their writings in the catastrophe area, an incentive which is consistent with the Insurance Code §2210.009(b) and §2210.053(b).

Further, the Association and the members would be required to prepare and use a single calculation for all assessments made during the year for class 2 public securities and class 3 public securities regardless of the year the public securities were issued. Finally, because members would have the same assessment obligation to each class 3 public security regardless of the year in which the security was issued, the TPFA might also be able to more readily refinance outstanding public securities of the same class and take advantage of changing market conditions.

For these reasons the Department has determined that the calendar year formula for determining participation levels currently used by the Association is most consistent with the requirements of the Insurance Code Chapter 2210.

The proposal also generated comments concerning the issuance and payment of class 2 and class 3 public securities. These comments requested a means of paying a lump sum assessment in lieu of participating in the public security obligation and a means of paying a lump sum towards the insurers' public security obligation.

The Insurance Code §2210.613(a) provides that 30 percent of the cost of public securities issued under the Insurance Code §2210.073 shall be paid from member assessments. The Insurance Code §2210.074(b) provides that if losses are paid with class 3 public securities, the class 3 public securities will be repaid in the manner described by the Insurance Code Chapter 2210, Subchapter M, through assessments as provided by §2210.074. Under both the Insurance Code §2210.613(a) and §2210.074(b), the Association shall notify each member of its assessment and that the proportion of losses allocable to each insurer shall be determined in the manner used to determine the insurer's participation in the Association under the Insurance Code §2210.052. The Insurance Code §2210.6135, which is in Subchapter M, has the same provisions related to notice and allocation as the Insurance Code §2210.074(b), and provides that the class 3 public securities would be paid through member assessments. The Insurance Code §2210.6135, however, further authorizes the Association to assess members up to $500 million per year.

The Insurance Code §§2210.074, 2210.613, and 2210.6135 indicate that the entire membership of the Association, and thus the Texas property insurance market, will be obligated for the repayment of the public securities. The commenter's suggestion would establish two groups with one being obligated to repay the public securities and one not being so obligated. Limiting the group would limit that public security funding resource to the financial strength of the obligated participating insurers and the potential that those insurers will continue to write in Texas until the public securities are repaid. This could limit the ability of the TPFA to issue class 3 public securities.

The question of overall repayment also holds true for an insurer seeking to prepay its proportionate share of any outstanding public security obligation in a lump sum assessment in lieu of continuing to participate in the payment of the public security obligation under the Insurance Code §§2210.074, 2210.609, 2210.613, and 2210.6135. The Insurance Code §§2210.074, 2210.609, 2210.613, and 2210.6135 do not specifically provide that a member insurer may elect to prepay its class 2 or class 3 public security obligation. Rather, the Insurance Code §2210.609 directs the TPFA to determine the amount of revenue that is required to fund the public security obligation for the current year. The Insurance Code §§2210.074, 2210.613, and 2210.6135 establish the sources of the revenue that will be used to fund that obligation. Sections 2210.074, 2210.613, and 2210.6135 provide that each insurer shall pay an assessment equal to its proportionate share of the amount due as determined under §2210.052. Thus, each member insurer is thus liable for an undivided share of the obligation until the obligation is paid in its entirety.

However, adopted §5.4145 and §5.4147 of this division (relating to Excess Class 2 Member Assessment Revenue and Excess Class 3 Member Assessment Revenue) provide that excess amounts may be used to pay class 2 public security obli-

TDI CC 0205     (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.E) TWIA 0505

gations payable in the subsequent year, offsetting the amount of the member assessment that otherwise would be required to be levied for that year under the Insurance Code Chapter 2210, Subchapter M. It is thus conceivable that an insurer could voluntarily overpay its current assessment obligation with an estimated payment of its subsequent year assessment, if such an arrangement was agreeable to the Association. The over-payment, however, would only work as an offset to the insurer's actual assessment in the subsequent year.

Therefore, these rules implement the Insurance Code §§2210.074, 2210.075, 2210.0613, and 2210.06135 by establishing a system that implements the Insurance Code based on those statutory provisions, including the funding of loss payments through the issuance of class 2 and class 3 public securities that shall be repaid by assessing the Association members. Further, this system reflects a single, annually determined, participation percentage rate for assessing class 2 and class 3 public securities over the course of the public securities, addressing issues resulting from member insurers beginning and ceasing to do business in Texas, and encouraging members to better their assessment position by increasing their writings in the catastrophe area which is consistent with the Insurance Code §2210.009(b) and §2210.053(b). Finally, because §5.4001 defines terms for use in §5.4001 and not this division, it is necessary to incorporate the definition and calculation of "net direct premiums" into this division, which is provided for in §5.4162(b).

Section 5.4162(c) incorporates the remainder of existing §5.4001(c)(2)(B) concerning member participation in the assessment. Section 5.4162(d) incorporates the Association's existing calendar year formula for determining participation levels that are set out in existing §5.4001(c)(2)(B)(i). Section 5.4162(d) also corrects an incomplete citation in the existing rule. The existing provision cites "subsection (a)(2)(i)(III) of this section." As all items within §5.4001(a)(2) have a following capital letter designation, the citation does not refer to any provision. The Department has determined that this provision referred to net direct premium as of 1988 using the citation "(a)(2)(I)(i)(III)." In subsequent revisions the "(I)" was inadvertently omitted. The Department is not aware of any time in which this alternative provision was used in determining participation levels. Section 5.4162(d) restates the citation as "§5.4001(a)(2)(N)(i)(III)" using the correct reference to "net written premium." This section also incorporates Figure: 28 TAC §5.4162(d), which is the same as that at §5.4001(c)(2)(B)(i).

Section 5.4162(e) restates existing §5.4001(c)(2)(B)(ii) of this subchapter concerning the Association's procedure for determining the member's participation percentage and notifying the member of that percentage. Section 5.4162(f) restates existing §5.4001(c)(2)(B)(iii) of this subchapter concerning the member's requirement to furnish to the Association on or before March 1 of each year a copy of its Exhibit of Premiums and Losses (Statutory Page 14) for the State of Texas. Finally, as necessary, §5.4162 makes nonsubstantive updates and uses terminology more consistent with this division, current statutes, and rules.

§5.4163. Notice of Assessment. Section 5.4163 restates existing §5.4001(c)(2)(C) of this subchapter which §5.4163 will control over. Section 5.4163 does not make any substantive changes to the existing provisions, but does divide the existing provision into three subsections to make it more accessible. As necessary, the section makes nonsubstantive updates and

uses terminology more consistent with this §§5.4161 - 5.4167, and current statutes and rules.

§§5.4164, 5.4165, 5.4166 and 5.4167. Payment of Assessment, Failure to Pay Assessment, Contest after Payment of Assessment, and Inability to Pay Assessment by Reason of Insolvency. Sections 5.4164, 5.4165, and 5.4166 restate existing §5.4001(c)(2)(D) of this subchapter, which §§5.4164, 5.4165, and 5.4166 will control over. The sections do not make any substantive changes to the existing provisions, but do divide the existing provisions into three sections and various subsections to make them more accessible. Section 5.4167 restates existing §5.4001(c)(2)(E) of this subchapter, which §5.4167 will control over. Section 5.4167 does not make any substantive changes to the existing requirement, which address the inability of a member to pay an assessment and the reallocation of the assessment. As necessary, §§5.4164, 5.4165, 5.4166, and 5.4167 make nonsubstantive updates and use terminology more consistent with this §§5.4161 - 5.4167, and current statutes and rules. Section 5.4167 was changed to capitalize the term "Association."

§5.4171. Premium Surcharge Requirement. Section 5.4171(a) identifies insurers that are, and that are not, subject to the provisions of §§5.4171 - 5.4172 and 5.4181 - 5.4192. Several commenters, however, questioned if the premium surcharge applied to surety contracts. It is determined that the Insurance Code §2210.613 did not intend to include surety contracts and has changed §5.4171(b) to specifically exclude surety from the scope of §§5.4171 - 5.4173 and 5.4181- 5.4192. In reaching this conclusion the Department considered the context of the language in the Insurance Code §2210.613 and the decision in *Great American Insurance V. North Austin Municipal Utility District No. 1,* 908 S.W.2d 415 (Tex. 1995).

The *Great American* decision provides that under Texas law, insurance and surety are legally distinct. This differs from other states such as Florida which statutorily defines an insurer as "every person engaged as indemnitor, surety, or contractor in the business of entering into contracts of insurance or of annuity" (Florida Statutes §604.03 cited in *Snow v. Jim Rathman Chevrolet, Inc.,* 39 So.3d 368 (Fla.App. 5 Dist. 2010)). The Department does not take the position that the failure to reference terms related to surety contracts excludes those contracts from the application of a particular statute.

Thus, the Department looks to the specific terms used and the context of their usage. The Insurance Code §2210.613(c) provides that the premium surcharge applies to all "policies" described in §2210.613(b) that provide "coverage" for all "property and casualty lines of insurance." The Insurance Code §2210.613(b) provides that each "insurer," the Association and the Texas FAIR Plan Association shall assess a premium surcharge to its policyholders. Further, the term "insurer" is defined for use in the Insurance Code Chapter 2210, Subchapter M under §2210.602(6) as "each property and casualty insurer authorized to engage in the business of property and casualty insurance in this state and an affiliate of such an insurer, as described by §823.003, including an affiliate of that is not authorized to engage in the business of property and casualty insurance in this state." The use of the terms "insurer," "policyholders," "policies," "coverage," and "property and casualty lines of insurance" in these contexts indicate that the Legislature was addressing insurance contracts only rather than taking a more expansive view of applying the premium surcharge to both insurance and surety contracts.

TDI CC 0206                    (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.E) TWIA 0506

Based on comments concerning costs associated with implementing §§5.4171 - 5.4173 and 5.4181- 5.4192, the Commissioner has also considered other alternatives to accomplish the statutory requirements. It is recognized that insurers do not rate coverage or allocate premium for some lines of property and casualty insurance based on the location of an insured's operation. Further, even those insurers that write property lines in addition to other lines may not have systems that can readily identify and communicate this type of information internally because it was unnecessary prior to the enactment of HB 4409. Thus, allocating such previously unallocated premium to the catastrophe area will require insurers writing such lines to incur significant costs in upgrading their systems and information gathering requirements.

The Insurance Code §2210.613(c), however, requires that the premium surcharge apply to all policies that provide coverage on any premises, locations, operations, or property located in the catastrophe area for all property and casualty lines of insurance, other than the four listed exceptions. Thus the option is either to allocate the premium to the catastrophe area or surcharge the total premium of any policy meeting those qualifications.

An apparent intent of HB 4409 in reducing the Association's reliance on statewide assessments was to shift greater responsibility for Association losses to the catastrophe area. A premium surcharge of the total policy premium, while affecting property and operations in the catastrophe area, would also spread the Association's costs throughout the state. This spreading would be unequal, however, as it would only affect persons with property or operations in the catastrophe area. Further, the amount of the surcharge would be unrelated to the actual exposure in the catastrophe area versus the remainder of the state. This could result in commercial operations choosing not to do business in the catastrophe area. Thus, a premium surcharge on the total premium would be inconsistent with the intent of HB 4409 and could adversely impact the economy of the catastrophe area, and thus the state, which is inconsistent with the purpose of the Insurance Code Chapter 2210, as described in §2210.001.

Therefore, the remaining option is to develop procedures to allocate the premium to the catastrophe area so that the premium surcharge may be assessed in compliance with the Insurance Code §2210.613. Several means of reducing the expense of implementing this requirement have been addressed in this adoption. Additionally, the Legislature may reconsider the premium surcharge and allocation based on the cost factors outlined in the proposal, which is expected to range from several hundred thousand dollars to several million dollars per insurer or insurer group.

Time periods for implementing these sections have also been evaluated and extended based on the timing of this order. The proposal was made during hurricane season with the possibility that a hurricane could occur within months of the proposal. The timing of this adoption, however, provides additional time for implementation prior to the next hurricane season. Therefore, §5.4171(d) has been added to read: "For all lines of insurance subject to §5.4182 of this division (relating to Allocation Method for Specified Lines of Insurance) this section, §§5.4172, 5.4173 and 5.4181 - 5.4192 of this division are effective June 1, 2011." Additionally, §5.4171(e) has been added to read: "For all other lines, this section, §§5.4172, 5.4173, and 5.4181 - 5.4192 of this division are effective October 1, 2011." The requirement in §5.4192(b) has been revised to provide as follows: (1) for policies subject to §5.4182, compliance is required for all policies *in force* on or after October 1, 2011; and (2) for policies subject to §5.4183, compliance is required for all policies effective on or after October 1, 2011. Finally §5.4171 is adopted with nonsubstantive change to the section references.

§5.4172. Premium Surcharge Definitions. Section 5.4172 provides definitions used in this §§5.4171 - 5.4172 and 5.4181 - 5.4192. The definitions are derived in part from Subchapter M, Chapter 2210 of the Insurance Code. The definition of "insurer" was expanded from the definition contained in Subchapter M, Chapter 2210 of the Insurance Code to include the Association and the Texas FAIR Plan Association (FAIR Plan). The Insurance Code §2210.613 provides that premium surcharges also apply to Association and FAIR Plan policyholders that reside in, or have insured property or operations in the catastrophe area. This section also provides definitions for "insured property," "premises," and "operations," since these terms are not defined in the Insurance Code §2210.613.

In response to comments concerning the use of the term "resides in" the definition of operations was reconsidered. The intent of using the term "resides in" was to require insurers to surcharge personal automobile policies only if the insured resided in the catastrophe area, notwithstanding whether the insured regularly drives to, within, or through the catastrophe area. The alternative reading based on the location of a business owner or board member's residence was unintended. To reduce this potential for confusion the definition of "operations" in §5.4172(6) has been changed to remove the term "resides in" and to specifically reference automobiles located in the catastrophe area. Further, to be consistent with the terminology, references in §5.4172(4) and §5.4182(a)(1) have been conformed to refer to the term "automobile" or "auto," rather than motor vehicle. These changes will have no effect on any decision to surcharge automobile policies, because §5.4182(a)(1) provides that the surcharge is based on the location where the automobiles are principally garaged. Finally §5.4172 is adopted with nonsubstantive change to the section references.

§5.4173. Determination of the Surcharge. Section 5.4173 establishes the procedure for the Association to request Commissioner approval of a premium surcharge in an amount that is sufficient to fund class 2 public security obligations, including any required contractual coverage amounts that are reported to the Association by the TPFA.

§§5.4181 - 5.4183. Premiums to be Surcharged, Allocation Method for Specified Lines of Insurance, and Allocation Method For Other Lines of Insurance. Insurance policies can provide coverage for risks located in a single location, risks located in multiple locations, or even property in transit. Some insurance coverages, such as property insurance, are rated based on the specific location of the risk, and thus insurers can determine how much of the policy premium relates to insured property or operations located within the catastrophe area. Other lines of insurance may require an allocation calculation. Section 5.4181 sets forth which premium is to be surcharged. Section 5.4182 provides the method for determining the premium surcharge for certain lines of insurance, including fire; allied lines; multi-peril crop; farmowners; homeowners; commercial multi-peril (property); commercial multi-peril policies written on an indivisible premium basis; earthquake; boiler and machinery; burglary and theft; private passenger auto; and commercial auto policies rated based on the location of the vehicle(s). Section 5.4183 establishes the procedure for determining the premium surcharge for other lines of insurance, including those that are not rated based on the specific location of the risk.

TDI CC 0207                    (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.E) TWIA 0507

In considering comments on the proposal it was determined that certain nonsubstantive grammatical changes were necessary to §5.4181(a)(2). Specifically, the references to premium tax, surplus lines premium tax, and independently procured premium tax should be separated by semicolons, and this change has been made. Additionally, the reference "surplus lines premium taxes" has been changed to "surplus lines premium tax."

Section 5.4182(a)(1) specifically lists the lines of insurance where a direct method of determining the surcharge is required. The lines of insurance listed in §5.4182 are lines where insurers know, or should know, the geographic location of their risks. Section 5.4183 has been changed as a result of comments to specify that it applies to all other applicable lines of insurance not specified in §5.4182. Thus, §5.4183 does not apply to those lines listed in §5.4182, nor does it apply to lines, insurers, premiums, or policies excluded under §5.4171(b) and (c).

Finally, §5.4182(a)(1) has been changed to make the list more complete with the addition of earthquake, boiler and machinery; burglary and theft coverage. In addition, in reviewing comments related to the use of the commercial property premium for the determination of the catastrophe allocation percentage under §5.4183, it was determined that policies written under the commercial multi-peril (liability) line of insurance are more appropriately covered under §5.4183(2). However, commercial multi-peril policies written on an indivisible premium basis were retained under §5.4182. These policies, similar to homeowner's policies, are rated in a manner such that a separate property and liability premium is not determined. Because of their similarity to homeowners policies in this regard, the Department believes the surcharge should be determined in a similar manner.

In comments on the proposal it was noted that the term "operations" in the Insurance Code §2210.613(c) is vague and ambiguous and will lead to confusion for insurers who have to determine how to apply the statute and rule's surcharge provisions. This may be especially true for lines such as directors' and officers' liability insurance, general liability insurance, which may not be tied to specific locations, as well as commercial automobile liability insurance which may provide coverage for vehicles traveling through the catastrophe area on a regular basis. For this reason §5.4173(6) defines the term "operations" as "[A] person's interest in property, or activities, that may result in, or give rise to, a loss that is insurable under a property or casualty insurance policy, including the use of an automobile; ownership, lease, or occupancy of a residence or other real property; and activities performed by a person in connection with the manufacture, distribution, or sale of goods or services. A person is considered to have operations in the catastrophe area if the person maintains an automobile or a physical location in the catastrophe area, regardless of whether that location is owned, leased, rented, or occupied by the person."

Therefore, an insured is not considered to have "operations" in the catastrophe area unless the insured maintains an automobile or a physical location within the catastrophe area. So, for example, a commercial automobile insured that traveled intermittently through the catastrophe area but did not maintain a business location in the catastrophe area where operations are performed, would not be subject to the premium surcharge.

Further, as suggested in comments, as a means to avoid confusion and uncertainty for businesses that have premises, operations, or insured property located both in and outside the catastrophe area, proposed §5.4183 has been changed to provide for the use of the allocation percentage indicated by the insured's commercial property insurance premium in cases where the insurer also provides commercial property insurance to the insured.

Property in the catastrophe area is a significant factor indicating "operations" in the catastrophe area. Since the insurer is already required to determine the percentage of premium attributed to the catastrophe area for its insured's commercial property policy, this information should be available to the insurer. In cases where the insurer also provides commercial property insurance to the insured and the insurer cannot reasonably determine or allocate the other premium to the catastrophe area, the insurer will determine the catastrophe area allocation percentage as the ratio of the commercial property premium attributable to the catastrophe area, divided by the total Texas premium of the commercial property policy. The insurer will then apply this allocation percentage to the insured's Texas premium for lines of insurance covered under §5.4183. As revised, §5.4183 also provides that in the case where the insurer does not provide commercial property insurance to the insured, the percentage of premium attributable to the catastrophe area shall be determined by the insurer from information provided by its insured. Insurers are not required to verify or otherwise determine the reasonableness of the allocation percentage provided by the insured.

Section 5.4183 should reduce disputes between insurers and insureds over the premium allocation. In the case where the insurer also writes the insured's commercial property, there should be no dispute as to the allocation. In the case where the insurer does not write the insured's commercial property, the insurer may rely on information provided by the insured. Because of these changes the proposed provisions for establishing a default allocation that increased over time and the appeal procedure requirement for handling disagreements between the insurer and the insured have been removed.

This allocation methodology is adopted with the awareness that some insureds, or insurers on the insured's behalf, might seek to underestimate the amount of premium attributable to the catastrophe area as a means to avoid paying their "full" surcharge. Seeking to reach a perfect allocation, however, is an impractical solution to this problem and would only result in requiring insurers and insureds alike to incur significant additional costs. The adopted allocation methodology provides a reasonable means to implement the Insurance Code §2210.613 at this time. If necessary, the adopted allocation methodology in §5.4182 and §5.4183 may be refined in the future based on experience.

Finally, the Department disagrees that insurer underreporting could lead to a completely unreliable and unpredictable revenue stream which may result in problems when marketing the public securities. The Department consulted with the TPFA regarding this question and was informed that such a result was unlikely. First, the premium surcharge will be based on the reported premium in the catastrophe area as required in the Insurance Code §2210.613. If premium is underreported, the result would be a greater percentage premium surcharge and not an unpredictable revenue stream. Second, to the extent that such reporting did raise a concern, the lenders would require an additional contractual coverage requirement (an amount required to be collected annually in excess of the principal, interest and expenses due on the public securities) to cover any uncertainty in the revenue stream. To the extent that an additional contractual coverage amount was required, any excess class 2 premium surcharge revenue would be distributed annually as provided in the Insur-

TDI CC 0208                    (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.E) TWIA 0508

ance Code §2210.611. Thus, marketability of the bonds would not be endangered.

The changes to the allocation methodology set forth in §5.4183 requires conforming changes to the proposed text in §§5.4184(d), 5.4184(f), 5.4187(a), 5.4189, 5.4190(e), and 5.4192(b).

§5.4184. Application of the Surcharges. Section 5.4184 provides that all applicable policies with effective dates on or after the date of the Commissioner's surcharge order are to be surcharged. It also makes clear that insurers are not responsible for collecting surcharges on policies that did not go into effect, or were cancelled as of the inception date, as well as provides instructions for surcharging policies that remain in effect for multiple years. Section 5.4184 further establishes how premium surcharges are to be determined when the policy is either cancelled mid-term or the premium is changed on the policy in the middle of the policy period. The Insurance Code §2210.613 states that premium surcharges are non-refundable, thus there is no refund for the "unexpired" portion of the surcharge when a policy is cancelled prior to the expiration date. Similarly, since premium surcharges are non-refundable, when the premium on the policy is changed in mid-term resulting in a *reduction* in the total policy premium, there is no commensurate refund of the surcharge, but there is a commensurate increase in the premium surcharge for mid-term changes resulting in an increase in the premium.

In consideration of comments, §5.4184(b) has been changed to reflect that an additional surcharge is not required for a reinstated policy. This change was done to conform with such provisions as the Insurance Code §551.106. Although commenters used other terms such as reissue with regards to this concept, the term reinstated was selected because it is used in the Insurance Code §551.106. The revised provision also provides that for the purposes of this division a policy is reinstated if it covers the same period as the original policy without a lapse in coverage, except as provided in the Insurance Code §551.106. Policies that do not meet this definition of reinstated, regardless of what the practice is called, are subject to an additional surcharge.

The purpose of the language in §5.4184(c) regarding "all transactions on a policy occurring within a seven day period" is to recognize that multiple related transactions on a policy may occur over the course of several days. The purpose is to allow insurers to combine the premium effect of all policy transactions over a short period of time to determine the amount of any additional premium that may apply to the policy. For example, an insured may add a new vehicle to a policy and several days later delete an old vehicle. The purpose is to allow insurers to "net out" these transactions before determining if they result in an additional premium and an additional premium surcharge is required. The Department is aware that this may result in additional programming and systems costs to insurers, however, it should also reduce conflicts between insurers and insureds related to the order transactions are completed and concepts of continuous coverage.

Further with respect to §5.4184(c), the requirement is that a premium surcharge be applied to any additional premium. If this provision were not included, insureds could attempt to reduce their surcharge by purchasing minimal coverage initially and then immediately adding additional coverage to that policy. As for the amount of the additional premium and the premium surcharge, many insurers already have rules in place that waive additional or return premiums for what may be considered "de minimus" amounts. Thus, the insurer has already determined that any ad-

ditional (or return) premium is above a "de minimus" amount. For additional premiums, if the insurer has determined it is worth the cost of collecting the additional premium, as such, an additional surcharge should also be collected in these cases.

Section 5.4184(f) addresses policies that are subject to premium audits, retrospective rating adjustments, or other similar adjustments that occur after policy expiration. In the case of a policy subject to audit or retrospective rating adjustments, the premium paid at policy inception is merely a "deposit premium" and not the "policy premium." In this case there is the expectation of the insurer and insured that the "policy premium" will be determined after retrospective rating adjustments or audit adjustments. This differs from a mid-term adjustment to the policy premium considered under §5.4184(c), because there was no expectation that the premium paid at the policy inception would later be adjusted and the actual premium would be determined after the policy expired. Further, §5.4184(f) only applies to an audit adjustment that results from an audit after the policy expires. Thus, §5.4184(f) should not result in new costs to the insurer based on determining cancelation return premium and mid-term change return premium.

Finally §5.4184(d) and (f) have been changed to conform with the previously discussed changes in §5.4183.

§5.4185. Premium Surcharges are Mandatory. Section 5.4185 provides that premium surcharges are mandatory, and are paid on a "first dollar" basis. Insurers may not pay the surcharge on behalf of the insured, and insurers must apply policyholder payments to the surcharge before applying any payments to premiums or other amounts owed to the insurer. Section 5.4185(c) also reiterates the provision in Insurance Code §2210.613(d) that failure to pay a premium surcharge constitutes failure to pay premium for the purposes of policy cancellation.

§5.4186. Remittance of Premium Surcharges. Section 5.4186 establishes the procedure for remitting collected premium surcharges to the Association and has been changed in response to comments to provide that insurers shall remit all surcharges paid by its insureds not later than the last day of the month following the month in which the surcharge was received.

Section 5.4186 does not provide that the Surplus Lines Stamping Office of Texas (SLSOT) will be the primary source of collection and reporting surplus lines information required under §5.4186. Such an action would require amending the SLSOT's plan of operation, which was not contemplated in the proposal or evaluated for cost. The Department will continue to receive information related to whether the SLSOT should be required to collect the information related to surplus lines insurers. Further, §5.4186(a) makes clear that surplus lines insurers will ultimately be held responsible for the failure of its agents to comply with these rules. Additional language stating what may and may not be placed in a contract between an insured and its agent as a result of these rules is not necessary.

§5.4187 and §5.4188. Offsets and Surcharges not Subject to Commissions or Premium Taxes. Section 5.4187 provides a method for crediting an insurer for surcharges previously paid that were not due to the Association. Section 5.4187(a)(3) has been removed to conform with the changes in §5.4183. Section 5.4188 provides that premium surcharges are neither subject to agents' commissions nor premium taxes. This reiterates the language contained in Insurance Code §2210.613(d), and prohibits an insurer from increasing the surcharge in order to pay agents'

TDI CC 0209

(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.E) TWIA 0509

commissions or premium taxes on a surcharge, and prohibits an agent from collecting or charging a commission on a surcharge.

§5.4189. Notification Requirements. Section 5.4189 provides that insurers must provide insureds subject to a premium surcharge a uniform notice that a premium surcharge has been applied to their policy. Section 5.4189(a) provides the text of the notice required for all policyholders subject to the premium surcharge. In response to comments that the notice was not consumer friendly, the notice has been revised. The bracketed area of the revised notice allows the insurer the option of including the amount of the surcharge, as required by §5.4189(b), either in this notice or a separate document. In response to comments that providing the notice to applicants creates an undue burden, §5.4189(c) has been revised to require that notice of the premium surcharge will be provided only be provided at the time the policy is issued, in the case of new business, and with the renewal notice, in the case of renewal business. In a conforming change based on previously discussed changes to §5.4183, proposed language in §5.4189(c) and (e) concerning additional information that insurers were to have provided policyholders has been removed. In responses to comments, §5.4189(c) has also been revised to extended the time period for providing the notice following a mid-term policy change from 10 to 20 days after completion of the transaction. This time period remains the same for all insurers and surplus lines insurers. The requirement that the notice be sent with a renewal notice has not been changed.

§5.4190 and §5.4191. Annual Premium Surcharge Report and Premium Surcharge Reconciliation Report. Section 5.4190 and §5.4191 specify the types of information insurers are required to maintain for the purposes of determining compliance with §§5.4171 - 5.4173 and 5.4181 - 5.4188. Section 5.4190 requires insurers to provide an annual report to the Association which provides information regarding the amount of premium collected subject to surcharge, the amount of premium surcharges remitted to the Association, and the amount of premium surcharges collected by the insurer during the previous calendar year. In response to comments, the required time period for providing these reports to the Association is been extended from 60 to within 90 days after the end of a calendar year in which a surcharge is in effect. However, annual reports are not required if a surcharge has been in effect for less than 45 days in the applicable calendar year. Each insurance company is required to provide an annual report.

Section 5.4190 has been revised to remove the requirement that the annual premium surcharge report be provided by line of business. This was done in response to a comment that the requirement to report collected premium surcharges by line of business placed a significant cost burden on insurers. The Department will monitor the data collection to make certain that current measures are sufficient to fulfill the requirements of the Insurance Code §2210.613. Further, in response to a comment suggesting a simplified reporting scheme, §5.4190(e)(4)(A) - (C) have been combined under subparagraph (A) and subparagraph (D) has been redesignated as subparagraph (B). It is anticipated that this change will reduce insurer compliance costs. Finally, §5.4190(e)(4)(A) has been revised to conform with the changes to the allocation methodology that has been previously discussed in §5.4183.

Also as a matter of clarification, §5.4190 does not require SLSOT to make any changes to its reporting system or report on behalf of affiliated surplus lines insurers. However, §5.4190 does not prohibit SLSOT from reporting on behalf of surplus lines insurers if SLSOT and the insurer agree to such an arrangement.

Section 5.4191 requires insurers to maintain sufficient records in order to, within 10 days of a request, provide the Department with a reconciliation report for a time period specified in the request. These reports are adopted under the authority set forth in the Insurance Code §2210.008, because the reports are necessary to ensure compliance with §§5.4171 - 5.4173 and 5.4181 - 5.4188 and, as such, are necessary to the implementation of Chapter 2210. The purpose of the reports is to track the actual collection of premium surcharges and enhance compliance with the premium surcharge requirements.

As discussed, §5.4190 has been revised generally to remove references to collecting and providing premium surcharge information by line of business. Because §5.4191 would rely on the same information, the requirement that annual premium surcharge information be available by line of business has also been removed from this section in response to a comment. Additionally, because a reconciliation report is considered a regulatory report, §5.4191(b) has been revised to provide that only the Department may request a reconciliation report under §5.4191.

With respect to both §5.4190 and §5.4191, a commenter noted that because the surcharge report and annual premium surcharge reconciliation report ask for premium written in the calendar year, as well as premium surcharges collected in the calendar year, these figures are never going to reconcile because written premium is different from collected premium. Under the example offered by the commenter, if a company writes a policy in December the company would report the full annual premium as written premium; but if the premium were billed on an installment basis, the company would only be allowed to collect surcharge on the first installment of premium. The Department disagrees that the commenter's example exposes a significant flaw.

Some mismatches may occur between calendar year written premium and surcharges collected for the same period of time. The Department, however, believes that the reports will provide useful information for the Department and Association concerning the collection of premium surcharges. Further, the Department does not consider it necessary at this time for insurers to incur additional costs to enhance the reconciliation of these reports. Additionally, the commenter's example incorrectly states that under an installment plan only one month of the surcharge would have been collected. As previously discussed, §5.4185(b) requires insurers to apply money received from the insured to the premium surcharge prior to applying funds to premium or any other obligations. Section 5.4185(b)(1) clarifies this requirement by prohibiting insurers from allocating pro-rata or otherwise mixing premium surcharges with premium over installment plan payments.

Finally, §5.4190 and §5.4191 have been revised to conform to the determination that §§5.4171 - 5.4173 and 5.4181- 5.4192 do not apply to surety contracts as previously discussed in §5.4171.

§5.4192. Data Collection. Section 5.4192 requires each insurer to maintain sufficient records in order to report certain information to the Department. This information will provide the premium base available to be surcharged and thus is necessary to the implementation of the Insurance Code §2210.613. This section does not change, is not intended to change, and should not be construed as changing, any statistical plan reporting require-

TDI CC 0210

(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.E) TWIA 0510

ments established pursuant to the Insurance Code Chapter 38 or other requirement.

Section 5.4192(b) has been changed to modify the reporting requirement and provide an extension for insurers using the allocation methodology established in §5.4183. Proposed §5.4192(b) established the requirement for all policies with effective dates on or after October 1, 2010. This requirement in §5.4192(b) has been revised to provide as follows: (1) for policies subject to §5.4182, compliance is required for all policies *in force* on or after October 1, 2011; and (2) for policies subject to §5.4183, compliance is required for all policies effective on or after October 1, 2011.

The change is necessary because it is possible that there may be a catastrophic event in 2011. The TPFA will need reliable catastrophe area premium information to secure the issuance of any public securities that may be issued under the Insurance Code §2210.073. Additionally, if a surcharge is needed, the Commissioner and the Association must be able to obtain reliable catastrophe area premium information in a timely manner in order to determine any necessary premium surcharge percentage. Further, it is anticipated that the lines of insurance subject to §5.4182 will make up the bulk of the catastrophe area premium.

As previously discussed, for lines of insurance subject to §5.4182, insurers already know, or should already know, the geographic location of these risks. In addition, for residential and commercial property lines of insurance, insurers should know premiums attributable to risks located in the catastrophe area.

The Department recognizes that for lines of insurance other than residential and commercial property, insurers may not know whether a Harris County insured is located within those portions of Harris County designated as a catastrophe area. The Department believes the October 1, 2011 date provides sufficient time for insurers to make this determination for policies in force on that date.

For lines of insurance subject to §5.4183, insurers may not know the geographic location of its insureds. Thus, the requirement for compliance with §5.4192 is extended to apply to those policies effective on or after October 1, 2011.

HOW THE SECTIONS WILL FUNCTION. The sections implement legislative changes to the Insurance Code Chapter 2210 under HB 4409, 81st Legislature, 2009 Regular Session, and create a more efficient rule structure by grouping Association loss funding mechanisms in this division.

§5.4161. Member Assessments. Section 5.4161(a) provides that the Association shall determine if a member assessment is necessary to fund the Association's outstanding class 2 and class 3 public security obligations based upon the evaluation of information provided to the Association by the Texas Public Finance Authority. Section 5.4161(b) provides that if the Association determines an assessment to be reasonable and necessary, the Association shall assess its member insurers. Section 5.4161(c) establishes that §§5.4161 - 5.4167 shall control over any conflicting provision in §5.4001 of this subchapter.

§5.4162. Amount of Assessment. Section 5.4162(a) provides that the Association shall determine which of its members shall participate in the assessment. This includes determining if the member is eligible for the two year exemption period. Section 5.4162(b) provides that the member participation shall be determined in the year the assessment is made and not the year of the occurrence, unless they are the same. Section 5.4162(c) provides that each member shall pay its proportionate share of the assessment. Section 5.4162(d) sets out how each member's share of the assessment shall be calculated. Section 5.4162(e) addresses the Association's procedure for determining the member's participation percentage and notifying the member of that percentage. Section 5.4162(f) establishes the requirement that each member must furnish to the Association on or before March 1 of each year a copy of its Exhibit of Premiums and Losses (Statutory Page 14) for the State of Texas which shall also be used in determining the member's participation percentage.

§5.4163. Notice of Assessment. Section 5.4163 provides the procedure by which the Association shall give notice of an assessment to its members and addresses how members may appeal their individual assessments.

§5.4164. Payment of Assessment. Section 5.4164 provides that the assessment must be paid within 30 days of receipt of the assessment notice.

5.4165. Failure to Pay Assessment. Section 5.4165 addresses the procedure and remedies if a member insurer fails to pay its assessment.

5.4166. Contest after Payment of Assessment. Section 5.4166 provides the procedure for a member to contest its assessment even after payment of the assessment.

5.4167. Inability to Pay Assessment by Reason of Insolvency. Section 5.4167 addresses the reallocation of an insolvent members share amongst the remaining members.

§5.4171. Premium Surcharge Requirement. Section 5.4171(a) - (c) identify insurers that are, and that are not, subject to §§5.4171 - 5.4173 and 5.4181 - 5.4192. Section 5.4171(d) has been added to read: "For all lines of insurance subject to §5.4182 of this division (relating to Allocation Method for Specified Lines of Insurance) this section, §§5.4172, 5.4173 and 5.4181 - 5.4192 of this division are effective June 1, 2011." Additionally, §5.4171(e) has been added to read: "For all other lines, this section, §§5.4172, 5.4173, and 5.4181 - 5.4192 of this division are effective October 1, 2011."

§5.4172. Premium Surcharge Definitions. Section 5.4172 provides definitions used in §§5.4171 - 5.4173 and 5.4181 - 5.4192. The definitions are derived in part from Subchapter M, Chapter 2210 of the Insurance Code. The definitions are in addition to those adopted in §5.4102 of this division.

§5.4173. Determination of the Surcharge. Section 5.4173 establishes the procedure for the Association to request Commissioner approval of a premium surcharge in an amount that is sufficient to fund class 2 public security obligations, including any required contractual coverage amounts that are reported to the Association by the TPFA.

§§5.4181 - 5.4183. Premiums to be Surcharged, Allocation Method for Specified Lines of Insurance, and Allocation Method For Other Lines of Insurance. Section 5.4181 sets forth which premium is to be surcharged. Section 5.4182 provides the method for determining the premium surcharge for certain lines of insurance, including fire; allied lines; multi-peril crop; farmowners; homeowners; commercial multi-peril (property); commercial multi-peril policies written on an indivisible premium basis; earthquake; boiler and machinery; burglary and theft; private passenger auto; and commercial auto policies rated based on the location of the vehicle(s). Section 5.4183 establishes the procedure for determining the premium surcharge for other

TDI CC 0211

(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.E) TWIA 0511

lines of insurance, including those that are not rated based on the specific location of the risk.

§5.4184. Application of the Surcharges. Section 5.4184 provides that all applicable policies with effective dates on or after the date of the Commissioner's surcharge order are to be surcharged. The section also makes clear that insurers are not responsible for collecting surcharges on policies that did not go into effect, or were cancelled as of the inception date, as well as provides instructions for surcharging policies that remain in effect for multiple years. Section 5.4184 further establishes how premium surcharges are to be determined when the policy is either cancelled mid-term or the premium is changed on the policy in the middle of the policy period. The Insurance Code §2210.613 states that premium surcharges are non-refundable, thus there is no refund for the "unexpired" portion of the surcharge when a policy is cancelled prior to the expiration date. Similarly, since premium surcharges are non-refundable, when the premium on the policy is changed in mid-term resulting in a *reduction* in the total policy premium, there is no commensurate refund of the surcharge, but there is a commensurate increase in the premium surcharge for mid-term changes resulting in an increase in the premium. Section 5.4184(f) addresses policies that are subject to premium audits, retrospective rating adjustments, or other similar adjustments that occur after policy expiration.

§5.4185. Premium Surcharges are Mandatory. Section 5.4185 provides that premium surcharges are mandatory, and are paid on a "first dollar" basis. Insurers may not pay the surcharge on behalf of the insured, and insurers must apply policyholder payments to the surcharge before applying any payments to premiums or other amounts owed to the insurer. Section 5.4185(c) also reiterates the provision in Insurance Code §2210.613(d) that failure to pay a premium surcharge constitutes failure to pay premium for the purposes of policy cancellation.

§5.4186. Remittance of Premium Surcharges. Section 5.4186 establishes the procedure for remitting collected premium surcharges to the Association. It provides that insurers shall remit all surcharges paid by its insureds not later than the last day of the month following the month in which the surcharge was received.

§5.4187 and §5.4188. Offsets and Surcharges not Subject to Commissions or Premium Taxes. Section 5.4187 provides a method for crediting an insurer for surcharges previously paid that were not due to the Association. Section 5.4188 provides that premium surcharges are neither subject to agents' commissions nor premium taxes. This reiterates the language contained in the Insurance Code §2210.613(d), and prohibits an insurer from increasing the surcharge in order to pay agents' commissions or premium taxes on a surcharge, and prohibits an agent from collecting or charging a commission on a surcharge.

§5.4189. Notification Requirements. Section 5.4189 provides that insurers must provide insureds subject to a premium surcharge a uniform notice that a premium surcharge has been applied to their policy. Section 5.4189(a) provides the text of the notice required for all policyholders subject to the premium surcharge. The bracketed area of the notice allows the insurer the option of including the amount of the surcharge, as required by §5.4189(b), either in this notice or a separate document. Section 5.4189(c) establishes requirements regarding the form of the notice and when the notice must be delivered.

§5.4190 and §5.4191. Annual Premium Surcharge Report and Premium Surcharge Reconciliation Report. Section 5.4190 and §5.4191 specify the types of information insurers are required to maintain for the purposes of determining compliance with §§5.4171 - 5.4173 and 5.4181 - 5.4188. Section 5.4190 requires insurers to provide an annual report to the Association which provides information regarding the amount of premium collected subject to surcharge, the amount of premium surcharges remitted to the Association, and the amount of premium surcharges collected by the insurer during the previous calendar year.

Section 5.4191 requires insurers to maintain sufficient records in order to, within 10 days of a request, provide the Department with a reconciliation report for a time period specified in the request.

§5.4192. Data Collection. Section 5.4192 requires each insurer to maintain sufficient records in order to report certain information to the Department. This information will provide the premium base available to be surcharged and thus is necessary to the implementation of the Insurance Code §2210.613. This section does not change, is not intended to change, and should not be construed as changing, any statistical plan reporting requirements established pursuant to the Insurance Code Chapter 38 or other requirement. As to the reporting requirement, §5.4192(b) provides as follows: (1) for policies subject to §5.4182, compliance is required for all policies *in force* on or after October 1, 2011; and (2) for policies subject to §5.4183, compliance is required for all policies effective on or after October 1, 2011.

SUMMARY OF COMMENTS AND AGENCY RESPONSE TO COMMENTS. During the August 24, 2010 public hearing the Commissioner extended the period for submitting written comments by five days. The Department considers the extension to include only business days. Thus, the original date for the submission of written comments of Monday, August 30, 2010, was extended through the Labor Day weekend and expired at 5:00 p.m., Tuesday, September 7, 2010.

General. A commenter questioned whether the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) would prohibit premium surcharges on some surplus lines insurance policies.

Agency Response. The Dodd-Frank Act affects the regulation of surplus lines insurance and may be determined to prohibit the inclusion of certain surplus lines premiums in the determination of premium surcharges and assessments. Because the Dodd-Frank Act was adopted after the proposal was submitted to the *Texas Register* it was not considered in the proposal. Further the Department is not aware of any final decision exempting surplus lines premium or policies from the application of the Insurance Code Chapter 2210. However, because the possibility does exist §5.4162 and §5.4171 have been changed to exclude such surplus lines premium and policies that a federal agency or court of competent jurisdiction determines to be exempt from assessment or premium surcharge under the Insurance Code Chapter 2210.

General. A commenter suggested that the Association be required to semiannually evaluate its capital position, including capacity to pay claims at varying levels of catastrophe loss, expenses, expected costs of capital and the consideration of funding sources such as reinsurance.

Agency Response. The requirements and costs that would be involved in implementing the commenter's suggestion were not addressed in the proposal. Such matters, however, may be considered by the Association's Board of Directors without the need for an additional requirement.

TDI CC 0212                    (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.E) TWIA 0512

General. A commenter questioned as to whether public security funding was limited to $2.5 billion per catastrophe event or whether the Department interprets the Insurance Code Chapter 2210 to permit the issuance of additional public securities in subsequent years for a prior event if the first years public securities are insufficient to fund the losses.

Agency Response. The Department considers the Insurance Code Chapter 2210 to authorize the latter approach. The authorized amount of public securities that may be issued per year is limited; however, under the statute and this adoption, over time funding is only limited by the amount of public securities of any class that may be issued. As previously discussed in this adoption, the limit of public securities that may be issued to fund excess losses under the Insurance Code Chapter 2210, Subchapter B-1, is $2.5 billion per year. This adoption also notes that public security funding may be further limited and reduced based on market conditions. However, while §§2210.072 - 2210.074 limit the authorized amount of public securities that may be issued "per year," these limits are not directly tied to losses resulting from an occurrence or series of occurrences in that year.

The Insurance Code Chapter 2210, Subchapter B-1, does not define the term "year." Because the Association is at greatest risk of a catastrophic event during hurricane season, which occurs June through November, it is reasonable to consider this period to be a calendar year and not twelve months between public security issuances. This is because limiting public security issuances to twelve months intervals could work to significantly delay loss payments to Association policyholders who incurred an early season storm in a year following a significant late season storm. Thus, on January 1 of each year an additional amount of funding is authorized.

The Insurance Code §2210.071 provides that if an occurrence or series of occurrences in a catastrophe area results in insured losses and operating expenses of the Association in excess of premium and other revenue of the Association, the excess losses and operating expenses shall be paid as provided by the Insurance Code Chapter 2210, Subchapter B-1. The Insurance Code Chapter 2210, Subchapter B-1 does not specifically limit funding to the year in which the catastrophic event occurred. Rather, the only limitation is the "per year" amount of public securities that may be issued to fund the losses. Thus, funding, in class order as available, may be accessed to cover losses incurred in a prior year so long as the basic condition of a "catastrophic event" persists.

However, using funds authorized for a subsequent year has certain limitations. Some sources of funding under §§2210.072 - 2210.074 may not be available to the Association annually based on market conditions. Further, use of current year authorized public securities to essentially fund continuing losses from a prior year would significantly reduce or eliminate those remaining funding resources in the current year. Thus, the Legislature may determine that an alternative funding structure is necessary if losses exceed $2.5 billion or those lesser amounts that can be reasonably borrowed based on market conditions.

Sections 5.4161, 5.4162, and 5.4164. A commenter suggested as a means of simplifying the process and reducing costs that the rule allow member insurers the option of paying their proportionate share of any loss in lieu of annually participating in the payment of the public security obligation. Thus, the members would not participate in the public security obligation.

Agency Response. The Department considers the suggestion that an insurer may elect to pay their proportionate share of any loss in a lump sum assessment in lieu of continuing to participate in the payment of the public security obligation under the Insurance Code §§2210.074, 2210.609, 2210.613, and 2210.6135 to be inconsistent with the Insurance Code Chapter 2210 or the adopted rules implementing the Insurance Code Chapter 2210. Therefore, no changes have been made based on this comment.

The Insurance Code §2210.613(a) provides that 30 percent of the cost of public securities issued under the Insurance Code §2210.073 shall be paid from member assessments. The Insurance Code §2210.074(b) provides that if losses are paid with class 3 public securities, the class 3 public securities will be repaid in the manner described by the Insurance Code Chapter 2210, Subchapter M, through assessments as provided by §2210.074. Under both the Insurance Code §2210.613(a) and §2210.074(b), the Association shall notify each member of its assessment and that the proportion of losses allocable to each insurer shall be determined in the manner used to determine the insurer's participation in the Association under the Insurance Code §2210.052. The Insurance Code §2210.6135, which is in Subchapter M, has the same provisions related to notice and allocation as the Insurance Code §2210.074(b), and provides that the class 3 public securities would be paid through member assessments. The Insurance Code §2210.6135, however, further authorizes the Association to assess members up to $500 million per year.

The Insurance Code §§2210.074, 2210.613, and 2210.6135 indicate that the entire membership of the Association, and thus the Texas property insurance market, will be obligated for the repayment of the public securities. The commenter's suggestion would establish two groups with one being obligated to repay the public securities and one not being so obligated. This could limit that public security funding resource to the financial strength of the obligated participating insurers and the potential that those insurers will continue to write in Texas until the public securities are repaid. This could limit the ability of the TPFA to issue class 3 public securities.

Sections 5.4161, 5.4162, and 5.4164. A commenter suggests as a means of simplifying the process and reducing costs that, following the issuance of public securities, the rule allow member insurers the option of paying their proportionate share of any outstanding public security obligation in a lump sum assessment in lieu of annually participating in the payment of the public security obligation.

Agency Response. The Department considers the suggestion that an insurer may elect to pay their proportionate share of any outstanding public security obligation in a lump sum assessment in lieu of continuing to participate in the payment of the public security obligation under the Insurance Code §§2210.074, 2210.609, 2210.613, and 2210.6135 to be inconsistent with the Insurance Code Chapter 2210 or the adopted rules implementing the Insurance Code Chapter 2210. Therefore, no changes have been made based on this comment.

The Insurance Code §§2210.074, 2210.609, 2210.613, and 2210.6135 do not specifically provide that a member insurer may elect to prepay its class 2 or class 3 public security obligation. Rather the Insurance Code §2210.609 directs the TPFA to determine the amount of revenue that is required to fund the public security obligation for the current year. The Insurance Code §2210.613 and §2210.6135 establish the sources of the revenue that will be used to fund that obligation. The Insurance

TDI CC 0213

(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.E) TWIA 0513

Code §§2210.074, 2210.613, and 2210.6135 provide that each insurer shall pay an assessment equal to its proportionate share of the amount due as determined under the Insurance Code §2210.052. Each member insurer is thus liable for an undivided share of the obligation until the obligation is paid in its entirety. Additionally, prepayment may not result in a reduced annual obligation, but rather simply spread the annual obligation amount over the remaining members.

However, §5.4145 and §5.4147 of this division (relating to Excess Class 2 Member Assessment Revenue and Excess Class 3 Member Assessment Revenue) provide that excess amounts may be used to pay class 2 public security obligations payable in the subsequent year, offsetting the amount of the member assessment that otherwise would be required to be levied for that year under the Insurance Code Chapter 2210, Subchapter M. It is thus conceivable that an insurer could voluntarily overpay its current assessment obligation with an estimated payment of its subsequent year assessment, if such an arrangement was agreeable to the Association. The over payment however, would only work as an offset to the insurers actual assessment in the subsequent year.

Prepayment of the obligation is also not consistent with adopted procedures that will create annual adjustments to the participation percentage to incentivize increased writings in the catastrophe area and account for members entering and leaving the Texas insurance market under the Insurance Code §§2210.009, 2210.052, and 2210.053.

Section 5.4162. A commenter suggested that allowing the participation percentage to adjust annually, rather than being established in the year of the occurrence of the catastrophic event, would allow for consistency between the insurers Association loss obligations and statutory accounting.

Agency Response. The Department agrees that fixing the amount of an insurer's obligation to the Association in the year the catastrophic event occurred could simplify accounting for the insurer's loss obligation. However, as addressed in other responses to comments concerning this section, the insurer's loss obligation is not "fixed" as to the insurer, but is an obligation of the member insurers to satisfy over the term of the public securities. Basing the insurer's responsibility for the public security obligation on just those insurers participating in the year of the catastrophic event does not limit potential changes in the obligation. This is because of the potential for members to withdraw from the Texas market. Thus, under the commenter's proposed methodology or the adopted methodology, the amount of each insurer's total liability for the public securities liability is initially an estimate and will not become known with certainty until all of the public securities are retired. No changes have been made in response to this comment.

General. A commenter suggested that given the estimated costs of compliance with §§5.4171 - 5.4173 and 5.4181 - 5.4192 the Commissioner consider other alternatives to accomplish the statutory requirements.

Agency Response. The Department recognizes that insurers do not rate coverage or allocate premium for some lines of property and casualty insurance based on the location of an insured's operation. Further, even those insurers that write property lines in addition to other lines may not have systems that can readily identify and communicate this type of information internally because it was unnecessary prior to the enactment of HB 4409. Thus, allocating such previously unallocated premium to the catastrophe area will require insurers writing such lines to incur significant costs in upgrading their systems and information gathering requirements.

The Insurance Code §2210.613(c), however, requires that the premium surcharge apply to all policies that provide coverage on any premises, locations, operations, or property located in the catastrophe area for all property and casualty lines of insurance, other than the four listed exceptions. Thus the option is either to allocate the premium to the catastrophe area or surcharge the total premium of any policy meeting those qualifications.

An apparent intent of HB 4409 in reducing the Association's reliance on statewide assessments was to shift greater responsibility for Association losses to the catastrophe area. A premium surcharge of the total policy premium, while affecting property and operations in the catastrophe area, would also spread the Association's costs throughout the state. This spreading would be unequal, however, as it would only affect persons with property or operations in the catastrophe area. Further, the amount of the surcharge would be unrelated to the actual exposure in the catastrophe area versus the remainder of the state. This could result in commercial operations choosing not to do business in the catastrophe area. Thus, a premium surcharge on the total premium would be inconsistent with the intent of HB 4409 and could adversely impact the economy of the catastrophe area, and thus the state, which is inconsistent with the purpose of the Insurance Code Chapter 2210, as described in §2210.001.

Therefore, the remaining option is to develop procedures to allocate the premium to the catastrophe area so that the premium surcharge may be assessed in compliance with the Insurance Code §2210.613. Several means of reducing the expense of implementing this requirement have been addressed in this adoption. Additionally, the Legislature may reconsider the premium surcharge and allocation based on the cost factors outlined in the proposal, which is expected to range from several hundred thousand dollars to several million dollars per insurer or insurer group.

Section 5.4171 and §5.4192. Several commenters stated that the time periods for implementing these sections should be extended based on the various changes and procedures that will be required.

Agency Response. The Department agrees that insurers will need adequate time to implement these sections. Therefore, §5.4171(d) has been added to read: "For all lines of insurance subject to §5.4182 of this division (relating to Allocation Method for Specified Lines of Insurance) this section, §§5.4172, 5.4173 and 5.4181 - 5.4192 of this division are effective June 1, 2011." Additionally, §5.4171(e) has been added to read: "For all other lines, this section, §§5.4172, 5.4173, and 5.4181 - 5.4192 of this division are effective October 1, 2011." The requirement in §5.4192(b) has been revised to provide as follows: (1) for policies subject to §5.4182, compliance is required for all policies in force on or after October 1, 2011; and (2) for policies subject to §5.4183, compliance is required for all policies effective on or after October 1, 2011.

Section 5.4171. Several commenters argued that the Legislature did not intend to include surety contracts within the scope of the Insurance Code §2210.613 and that the proposed text should be amended to clarify that surety contracts were not subject to premium surcharge within the scope of §5.4171.

Agency Response. The Department agrees with the comment and has changed §5.4171(b) to specifically exclude surety from

TDI CC 0214

the scope of §§5.4171 - 5.4173 and 5.4181 - 5.4192. In reaching this conclusion the Department considers the context of the language in the Insurance Code §2210.613 and the decision in *Great American Insurance V. North Austin Municipal Utility District No. 1,* 908 S.W.2d 415 (Tex. 1995).

The *Great American* decision provides that under Texas law, insurance and surety are legally distinct. This differs from other states such as Florida which statutorily defines an insurer as "every person engaged as indemnitor, surety, or contractor in the business of entering into contracts of insurance or of annuity" (Florida Statutes §604.03 cited in *Snow v. Jim Rathman Chevrolet, Inc.,* 39 So.3d 368 (Fla.App. 5 Dist. 2010)). The Department does not take the position that the failure to reference terms related to surety contracts excludes those contracts from the application of a particular statute.

Thus, the Department looks to the specific terms used and the context of their usage. The Insurance Code §2210.613(c) provides that the premium surcharge applies to all "policies" described in §2210.613(b) that provide "coverage" for all "property and casualty lines of insurance." The Insurance Code §2210.613(b) provides that each "insurer," the Association and the Texas FAIR Plan Association shall assess a premium surcharge to its policyholders. Further, the term "insurer" is defined for use in the Insurance Code Chapter 2210, Subchapter M, under §2210.602(6) as "each property and casualty insurer authorized to engage in the business of property and casualty insurance in this state and an affiliate of such an insurer, as described by §823.003, including an affiliate of that is not authorized to engage in the business of property and casualty insurance in this state." The use of the terms "insurer," "policyholders," "policies," "coverage," and "property and casualty lines of insurance" in these contexts indicate that the Legislature was addressing insurance contracts only rather than taking a more expansive view of applying the premium surcharge to both insurance and surety contracts.

Section 5.4171. Several commenters argued that application of the premium surcharge was unworkable with respect to surety contracts, and thus the sections should explicitly exclude surety contracts.

Agency Response. The Department disagrees with this argument. The person purchasing the surety contract could pay the premium surcharge just as easily as a person purchasing an insurance contract may pay the premium surcharge. Further discussion of this issue is unnecessary because the Department has determined that the Insurance Code §2210.613 premium surcharge does not apply to surety contracts.

Section 5.4172(6). A commenter stated that the inclusion of the term "resides in" in the definition of "operations" causes confusion with regard to commercial coverages and should be deleted from the definition. The commenter argued that location of a business owner or board member's residence should have no effect on the premium or premium surcharge related to a commercial policy.

Agency Response. The Department agrees with the commenter. The intent of using the term "resides in" was to require insurers to surcharge personal automobile policies only if the insured resided in the catastrophe area, notwithstanding whether the insured regularly drives to, within, or through the catastrophe area. The alternative reading based on the location of a business owner or board member's residence was unintended. To reduce this potential for confusion, the Department has removed the

term "resides in" from §5.4172(6) and amended the definition to include automobiles located in the catastrophe area. Further, to be consistent with the terminology, references in §5.4172(4) and §5.4182(a)(1) have been conformed to refer to the term "automobile" or "auto," rather than motor vehicle. These changes will have no effect on any decision to surcharge automobile policies, because §5.4182(a)(1) provides that the surcharge is based on the location where the automobiles are principally garaged.

Section 5.4182. A commenter questions the necessity of §5.4182(b) and (c) and suggests that sufficient instruction is given in §5.4183 to allocate premium to the catastrophe area based on the proportion the exposure in the catastrophe area bears to the total exposure on the policy.

Agency Response. The Department disagrees that §5.4182(b) and (c) are unnecessary. Section 5.4182 specifically lists the lines of insurance where a direct method of determining the surcharge is required. The lines of insurance listed in §5.4182 are lines where insurers know, or should know, the geographic location of their risks. Section 5.4183 refers to other lines not included within the scope of §5.4182.

Section 5.4182 and §5.4183. A commenter states that the term "operations" in the Insurance Code §2210.613(c) is vague and ambiguous and will lead to confusion for insurers who have to determine how to apply the statute and rule's surcharge provisions. The commenter brought up examples of directors' and officers' liability insurance, general liability insurance, which may not be tied to specific locations, as well as commercial automobile liability insurance which may provide coverage for vehicles traveling through the catastrophe area on a regular basis.

Agency Response. The Department agrees that the Insurance Code §2210.613(c) does not define the term "operations," and agrees it is challenging to determine the proportion of operations attributable to the catastrophe area for some lines of insurance, such as D&O, and general liability, where the premium is not determined based on the geographic location of the insured's operations. In response to this comment §5.4183 has been changed.

Section 5.4173(6) defines the term "operations" as "[a] person's interest in property, or activities, that may result in, or give rise to, a loss that is insurable under a property or casualty insurance policy, including the use of an automobile; ownership, lease, or occupancy of a residence or other real property; and activities performed by a person in connection with the manufacture, distribution, or sale of goods or services. A person is considered to have operations in the catastrophe area if the person maintains an automobile or a physical location in the catastrophe area, regardless of whether that location is owned, leased, rented, or occupied by the person."

Therefore, an insured is not considered to have "operations" in the catastrophe area unless the insured maintains an automobile or a physical location within the catastrophe area. So, for example, a commercial automobile insured that traveled intermittently through the catastrophe area but did not maintain a business location in the catastrophe area where operations are performed, would not be subject to premium surcharge. Section 5.4183 has been changed to provide for the use of the allocation percentage indicated by the insured's commercial property insurance premium in cases where the insurer also provides commercial property insurance to the insured. Since the insurer is already required to determine the percentage of premium attributed to the catastrophe area for its insured's commercial property policy, this information should be available to the insurer. In the case

TDI CC 0215   (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.E) TWIA 0515

where the insurer does not provide commercial property insurance to the insured, the percentage of premium attributable to the catastrophe area shall be determined by the insurer from information provided by the insured. Further, as a means to reduce potential confrontation in implementing this section, insurers are not required to verify or otherwise determine the reasonableness of the allocation percentage provided by the insured.

Section 5.4183. A commenter suggested that §5.4183 should provide an exhaustive list of insurance lines subject to the premium surcharge or specify which insurance lines are not included.

Agency Response. The Department agrees that the rule should specify that lines of insurance not included in §5.4182 are addressed in §5.4183. Therefore, §5.4183 has been changed to specify that it applies to all other applicable lines of insurance not specified in §5.4182. Thus, §5.4183 does not apply to those lines listed in §5.4182, nor does it apply to lines, insurers, premiums, or policies excluded under §5.4171(b) and (c). In considering this comment the Department also examined §5.4181 and determined that certain nonsubstaintive grammatical changes were necessary to §5.4181(a)(2). Specifically, the Department separated the references to premium tax, surplus lines premium tax, and independently procured premium tax by semicolons and changed the reference "surplus lines premium taxes" to "surplus lines premium tax."

Section 5.4183. As a means to avoid confusion and uncertainty for businesses that have premises, operations, or insured property located both in and outside the catastrophe area, several commenters recommend that if a premium surcharge percentage and catastrophe area premium percentage can be established for the insured's property coverage, then the premium allocations for other lines should default to the allocation percentage of the insured's property coverage. The commenters' proposals differed in degree of complexity and terminology.

Agency Response. The Department concurs in this concept. Thus, §5.4183 has been changed to provide for the use of the allocation percentage indicated by the insured's commercial property insurance premium in cases where the insurer provides commercial property insurance to the insured in addition to other lines. As discussed in response to prior comments, property in the catastrophe area is a significant factor indicating "operations" in the catastrophe area. Since the insurer is already required to determine the percentage of premium attributed to the catastrophe area for its insured's commercial property policy, this information should be available to the insurer. In cases where the insurer also provides commercial property insurance to the insured and the insurer cannot reasonably determine or allocate premium to the catastrophe area, the insurer will determine the catastrophe area allocation percentage as the ratio of the commercial property premium attributable to the catastrophe area divided by the total Texas premium of the commercial property policy. The insurer will then apply this allocation percentage to the insured's Texas premium for lines of insurance covered under §5.4183.

As revised, §5.4183 also provides that in the case where the insurer does not provide commercial property insurance to the insured, the percentage of premium attributable to the catastrophe area shall be determined by the insurer from information provided by its insured. Insurers are not required to verify or otherwise determine the reasonableness of the allocation percentage provided by the insured. Therefore, in the case where the insurer also writes the insured's commercial property, there

should be no dispute as to the allocation. In the case where the insurer does not write the insured's commercial property, the insurer may rely on information provided by the insured, so there should be no reason for a dispute.

The adopted allocation methodology provides a reasonable means to implement the Insurance Code §2210.613 at this time. If necessary, the adopted allocation methodology in §5.4182 and §5.4183 may be refined in the future based on experience. The changes to the allocation methodology set forth in §5.4183 requires conforming changes to the proposed text in §§5.4184(d), 5.4184(f), 5.4187(a), 5.4189, 5.4190(e), and 5.4192(b).

Section 5.4183. A commenter states that they have serious concerns with the allocation methodology, especially as it applies to the commercial policies that are not physically located in the hurricane zone. The commenter stated that there was no provision in the rule that speaks to what is to be done if the insurer and the insured disagree on the amount of property located in catastrophe area, and that is a problem. The commenter believed the proposed system could lead to insured fraud and could lead to a completely unreliable and unpredictable revenue stream for class 2 public securities, which the commenter thought would lead to concerns regarding the marketability of the bonds.

Agency Response. As previously stated in these responses, the Department agrees that it is challenging to determine the proportion of operations attributable to the catastrophe area for some lines of insurance. The Department considered in its proposal several means of trying to alleviate the potential for allocation disputes between the insurer and the insured, including a notice procedure and a default percentage. As previously discussed in these responses to comments, the provisions establishing a procedure for handling disagreements between the insurer and the insured have been removed. Rather, in the case where the insurer also writes the insured's commercial property, there should be no dispute as to the allocation. In the case where the insurer does not write the insured's commercial property, the insurer may rely on information provided by the insured.

The Department is aware that some insureds, or insurers on the insured's behalf, might seek to underestimate the amount of premium attributable to the catastrophe area as a means to avoid paying their "full" surcharge. Seeking to reach a perfect allocation, however, is an impractical solution to this problem and would only result in requiring insurers and insureds alike to incur significant additional costs. It is in this attempt to balance imposing significant additional costs on insurers and insureds versus the amount of the surcharge for reporting insureds that the Department has revised the §5.4183 allocation scheme to be based, if possible, on catastrophe area property coverage as discussed in prior comments.

The Department however, will continue to monitor the situation. If insurers or insureds are uncooperative in their participation and compliance, the Department may revisit this allocation methodology and take appropriate remedial action.

Finally, the Department disagrees that such activity could lead to a completely unreliable and unpredictable revenue stream which may result in problems when marketing the public securities. The Department consulted with the TPFA regarding this question and was informed that such a result was unlikely. First, the premium surcharge will be based on the reported premium in the catastrophe area as required in the Insurance Code §2210.613. If premium is underreported, the result would be a greater per-

TDI CC 0216

(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.E) TWIA 0516

centage premium surcharge and not an unpredictable revenue stream. Second, to the extent that such reporting did raise a concern, the lenders would require an additional contractual coverage requirement (an amount required to be collected annually in excess of the principal, interest and expenses due on the public securities) to cover any uncertainty in the revenue stream. To the extent that an additional contractual coverage amount was required, any excess class 2 premium surcharge revenue would be distributed annually as provided in the Insurance Code §2210.611. Thus, marketability of the bonds would not be endangered.

Section 5.4183. A commenter suggests that there are some constitutional problems with increasing the default allocation percentages three percent per year.

Agency Response. The Department does not agree with the suggestion; however, as discussed in prior comments, the allocation method discussed in the comment has been removed from the text and therefore further discussion is unnecessary.

Section 5.4183. A commenter recommends the insured's appeal option be removed from the rule because allowing the insured an opportunity to object to the allocation methodology will require a burdensome, manual process to implement and to respond to objections.

Agency Response. As previously discussed in these responses to comments, §5.4183 has been changed. The premium surcharge will be based on the insured's allocated property premium, or if such information is unavailable, the information provided by the insured. Therefore, because the information is provided by the insured, the requirements concerning an objection by the insured have been removed.

Section 5.4184(b). Several commenters suggest that the requirement in §5.4184(b) be amended to not require an additional premium surcharge upon reinstatement or reissuance of a policy, such as is authorized in the Insurance Code §551.106.

Agency Response. The Department agrees with the suggestion and has changed §5.4184(b) but has adopted the term "reinstated" for use in this section, rather than "reissued." The Department considers a policy to be "reinstated" if it covers the same period as the original policy without a lapse in coverage, except as provided in the Insurance Code §551.106. In this context, policies that do not meet this definition of reinstated, regardless of what the practice is called, are subject to an additional surcharge.

Section 5.4184(c) and (d). Several commenters asked for clarification concerning the meaning of §5.4184(c) as it relates to "all transactions on a policy occurring within a seven day period."

Agency Response. The purpose of the language in §5.4184(c) regarding "all transactions on a policy occurring within a seven day period" is to recognize that multiple related transactions on a policy may occur over the course of several days. The purpose is to allow insurers to combine the premium effect of all policy transactions over a short period of time to determine the amount of any additional premium that may apply to the policy. For example, an insured may add a new vehicle to a policy and several days later delete an old vehicle. The purpose is to allow insurers to "net out" these transactions before determining if an additional premium surcharge is required. The Department is aware that this may result in additional programming and systems costs to insurers, however, it should also reduce conflicts between insurers and insureds related to the order transactions are completed and concepts of continuous coverage.

§5.4184(c) and (d). A commenter recommended that a "fixed dollar amount threshold" mechanism be substituted for the "seven day" trigger mechanism for mid-term policy changes to eliminate unnecessarily "de minimus" mid-term premium increase resulting in additional premium surcharges.

Agency Response. The Texas Insurance Code §2210.613 requires the premium surcharge on the policy premium. The rule requires a premium surcharge be applied to any additional premium. If this provision were not included, insureds could attempt to reduce their surcharge by purchasing minimal coverage initially and then immediately adding additional coverage to that policy. As for the amount of the additional premium and the premium surcharge, many insurers already have rules in place that waive additional or return premiums for what may be considered "de minimus" amounts. Thus, the insurer has already determined that any additional (or return) premium is above a "de minimus" amount. For additional premiums, the insurer has determined it is worth the cost of collecting the additional premium, as such, an additional surcharge should also be collected in these cases.

Section 5.4184(e) and (f). Several commenters assert that §5.4184(f) is inconsistent with the statutory provisions providing that the premium surcharge is nonrefundable because it allows a refund of a premium surcharge based on a preliminary deposit premium if "after exposure or premium audit, retrospective rating adjustment, or other similar adjustment after policy expiration, the deposit premium exceeds the actual premium . . . ". The commenters also noted that the rule allowed for a refund of the premium surcharge under §5.4184(f) but not for a mid-term policy change under §5.4184(e).

Agency Response. The Department disagrees with the assertion and considers the section to be consistent with the statute. In the case of a policy subject to audit or retrospective rating adjustments, the premium paid at policy inception is merely a "deposit premium" and not the "policy premium." In this case there is the expectation of the insurer and insured that the "policy premium" will be determined after retrospective rating adjustments or audit adjustments. This differs from a mid-term adjustment to the policy premium, because there was no expectation that the premium paid at the policy inception would later be adjusted and the actual premium would be determined after the policy expired. Thus, no changes have been made in response to this comment.

Section 5.4184(f). A commenter asserts that §5.4184(f), will require insurers to incur additional costs to develop software, systems and procedures necessary to identify and determine audited policies, cancelation return premium, and mid-term change return premium that would not be subject to surcharge premium.

Agency Response. The Department disagrees with the commenter's assertion because §5.4184(f) only applies to an audit adjustment that results from an audit after the policy expires. Thus, §5.4184(f) should not result in new costs to the insurer based on determining cancelation return premium and mid-term change return premium.

Section 5.4186(a). Several commenters recommend that the rule be revised to designate the Surplus Lines Stamping Office of Texas (SLSOT) as the primary source of collection and reporting surplus lines information required under §5.4186. A commenter points out that SLSOT currently collects data related to surplus lines transactions and that the information required to be

TDI CC 0217

(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.E) TWIA 0517

reported under these sections could be piggybacked on to that reporting process.

Agency Response. Such an action would require amending the SLSOT's plan of operation, which was not contemplated in the proposal or evaluated for cost. The Department will continue to receive information related to whether the SLSOT should be required to collect the information related to surplus lines insurers. The section was not changed in response to this comment.

Section 5.4186(a). A commenter recommends that the rule be changed to state that the responsibility for reporting and surcharges may not be shifted to the surplus lines agent by contract. The commenter proposes the following language: "[A]n affiliated surplus lines insurer may not delegate to a surplus lines agent any duty of the insurer under these Rules, except as otherwise authorized by Chapter 981, Insurance Code, or these Rules."

Agency Response. The Department disagrees that the suggested change is necessary at this time. Section 5.4186(a) already makes clear that surplus lines insurers will ultimately be held responsible for the failure of its agents to comply with these rules. Additional language stating what may and may not be placed in a contract between an insured and its agent as a result of these rules is not necessary.

Section 5.4186(b). Several commenters argue that the insurers and surplus lines agents should be given additional time to remit surcharges under §5.4186(b). One commenter suggested the deadline should be extended to 30 or 45 days after the end of the month. Another commenter suggested that the deadline for surplus lines agents should be extended to 60 days after the end of the month.

Agency Response. The Department agrees that the deadline should be extended to provide insurers, including surplus lines agents allowed by affiliated surplus lines insurers to remit the surcharges on their behalf, additional time to remit surcharges to the Association. Therefore §5.4186(b) has been changed to provide insurers and surplus lines agents until the end of the following month to remit surcharges to the Association.

Section 5.4189. A commenter suggests that the proposed notice required under §5.4189 is not consumer friendly and should be revised.

Agency Response. The Department has revised the notice based in part on suggested language from the commenter. The bracketed area of the revised notice allows the insurer the option of including the amount of the surcharge, as required by §5.4189(b), either in this notice or a separate document.

Section 5.4189. A commenter requests that §5.4189 be amended so that insurers are not required to provide notice to "applicants" and that notification must only be provided on the issuance or renewal of a policy.

Agency Response. The Department agrees that it is not necessary to require the notice to applicants and that the notice must be provided only upon policy issuance. The policy is purchased and priced for its intended term. The premium surcharge is a statutory requirement in addition to the price of the policy. Further, the additional information required under proposed §5.4189(c) has been deleted because, as provided in the changes to §5.4183, the method of determining the allocation percentage will either be determined by the insured based on their commercial property policy, or based on information provided by the insured. This makes the requirement that insurers notify their insureds of their right to dispute the allocation percentage unnecessary.

Section 5.4189(c). A commenter recommends that §5.4189 be revised to triple the time periods for satisfying the surcharge notice requirement when a policy is provided by a surplus lines agent.

Agency Response. The Department agrees that the proposed 10-day time period may have been too aggressive for all situations. Therefore, §5.4189(d) has been amended to give insurers 20 days after a mid-term change before an additional notice is required. The time period remains the same for all insurers and surplus lines insurers.

Section 5.4190. Several commenters suggest that the §5.4190 requirement for insurers to report surcharge collections may present implementation challenges because some insurers do not reconcile against amounts actually collected from insureds but instead track and reconcile to billed surcharges. The commenters request that the section allow sufficient time for implementation.

Agency Response. The Department agrees that insurers will require time to program and implement this requirement. As provided in the changes to §5.4171, this section shall not become effective until June 1, 2011, for all lines of insurance subject to §5.4182 of this division and October 1, 2011 for all other lines subject to §§5.4171 - 5.4173 and 5.4181 - 5.4192 of this division. Additionally, §5.4190 has been changed to require the report 90 days after the end of calendar year.

Section 5.4190(b). A commenter suggests that the 60-day period for filing the report required under §5.4190(b) is unworkable because surcharges are collected based on the effective date of policies written in the surcharge period, thus making it possible (and likely) that surcharge collection will continue long after the end of the calendar year.

Agency Response. The Department disagrees that surcharges will be routinely collected long after the end of the calendar year. As provided in §5.4185(b), insurers must apply money received from the insured to the premium surcharge prior to applying funds to premium or any other obligations. Section 5.4185(b)(1) clarifies this requirement by prohibiting insurers from allocating pro-rata or otherwise mixing premium surcharges with premium over installment plan payments. Thus, except for possible additional surcharges due to mid-term policy changes, insurers will not collect surcharges over the life of the policy, but rather upon policy inception. Mid-term policy changes, and adjustments for policies based on premium audits or retrospective rating occurring in a subsequent year would be reported on the subsequent year's annual report. As to the proposed 60-day period, §5.4190 has been changed to require the report 90 days after the end of the calendar year.

Section 5.4190(c). A commenter assumes that the SLSOT would make the report required under §5.4190 on behalf of affiliated surplus lines insurers when possible.

Agency Response. The Department disagrees that §5.4190 establishes such a reporting requirement. Section 5.4190 does not require SLSOT to make any changes to its reporting system or report on behalf of affiliated surplus lines insurers. However, §5.4190 does not prohibit SLSOT from reporting on behalf of surplus lines insurers if SLSOT and the insurer agree to such an arrangement.

TDI CC 0218

(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.E) TWIA 0518

Section 5.4190(e). A commenter asks that the purpose of the distinction between surcharges determined under subparagraphs (A), (B), and (C) of §5.4190(e)(4) be clarified. The commenter suggests that it seems sufficient to provide the allocation of total premium to the catastrophe area and of total premium outside the catastrophe area. Further, requiring additional layers of reporting is not necessary under HB 4409 and will vastly increase the cost and time needed to enhance insurer computer systems.

Agency Response. The Department agrees that §5.4190 can be simplified by combining §5.4190(e)(4)(A) - (C) under subparagraph (A) and redesignation of subparagraph (D) as subparagraph (B).

Section 5.4190 and §5.4191. A commenter notes that because the annual premium surcharge report and annual premium surcharge reconciliation report ask for premium written in the calendar year, as well as premium surcharges collected in the calendar year, these figures are never going to reconcile because written premium is different from collected premium. For example, if a company writes a policy in December the company would report the full annual premium as written premium. But if the premium were billed on an installment basis, the company would only be allowed to collect surcharge on the first installment of premium.

Agency Response. The Department agrees that in some instances there may be mismatches between calendar year written premium and surcharges collected for the same period of time. However, the reports provide useful information for the Department and Association concerning the collection of premium surcharges. The Department does not consider it necessary at this time for insurers to incur additional costs to enhance the reconciliation of these reports.

The Department disagrees with the statement in the example that under an installment plan only one month of the surcharge would have been collected. As previously discussed, §5.4185(b) requires insurers to apply money received from the insured to the premium surcharge prior to applying funds to premium or any other obligations. Section 5.4185(b)(1) clarifies this requirement by prohibiting insurers from allocating pro-rata or otherwise mixing premium surcharges with premium over installment plan payments.

Section 5.4190 and §5.4191. A commenter argues that there is no apparent reason for requiring information by line under §5.4191, but requiring it by line adds a huge cost for each insurer trying to comply with this regulation. The annual premium surcharge report requires insurers to report collected premium surcharges by line of business and requires insurers to provide information at the policy and risk level, including any alternative allocation percentages used, which represents a significant issue, since any alternative method will be a manual calculation resulting only in a surcharge amount being booked.

Agency Response. The Department disagrees that the requirement that insurers report by line of business requires insurers to provide information at the policy and risk level. However, the Department agrees that it is not necessary at this time to collect this data by line of business. As such §5.4190 and §5.4191 have been changed to remove the requirement that these reports be provided by line of business.

Section 5.4192. A commenter suggests that implementing the requirements in §5.4192 will take a significant amount of time and suggests that the proposed October 1, 2010 effective date under §5.4192 be postponed until March 1, 2011.

Agency Response. As previously discussed in the responses to comments, the Department agrees that implementation of the §5.4192 will involve a significant amount of time. Therefore the implementation date for this section has been established as follows: (1) for policies subject to §5.4182, compliance is required for all policies *in force* on or after October 1, 2011; and (2) for policies subject to §5.4183, compliance is required for all policies effective on or after October 1, 2011.

Section 5.4192. A commenter suggests that §5.4192 should be revised to require that the Department initially obtain the information required from affiliated surplus lines insurers through the stamping office, and that the stamping office amend its procedures to facilitate such collection, maintenance, and reporting of information.

Agency Response: The Department declines to make the suggested change. Section §5.4192(c) states the Department's intent to utilize SLSOT as a resource when it is possible and practical. The described change, however, would require the Department to amend SLSOT's plan of operation, which was not contemplated in the proposed rules or evaluated for costs. The Department will continue to receive information related to whether the SLSOT is best to collect the information related to surplus lines insurers. Therefore, the Department has not made any changes in response to this comment.

Section 5.4192. A commenter requests confirmation that §5.4192(a) - (c) establishes that the duty of collecting, maintaining and reporting the required information is on the insurer and that the proposed rules impose no similar or related duty on surplus lines agents.

Agency Response. Section 5.4192(a) - (c) establishes the requirements set forth in that section. It is not intended that this section require a surplus lines agent to assume the duties of a surplus lines insurer.

Section 5.4192. A commenter requests confirmation that the §5.4192(b) requirement that each insurer shall collect, maintain, and report sufficient data records . . . "[f]or policies with effective dates on or after October 1, 2010 . . ." means that the data collection, maintenance and reporting duties are to be performed by insurers on a "go forward" basis beginning on October 1; and apply to policies with an "inception date" or "renewal date" on or after October 1, and not those policies merely in force on that date.

Agency Response. Section 5.4192(b) has been changed to modify the reporting requirement and provide an extension for insurers using the allocation methodology established in §5.4183. Proposed §5.4192(b) established the requirement for all policies with effective dates on or after October 1, 2010. This requirement in §5.4192(b) has been revised to provide as follows: (1) for policies subject to §5.4182, compliance is required for all policies *in force* on or after October 1, 2011; and (2) for policies subject to §5.4183, compliance is required for all policies effective on or after October 1, 2011.

The change is necessary because it is possible that there may be a catastrophic event in 2011. The TPFA will need reliable catastrophe area premium information to secure the issuance of any public securities that may be issued under the Insurance Code §2210.073. Additionally, if a surcharge is needed, the Commissioner and the Association must be able to obtain reliable catas-

TDI CC 0219

(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.E) TWIA 0519

trophe area premium information in a timely manner in order to determine any necessary premium surcharge percentage. Further, it is anticipated that the lines of insurance subject to §5.4182 will make up the bulk of the catastrophe area premium.

As previously discussed, for lines of insurance subject to §5.4182, insurers already know, or should already know, the geographic location of these risks. In addition, for residential and commercial property lines of insurance, insurers should know premiums attributable to risks located in the catastrophe area.

The Department recognizes that for lines of insurance other than residential and commercial property, insurers may not know whether a Harris County insured is located within those portions of Harris County designated as a catastrophe area. The Department believes the October 1, 2011 date provides sufficient time for insurers to make this determination for policies in force on that date.

For lines of insurance subject to §5.4183, insurers may not know the geographic location of their insureds. Thus, the requirement for compliance with §5.4192 is extended to apply to those policies effective on or after October 1, 2011.

NAMES OF THOSE COMMENTING AGAINST THE SECTIONS.

Against, with changes: American Insurance Association; Association of Fire and Casualty Companies of Texas; Casey, Gentz & Magness, L.L.P.; Insurance Council of Texas; Liberty Mutual Insurance Company; Office of Public Insurance Counsel; Property and Casualty Insurers of America; Surplus Lines Stamping Office of Texas; Texas Surplus Lines Association, Inc.; The Surety and Fidelity Association of America; and Travelers.

STATUTORY AUTHORITY. The sections are adopted under the Insurance Code §§2210.008, 2210.052, 2210.053, 2210.071, 2210.072, 2210.073, 2210.074, 2210.151, 2210.152, 2210.609, 2210.613, 2210.6135, and 36.001. Section 2210.008(b) authorizes the Commissioner to adopt reasonable and necessary rules in the manner prescribed in Subchapter A, Chapter 36, Insurance Code.

The Insurance Code §2210.052(a) requires that a member company share in the losses and expenses of the Association based on the proportion that the net direct premiums of that member during the preceding calendar year bears to the aggregate net direct premiums by all members of the Association. Under the Insurance Code §2210.052(c), a member company's share of the losses and expenses of the Association is required to be determined annually and in the manner provided by the plan of operation. In the determination of a member company's share of the losses and expenses of the Association, the Insurance Code §2210.052(d) specifies that members are entitled to a credit for insurance voluntarily written in the catastrophe areas. The Insurance Code §2210.052(d) also requires that the method for calculating the credit be contained in the plan of operation.

Section 2210.052(e) provides an exemption from participation in any insured losses and operating expenses of the Association in excess of premium and other revenue of the Association until the second anniversary of the date on which the insurer first becomes a member of the Association for an insurer that becomes a member of the Association and that has not previously been a member of the Association. The Insurance Code §2210.053(b) provides the Department may develop a program designed to create incentives for insurers to write voluntary windstorm and hail insurance in the catastrophe areas.

Section 2210.071(a) provides that if an occurrence or series of occurrences in a catastrophe area results in insured losses and operating expenses of the Association in excess of premium and other revenue of the Association, the excess losses and operating expenses shall be paid as provided by Subchapter B-1, Chapter 2210, Insurance Code. Section 2210.072(a) provides that losses not paid under the Insurance Code §2210.071 shall be paid as provided by §2210.072 from the proceeds from class 1 public securities. Section 2210.072(b) authorizes class 1 public securities to be issued in a principal amount not to exceed $1 billion per year. Section 2210.072(c) requires class 1 public securities to be repaid in the manner prescribed by Subchapter M, Chapter 2210, Insurance Code, from Association premium revenue.

Section 2210.073 provides that losses not paid under Insurance Code §2210.072 shall be paid as provided by §2210.073 from the proceeds from class 2 public securities issued in accordance with Subchapter M, Chapter 2210, Insurance Code. Section 2210.073(b) authorizes class 2 public securities to be issued in a principal amount not to exceed $1 billion per year and requires class 2 public securities to be repaid in the manner prescribed by Subchapter M, Chapter 2210, Insurance Code. Section 2210.074(a) provides that losses not paid under Insurance Code §2210.072 and §2210.073 shall be paid as provided by §2210.074 from the proceeds from class 3 public securities issued in accordance with Subchapter M, Chapter 2210, Insurance Code. Section 2210.074(b) authorizes class 3 public securities to be issued in a principal amount not to exceed $500 million per year and requires class 3 public securities to be repaid in the manner prescribed by Subchapter M, Chapter 2210, Insurance Code.

Section 2210.151 authorizes the Commissioner to adopt the Association's plan of operation to provide Texas windstorm and hail insurance coverage in the catastrophe area by rule. Section 2210.152 provides that the Association's plan of operation provide for the efficient, economical, fair, and nondiscriminatory administration of the Association and include both underwriting standards and other provisions considered necessary by the Department to implement the purposes of Chapter 2210. The Insurance Code §2210.152(a)(2)(A) requires the plan of operation to include a plan for the equitable assessment of the members of the Association to defray losses and expenses.

Section 2210.609 provides that the Association shall repay all public security obligations from available funds, and if those funds are insufficient, from revenue collected in accordance with the Insurance Code §§2210.612, 2210.613, and 2210.6135. Section 2210.609 further provides that the Association shall deposit all revenue collected under §§2210.612, 2210.613, and 2210.6135 in the public security obligation revenue fund and further provides for the payment of the public security obligations and the public security administrative expenses by irrevocably pledging revenues received from premiums, premium surcharges, and amounts on deposit in the public security obligation revenue fund, together with any public security reserve fund.

Section 2210.613 provides that the Association shall pay class 2 public securities issued under §2210.073 with premium surcharges and member assessments as provided by §2210.613. Section 2210.6135 provides that the Association shall pay class 3 public securities issued under Section §2210.074 as provided

TDI CC 0220                    (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.E) TWIA 0520

by §2210.6135 through member assessments. Section 36.001 provides that the Commissioner of Insurance may adopt any rules necessary and appropriate to implement the powers and duties of the Texas Department of Insurance under the Insurance Code and other laws of the state.

*§5.4161.    Member Assessments.*

(a)    The Association shall determine if a member assessment is necessary to fund the Association's outstanding class 2 and class 3 public security obligations, including any required contractual coverage amount (required obligations) based upon the evaluation of information that is provided to the Association by the Texas Public Finance Authority.

(b)    Pursuant to Insurance Code Chapter 2210 and the Association's plan of operation, if the Association determines that a member assessment is required to fulfill the Association's required obligations the Association shall assess the members of the Association in an amount the Association determines to be reasonable and necessary to fully provide for the Association's required obligations.

(c)    This section and §§5.4162 - 5.4167 of this division (relating to Amount of Assessment; Notice of Assessment; Payment of Assessment; Failure to Pay Assessment; Contest After Payment of Assessment; and Inability to Pay Assessment by Reason of Insolvency, respectively) are a part of the Texas Windstorm Insurance Association's plan of operation and shall control over any conflicting provision in §5.4001 of this subchapter (relating to Plan of Operation).

*§5.4162.    Amount of Assessment.*

(a)    The Association shall determine which members of the Association shall participate in any assessment to provide for the Association's required obligations as determined under §5.4161 of this division (relating to Member Assessments).

(1)    The Association may not include in the assessment an insurer that became a member of the Association after September 1, 2009, and had not previously been a member of the Association, until after the second anniversary of the date on which the insurer first becomes a member of the Association. The anniversary date shall be the date the insurer is authorized by the department to engage in the business of property insurance in this state.

(2)    The Association shall include in the assessment an insurer described under paragraph (1) of this subsection after the second anniversary of the date on which the insurer first becomes a member of the Association without regard as to whether the catastrophic event that gave rise to the class of public securities occurred prior to the second anniversary of the date on which the insurer first became a member of the Association.

(3)    The Association may not include in the assessment formula, the net direct premium of an affiliate insurer engaged in the business of surplus lines insurance as described in the Insurance Code §2210.052(c), that a federal agency or court of competent jurisdiction determines to be exempt from the assessment formula under the Insurance Code Chapter 2210.

(b)    This determination shall be computed on a calendar year basis for the year in which the assessment is made. This determination shall not be based on the year in which the catastrophic event occurred, except for an assessment made during that year. Net direct premiums shall be determined as provided under §5.4001 of this subchapter (relating to Plan of Operation).

(c)    The designated members of the Association shall participate in any assessment levied in the proportion that the net direct premiums of such member written in this state during the preceding calendar year bears to the aggregate net direct premiums written in this state by all members of the Association as furnished to the Association by the department after review of annual statements, other reports, and required statistics; provided, however, that if at the time of such assessment the department has not furnished to the Association information necessary to compute a member's participation during the preceding calendar year, then each member's participation shall be based upon information furnished to the Association from the last calendar year in which such information is available and, upon obtaining the necessary information from the department, the Association shall reassess or refund to each member such amounts as are necessary to properly reflect such member's participation; provided, further, that a member shall be entitled to receive the following credit for insurance, similar to catastrophe insurance, written in such catastrophe areas.

(d)    The Figure: 28 TAC §5.4162(d) graphically depicts the Texas Windstorm Insurance Association Procedure For Calculating Member Assessment Percentages Including Credit For Voluntary Writings. All premiums are for the most recent preceding calendar year ending December 31, as furnished by the department. Column 1(a): Statewide net direct premiums for extended coverage and other allied lines. Column 1(b): Statewide net direct premiums for extended coverage and other allied lines portion of the multiple peril line. Column 1(c): Statewide net direct premiums for homeowners and farm and ranch owners. Column 2: The sum of the statewide net direct premiums at 90% of the extended coverage and other allied lines, and 50% of the homeowners and farm and ranch owner's, or such percentage as may be determined in accordance with §5.4001(a)(2)(N)(i)(III) of this chapter (90% of Column 1(a) plus 90% of Column 1(b) plus 50% of Column 1(c)). Column 3: Each company's percentage of the net direct premiums as described in Column 2, which is the basis for indicating normal required participation in the Association prior to credits for voluntary writings in the designated areas. Column 4: Total windstorm and hail premiums in the designated areas (Association premiums plus voluntary premiums). Column 5: Normal company quota of total windstorm and hail premiums (Column 3 x Column 4). Column 6: Each company's voluntary writings in the designated areas multiplied by the same percentages as shown in Column 2. Note: Maximum credit shall be limited to company's normal quota. Column 7: Each company's maximum possible allocation after applying credits for voluntary writings (Column 5 minus Column 6). Negative allocation to be shown as zero. Column 8: Percentage participation of each member company in the Association, prior to application of offset. Note: The offset figure measures the excess premiums developed by the maximum credit in Column 6. Column 9: Percentage participation of each member company in the Association.
Figure: 28 TAC §5.4162(d)

(e)    The department shall furnish to the Association the amount of net direct premiums of each member company written on property in this state and the aggregate net direct premiums written on property in this state by all member companies during the preceding calendar year as reported by member companies to the department. Within a reasonable time after the receipt of same from the department, the Association shall notify each member company, in writing, sent by certified mail, the amount of the net direct premiums written on property in this state during the preceding calendar year by the member company to whom notice is given, including the net direct premiums of similar insurance voluntarily written in the catastrophe areas, upon which such company's percentage of participation will be determined. Such notice shall state that such notification, and the content thereof, is an act, ruling, or decision of the Association and that the member company to whom such notice is given shall be entitled to appeal such act, ruling, or decision within 30 days from the date shown on the notice in accordance with the Insurance Code §2210.551. Thereafter, the Association shall determine the percentage of participation for each mem-

TDI CC 0221                                    (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.E) TWIA 0521

ber company in the manner provided in this section and shall notify each member company thereof, in writing, sent by certified mail. Such notice shall state that such notification, and the content thereof, is an act, ruling, or decision of the Association insofar as the mathematical determination of the percentage of participation is concerned and that the member company to whom such notice is given shall be entitled to appeal therefrom within 30 days from the date of such act, ruling, or decision as shown on said notice in accordance with the Insurance Code §2210.551.

(f)   To assist the Association in determining each member insurer's percentage of participation as soon as possible in the calendar year, each member insurer shall furnish to the Association on or before March 1 of each year a copy of its Exhibit of Premiums and Losses (Statutory Page 14) for the State of Texas that is filed annually with the department as part of the insurer's Texas Property and Casualty Annual Statement.

*§5.4167.   Inability to Pay Assessment by Reason of Insolvency.*

In the event a member of the Association is placed in temporary or permanent receivership under order of a court of competent jurisdiction based upon a finding of insolvency, and such member has been designated an impaired insurer by the commissioner, and in the event it is necessary to obtain additional funds to provide for operating expenses and losses in the year the insurer is declared impaired, the aggregate net amount not recovered from such insolvent insurer shall be reallocated among the remaining members of the Association in accordance with the method of determining participation as determined in the plan of operation.

*§5.4171.   Premium Surcharge Requirement.*

(a)   Following a catastrophic event, insurers may be required to assess a premium surcharge under the Insurance Code §2210.613(b) and §2210.613(c) on all policyholders with property and casualty insurance policies that provide coverage on premises, operations, or insured property located in a catastrophe area. This requirement applies to admitted insurers, the Association, the Texas FAIR Plan Association, Texas Automobile Insurance Plan Association policies, affiliated surplus lines insurers, and includes policies independently procured from affiliated insurers.

(b)   This section and §§5.4172, 5.4173 and 5.4181- 5.4192 of this division (relating to Premium Surcharge Definitions, Determination of the Surcharge, Premiums to be Surcharged, Allocation Method for Specified Lines of Insurance, Allocation Method for Other Lines of Insurance, Application of the Surcharges, Premium Surcharges are Mandatory, Remittance of Premium Surcharges, Offsets, Surcharges not Subject to Commissions or Premium Taxes, Notification Requirements, Annual Premium Surcharge Report, Premium Surcharge Reconciliation Report, and Data Collection, respectively) do not apply to policies written and reported under the following annual statement lines of business:  federal flood; medical malpractice; group accident and health; all other accident and health; workers' compensation; excess workers' compensation, and surety.

(c)   This section and §§5.4172, 5.4173 and 5.4181 - 5.4192 of this division do not apply to:

(1)   a farm mutual insurance company operating under the Insurance Code Chapter 911;

(2)   a nonaffiliated county mutual fire insurance company described by the Insurance Code §912.310 that is writing exclusively industrial fire insurance policies as described by the Insurance Code §912.310(a)(2);

(3)   a mutual insurance company or a statewide mutual assessment company engaged in business under Chapter 12 or 13, Title

78, Revised Statutes, respectively, before those chapters' repeal by §18, Chapter 40, Acts of the 41st Legislature, 1st Called Session, 1929, as amended by Section 1, Chapter 60, General Laws, Acts of the 41st Legislature, 2nd Called Session, 1929, that retains the rights and privileges under the repealed law to the extent provided by those sections; and

(4)   premium and policies issued by an affiliated surplus lines insurer that a federal agency or court of competent jurisdiction determines to be exempt from a premium surcharge under the Insurance Code Chapter 2210.

(d)   For all lines of insurance subject to §5.4182 of this division (relating to Allocation Method for Specified Lines of Insurance) this section, §§5.4172, 5.4173 and 5.4181 - 5.4192 of this division are effective June 1, 2011.

(e)   For all other lines, this section, §§5.4172, 5.4173 and 5.4181 - 5.4192 of this division are effective October 1, 2011.

*§5.4172.   Premium Surcharge Definitions.*

The following words and terms when used in §§5.4171, 5.4173 and 5.4181 - 5.4192 of this division (relating to Premium Surcharge Requirement, Premiums to be Surcharged, Allocation Method for Specified Lines of Insurance, Allocation Method for Other Lines of Insurance, Application of the Surcharges, Premium Surcharges are Mandatory, Remittance of Premium Surcharges, Offsets, Surcharges not Subject to Commissions or Premium Taxes, Determination of the Surcharge, Notification Requirements, Annual Premium Surcharge Report, Premium Surcharge Reconciliation Report, and Data Collection, respectively) shall have the following meanings unless the context clearly indicates otherwise:

(1)   Affiliated insurer--An insurer that is an affiliate, as described by the Insurance Code §823.003, of an insurer authorized to engage in the business of property or casualty insurance in the State of Texas. Affiliated insurer includes an insurer not authorized to engage in the business of property or casualty insurance in the State of Texas.

(2)   Affiliated surplus lines insurer--An eligible surplus lines insurer that is an affiliate, as described by the Insurance Code §823.003, of an insurer authorized to engage in the business of property or casualty insurance in the State of Texas.

(3)   Exposure--The basic unit of risk that is used by an insurer to determine the insured's premium.

(4)   Insured property--Real property, or tangible or intangible personal property, including automobiles, covered under an insurance policy issued by an insurer.

(5)   Insurer--Each property and casualty insurer authorized to engage in the business of property or casualty insurance in the State of Texas and an affiliate of such an insurer, as described by the Insurance Code §823.003, including an affiliate that is not authorized to engage in the business of property or casualty insurance in the State of Texas, the Association, and the Texas Fair Access to Insurance Requirements Plan Association. The term specifically includes a county mutual insurance company, a Lloyd's plan, and a reciprocal or interinsurance exchange.

(6)   Operations--A person's interest in property, or activities, that may result in, or give rise to, a loss that is insurable under a property or casualty insurance policy, including the use of a automobile; ownership, lease, or occupancy of a residence or other real property; and activities performed by a person in connection with the manufacture, distribution, or sale of goods or services. A person is considered to have operations in the catastrophe area if the person maintains an automobile or physical location in the catastrophe area, regardless

TDI CC 0222   (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.E) TWIA 0522

of whether that location is owned, leased, rented, or occupied by the person.

    (7)   Premises--A physical location where a person resides, or owns, leases, rents, or occupies real property, or has operations.

    (8)   Premium surcharge percentage--The percentage amount determined by the commissioner under §5.4173 of this division (relating to the Determination of the Surcharge).

### §5.4181. Premiums to be Surcharged.

    (a)   The premium surcharge percentage shall be applied to:

    (1)   amounts reported as premium for the purposes of reporting under the Annual Statement, Exhibit of Premiums and Losses (Statutory Page 14), Texas; and

    (2)   if not reported as described in paragraph (1) of this subsection, those additional amounts collected that are subject to premium taxation by the comptroller, including policy fees not reported as premium; surplus lines premium tax; and independently procured premium tax.

    (b)   Premium surcharges do not apply to fees that are neither reported as premium in the Annual Statement, Exhibit of Premiums and Losses (Statutory Page 14), Texas, nor subject to premium taxation by the comptroller.

### §5.4182. Allocation Method for Specified Lines of Insurance.

    (a)   The methods addressed in this section shall apply to all:

    (1)   policies written and reported under the following annual statement lines of business: fire; allied lines; multi-peril crop; farmowners; homeowners; commercial multi-peril (property); commercial multi-peril policies written on an indivisible premium basis, regardless whether reported as commercial multi-peril (property) or commercial multi-peril (liability); earthquake; private passenger auto no fault (personal injury protection (PIP)), other private passenger auto liability, and private passenger auto physical damage; and commercial auto no fault (personal injury protection (PIP)), other commercial auto liability, and commercial auto physical damage for policies where the premium is determined based on the geographic location of the exposures, or where the automobiles are principally garaged; boiler and machinery; burglary and theft;

    (2)   personal and residential policies, including boat owners, personal liability, personal umbrella, and personal inland marine policies; and

    (3)   personal and commercial risks assigned by the Texas Automobile Insurance Plan Association (TAIPA) pursuant to the Insurance Code Chapter 2151.

    (b)   If the policy is rated based on the geographic location of the insured's premises, operations, or insured property, the premium surcharge shall be determined by applying the premium surcharge percentage to the policy premium determined in §5.4181 of this division (relating to Premiums to be Surcharged), attributable to premises, operations, or insured property located in the catastrophe area.

    (c)   In cases where the policy is not rated based on the geographic location of the insured's premises, operations, or insured property, the insurer shall allocate premium to the catastrophe area based on the proportion the exposure in the catastrophe area bears to the total exposure on the policy. The premium surcharge percentage shall apply to that portion of the policy premium allocated to the catastrophe area.

### §5.4183. Allocation Method for Other Lines of Insurance.
For all other applicable lines of insurance not specified in §5.4182 of this division (relating to Allocation Method for Specified Lines of Insurance) the surcharge shall be determined as follows:

    (1)   For lines of insurance where, as part of its normal underwriting, rating, or data collection processes, the insurer has sufficient information to determine the premium or exposure for each location, or can otherwise reasonably allocate premium to the catastrophe area, the insurer shall use the direct allocation methods set forth in §5.4182 of this division and determine the premium surcharge amount by applying the premium surcharge percentage to the premium attributable to the catastrophe area.

    (2)   For other lines and types of insurance not included in paragraph (1) of this section, and where the insurer, including an affiliate, provides insurance to the named insured covering real property and/or tangible personal property under a commercial property policy or a commercial multi-peril policy, regardless whether such coverage is provided on a monoline or multi-peril basis, the premium surcharge shall be determine as follows:

    (A)   The insurer shall determine the catastrophe area allocation percentage as the proportion of premium attributable to the catastrophe area for property insured under the commercial property or commercial multi-peril policy.

    (B)   The premium surcharge shall be determined by multiplying the total Texas premium by the catastrophe area allocation percentage and the premium surcharge percentage.

    (3)   For other lines, and types of insurance not included in subsection (a) of this section, and where neither the insurer nor an affiliate of the insurer provides insurance to the named insured covering real property and/or tangible personal property under a commercial property policy or a commercial multi-peril policy, the premium surcharge shall be determined as follows:

    (A)   Prior to the effective date of each new policy, and at the renewal of each renewal policy, the insurer shall determine from the insured the catastrophe area allocation percentage. The catastrophe area allocation percentage is determined as the proportion of premium attributable to the catastrophe area for property insured under the commercial property or commercial multi-peril (property) policy or the percentage of self-insured premium attributable to property located in the catastrophe area in the case where the insured is self-insured.

    (B)   The premium surcharge shall be determined by multiplying the total Texas premium by the catastrophe area allocation percentage and the premium surcharge percentage.

    (C)   Information required to be collected by insurers under subparagraph (A) of this paragraph shall be collected regardless whether or not a premium surcharge is in effect on the effective date, in the case of new policies, or the renewal date, in the case of renewal policies.

    (D)   Insurers are not required to verify or otherwise determine the reasonableness of information provided to them under subparagraph (A) of this paragraph.

### §5.4184. Application of the Surcharges.

    (a)   When assessed under the Insurance Code §2210.613, the premium surcharges shall apply to all policies with premises, operations, or insured property in the catastrophe area that are issued or renewed with effective dates in the assessment period specified in the commissioner's order, with two exceptions:

    (1)   insurers shall not surcharge policies, and are not responsible for collecting premium surcharges on policies, that did not go into effect or were cancelled as of the inception date of the policy; and

    (2)   for multi-year policies, the premium surcharge in effect on the effective date of the policy, or the anniversary date of the policy,

TDI CC 0223     (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.E) TWIA 0523

shall be applied to the 12-month premium for the applicable policy period.

(b)   Premium surcharges are non-refundable under the Insurance Code §2210.613.

(1)   If the policy is cancelled, a pro-rata portion of the surcharge is not returned to the policyholder; however,

(2)   an additional surcharge shall not apply to a policy that was cancelled subsequent to the effective date of the policy, and is later reinstated. For purposes of this section a policy is reinstated if it covers the same period as the original policy without a lapse in coverage, except as provided in the Insurance Code §551.106.

(c)   A mid-term policy change consists of all transactions on a policy occurring within a seven day period that result in a change in the premium.

(d)   If a mid-term policy change increases the premium on the policy, insureds must pay an additional surcharge for the increased premium attributable to premises, operations, or insured property in the catastrophe area which shall be determined as follows:

(1)   For policies where the premium surcharge is determined under §5.4182 or §5.4183(1) of this division (relating to Allocation Method for Specified Lines of Insurance and Allocation Method for Other Lines of Insurance), the additional premium surcharge is determined by applying the applicable premium surcharge percentage to that portion of the additional premium attributable to premises, operations or insured property located in the catastrophe area.

(2)   For policies where the premium surcharge is determined under §5.4183(1) and (2) of this division, the additional premium surcharge is determined by applying the premium surcharge percentage and the catastrophe area allocation percentage to the additional premium.

(e)   If a mid-term policy change decreases the premium, there shall be no corresponding decrease in the surcharge or refund of the surcharge.

(f)   Surcharges or refunds shall apply to all premium changes due to exposure or premium audits, retrospective rating adjustments, or other similar adjustments that occur after policy expiration. Upon policy inception, the premium surcharge shall be collected on the deposit premium paid. If after exposure or premium audit, retrospective rating adjustment, or similar adjustment after policy expiration, an additional premium is required, an additional surcharge shall be paid. If after exposure or premium audit, retrospective rating adjustment, or other similar adjustment after policy expiration, the deposit premium exceeds the actual premium, the excess surcharge shall be refunded to the insured, and the insurer may credit any refund paid to the Association through the offset process described in §5.4187 of this division (relating to Offsets). Additional surcharges and refunds shall be determined as follows:

(1)   For policies where the premium surcharge is determined under §5.4182 or §5.4183(1) of this division, the additional premium surcharge (or refund) is determined by applying the premium surcharge percentage in effect on the inception date of the policy, or the anniversary date of the policy in the case of multi-year policies, to the additional premium (or return premium) attributable to the catastrophe area.

(2)   For policies where the premium surcharge is determined under §5.4183(1) and (2) of this division, the additional premium surcharge (or refund) is determined by applying the premium surcharge percentage and the catastrophe area allocation percentage to the additional premium (or return premium).

(g)   Notwithstanding whether a surcharge was in effect on the inception date of the policy, or the anniversary date in the case of multi-year policies, no additional premium surcharges or refunds shall apply to premium changes resulting from exposure or premium audits, retrospective rating adjustments, or other similar adjustments that occur when there is no premium surcharge in effect.

§5.4186.   Remittance of Premium Surcharges.

(a)   Insurers shall remit to the Association the aggregate amount of surcharges paid by its policyholders; however, an affiliated surplus lines insurer may allow a surplus lines agent to remit premium surcharges to the Association on its behalf in accordance with any procedures established by the Association relating to premium surcharge remissions from surplus lines agents.

(b)   Insurers, or surplus lines agents allowed by affiliated surplus lines insurers to remit surcharges pursuant to subsection (a) of this section, shall remit all surcharges paid by its insureds not later than the last day of the month following the month in which the surcharge was received.

(c)   Insurers and agents may not allow, or require, policyholders to make separate payments for the surcharge amounts which are payable to the Association.

(d)   Subsection (b) of this section applies to all insurers regardless of whether the insured paid the premium surcharge through an agent of the insurer or the insured paid the premium surcharge directly to the insurer.

(e)   An affiliated surplus lines insurer who allows an agent to remit premium surcharges to the Association pursuant to subsection (a) of this section may be held liable by the department for the failure of its agent to remit the premium surcharges or timely remit the premium surcharges, pursuant to subsection (b) of this section.

§5.4187.   Offsets.

(a)   An insurer may credit a premium surcharge amount on its next remission to the Association if the insurer has already remitted the amount to the Association for:

(1)   the portion of the surcharge the insurer was not able to collect from the insured prior to the collection of any funds for premium or any other obligation or debt owed to the insurer; or

(2)   the portion of a surcharge paid to the Association in excess of a deposit premium as described in §5.4184 of this division (relating to Application of the Surcharges).

(b)   An agent may not offset payment of a premium surcharge to the insurer for any reason. However, a surplus lines agent allowed by an affiliated surplus lines insurer to remit surcharges to the Association on its behalf under §5.4186(a) of this division (relating to Remittance of Premium Surcharges), may offset as provided in this section.

§5.4189.   Notification Requirements.

(a)   Insurers shall provide written notice to policyholders receiving a premium surcharge that their policy contains a surcharge. The notice shall read: "Texas Insurance Code Sections 2210.073 and 2210.613 require a premium surcharge be added to certain property and casualty insurance policies providing coverage in the catastrophe area to pay the debt service on public securities issued to pay Texas Windstorm Insurance Association claims resulting from a catastrophe event. A premium surcharge {in the amount of $_____} has been added to your premium. This premium surcharge is non-refundable under Texas

TDI CC 0224

Insurance Code Section 2210.613. Should your policy be canceled by you or the insurer prior to its expiration date, the premium surcharge will not be refunded to you. Failure to pay the surcharge is grounds for cancellation of your policy."

(b)   Insurers shall provide written notice to policyholders of the dollar amount of the premium surcharge.

(c)   Notices required under subsections (a) and (b) of this section shall:

(1)   be provided at the time the policy is issued, in the case of new business;

(2)   be provided with the renewal notice, in the case of renewal business;

(3)   be provided within 20 days of the end of the transaction period as specified in §5.4184(c) of this division (relating to Application of the Surcharges) for any mid-term change in the premium surcharge; and

(4)   use at least 12 point font and either be contained on a separate page or shown in a conspicuous location on the declarations page.

§5.4190.   *Annual Premium Surcharge Report.*

(a)   This section does not apply to an insurer that, during the calendar year, exclusively wrote any or all of the following lines of insurance: federal flood insurance; medical malpractice insurance; accident and health insurance; workers' compensation insurance; or surety.

(b)   No later than 90 days following the end of a calendar year in which a premium surcharge was in effect, each insurer shall provide the Association with an annual premium surcharge report for the calendar year. However, an annual premium surcharge report for a given year is not required if premium surcharges were in effect for less than 45 days within the calendar year.

(c)   Annual premium surcharge reports shall provide information for each insurance company writing property or casualty insurance in the State of Texas, including affiliated surplus lines insurers, and affiliated insurers not authorized to engage in the business of insurance that issued independently procured insurance policies covering premises, operations, or insured property in the State of Texas.

(d)   Annual premium surcharge reports shall provide information for all applicable annual statement lines of business for which the insurer reported premium for the applicable calendar year.

(e)   Annual premium surcharge reports shall provide the following information:

(1)   the name and contact information of the individual responsible for submitting the report;

(2)   the five-digit NAIC number of the insurance company;

(3)   the name of the insurance company;

(4)   for policies with effective dates, or multi-year policies with anniversary dates, within the calendar year, separately for each surcharge period in effect during the calendar year, and within each surcharge period in effect during the calendar year for all applicable lines of business:

(A)   For all policies subject to a premium surcharge:

*(i)*   the total written premium attributable or allocated to premises, operations, or insured property in the catastrophe area; and

*(ii)*   the total written premium attributable or allocated to premises, operations, or insured property outside the catastrophe area; and

(B)   the total written premium for policies not subject to a premium surcharge because the insured had no premises, operations, or insured property in the catastrophe area;

(5)   for policies effective in portions of the calendar year when no surcharge period was in effect, or in the case of multi-year policies with an anniversary date in portions of the calendar year when no surcharge was in effect, the total written premium;

(6)   the total amount of premium surcharges collected during the applicable calendar year; and

(7)   the total amount of premium surcharges remitted to the Association during the applicable calendar year.

(f)   The Association shall:

(1)   review the reports submitted under this section as necessary to determine:

(A)   the consistency of premium surcharges actually remitted to the Association with premium surcharges shown in the reports as collected and the premium surcharges shown in the reports as remitted to the Association; and

(B)   the consistency of premiums shown in the reports as attributable to the catastrophe area with premium surcharges shown in the reports as collected by the insurer, given the requirements regarding the determination of premium surcharges in this division;

(2)   inform the department of any insurer the Association believes may not be in compliance with the rules established under this division; and

(3)   before July 1 on each year reports are required to be submitted to the Association, provide an aggregate summary of the reports to the department.

§5.4191.   *Premium Surcharge Reconciliation Report.*

(a)   This section does not apply to an insurer that, during an applicable calendar year, exclusively wrote any or all of the following lines of insurance: federal flood insurance; medical malpractice insurance; accident and health insurance; workers' compensation insurance, or surety.

(b)   Upon the written request of the department, an insurer shall provide the department with a premium surcharge reconciliation report for the year specified by the department in its request.

(c)   Reconciliation reports shall be provided to the department within 10 working days after the date the request is received by the insurer.

(d)   Reconciliation reports shall consist of the following information concerning premiums written and surcharges collected, separately for each applicable surcharge period, including periods in which no premium surcharges were in effect, within the specified year:

(1)   premium written at policy issuance for policies effective within the year, including anniversary dates within the year on multi-year policies, separately for:

(A)   premium subject to a premium surcharge, including premium allocated to the catastrophe area on policies having premises, operations, or insured property both in and outside of the catastrophe area; and

(B)   premium not subject to a premium surcharge, including premium not allocated to the catastrophe area on policies hav-

TDI CC 0225

(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.E) TWIA 0525

ing premises, operations, or insured property both in and outside of the catastrophe area; and

    (2) premium written due to mid-term coverage changes occurring within the specified time period separately for:

        (A) premium increases subject to a premium surcharge, including premium allocated to the catastrophe area on policies having premises, operations, or insured property both in and outside of the catastrophe area; and

        (B) premium not subject to a premium surcharge, including premium increases not allocated to the catastrophe area on policies having premises, operations, or insured property both in and outside of the catastrophe area and premium refunds, whether related to coverage within or without the catastrophe area; and

    (3) total premium due to post-term premium changes occurring within the specified time period, including adjustments due to premium or exposure audits, retrospective rating adjustments, or other similar adjustments that occur after policy expiration, separately for:

        (A) premium subject to a premium surcharge, including premium allocated to the catastrophe area on policies having premises, operations, or insured property both in and outside of the catastrophe area; and

        (B) premium not subject to a premium surcharge, including premium not allocated to the catastrophe area on policies having premises, operations, or insured property both in and outside of the catastrophe area; and

    (4) separately for paragraphs (1)(A), (2)(A), and (3)(A) of this subsection, the amounts of premium surcharges collected; and

    (5) the total amount of written premium for policies written in the State of Texas as reported in the Annual Statement, Exhibit of Premiums and Losses (Statutory Page 14), Texas.

    (e) Nothing in this section limits the department's authority to obtain information from insurers under the Insurance Code.

    (f) A report provided to the department under this section may be provided to the Association.

*§5.4192. Data Collection.*

    (a) The department may request from each insurer the information necessary to enable the department to determine the premium surcharge percentage applicable to insureds with premises, operations, or insured property located in the catastrophe area.

    (b) For lines of insurance subject to §5.4182 of this division (relating to Allocation Method for Specified Lines of Insurance) for policies in force on or after October 1, 2011, and for lines of insurance subject to §5.4183 of this division (relating to Allocation Method for Other Lines of Insurance) for policies effective on or after October 1, 2011, each insurer shall maintain sufficient records to report the following information to the department:

    (1) for policies where the premium surcharge was, or would be determined under §5.4182 or §5.4183(1) of this division, the total written premium attributable to the catastrophe area for policies with premises, operations, or insured property located in the catastrophe area; and

    (2) for policies where the premium surcharge was, or would be determined under §5.4183(1) or (2) of this division, the total written premium allocated to the catastrophe area.

    (c) When possible, and practical, the department will obtain information from the Texas Surplus Lines Stamping Office prior to requesting information from affiliated surplus lines insurers.

    (d) Nothing in subsection (c) of this section should be read to mean that subsections (a) and (b) of this section do not apply to affiliated surplus lines insurers.

    (e) Nothing in this section limits the department's authority to obtain information from insurers under the Insurance Code.

This agency hereby certifies that the adoption has been reviewed by legal counsel and found to be a valid exercise of the agency's legal authority.

Filed with the Office of the Secretary of State on January 27, 2011.

TRD-201100368
Gene C. Jarmon
General Counsel and Chief Clerk
Texas Department of Insurance
Effective date: February 16, 2011
Proposal publication date: July 30, 2010
For further information, please call: (512) 463-6327

♦     ♦     ♦

# TITLE 30. ENVIRONMENTAL QUALITY

# PART 1. TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

## CHAPTER 115. CONTROL OF AIR POLLUTION FROM VOLATILE ORGANIC COMPOUNDS
## SUBCHAPTER F. MISCELLANEOUS INDUSTRIAL SOURCES
## DIVISION 3. DEGASSING OF STORAGE TANKS, TRANSPORT VESSELS, AND MARINE VESSELS

The Texas Commission on Environmental Quality (TCEQ or commission) adopts the repeal of §§115.541, 115.542, and 115.545; adopts new §§115.540 - 115.542 and 115.545; and adopts the amendments to §§115.543, 115.544, 115.546, 115.547, and 115.549.

Sections 115.540 - 115.542, 115.544 - 115.546, and 115.549 are adopted *with changes* to the proposed text as published in the August 13, 2010, issue of the *Texas Register* (35 TexReg 6976). Section 115.543 and §115.547 are adopted *without changes* and the text will not be republished.

The adopted amended, repealed, and new sections will be submitted to the United States Environmental Protection Agency (EPA) as revisions to the state implementation plan (SIP).

BACKGROUND AND SUMMARY OF THE FACTUAL BASIS FOR THE ADOPTED RULES

Chapter 115, Subchapter F, Division 3, regulates the degassing of storage tanks, transport vessels, and marine vessels. Compliance with the rules is currently required for affected sources in the Houston-Galveston-Brazoria ozone nonattainment area and the Beaumont-Port Arthur area. Although not currently effective, the Chapter 115 degassing rules also apply in El Paso County as contingency measures that could become effective if the com-

**TDI CC 0226**

(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.E) TWIA 0526

(c)   Any actual or prospective bidder, offeror, or contractor claiming to have been aggrieved in connection with the solicitation, evaluation, or award of a contract by the Commission may submit a formal protest to the General Counsel of the Commission (General Counsel).  Protests must be in writing and received by the General Counsel within 10 working days after the protesting party knows, or should have known, of the occurrence of the action that is the subject of the protest.  Formal protests must conform to this subsection and subsection (e) of this section, and shall be resolved through the procedures described in subsections (f) - (l) of this section.  The protesting party must mail or deliver copies of the formal protest to all interested parties.

(d)   In the event a formal protest is timely received, the Commission shall not proceed further with the solicitation, evaluation, or award a contract unless the General Counsel, after consultation with the Commission's Executive Director, makes a written determination that a contract must be awarded without delay to protect the best interests of the state.

(e)   A formal protest must be sworn and contain:

(1)   a specific identification of the statutory or regulatory provision(s) that the protesting party alleges has been violated;

(2)   a specific description of each action that the protesting party alleges to be a violation of the statutory or regulatory provision(s);

(3)   a statement of the relevant facts;

(4)   a statement of any issues of law or fact that the protesting party contends must be resolved;

(5)   a statement of the argument and authorities that the protesting party offers in support of the protest; and

(6)   a statement that copies of the formal protest have been mailed or delivered to all identifiable interested parties.

(f)   The General Counsel may settle and resolve the dispute over the solicitation, evaluation, or award of a contract at any time before the matter is submitted on appeal to the Executive Director of the Commission (Executive Director).  The General Counsel may solicit written responses to the formal protest from interested parties.

(g)   If the protest is not resolved by mutual agreement, the General Counsel shall send a determination letter resolving the formal dispute to the protesting party and interested parties.  The determination letter shall set for the reasons for the determination; and

(1)   If the General Counsel determines that a violation of any statutory or regulatory provisions has occurred in a situation in which a contract has not been awarded, include in the determination letter the appropriate remedy for the violation; or

(2)   If the General Counsel determines that a violation of any statutory or regulatory provisions has occurred in a situation in which a contract has been awarded, may declare the awarded contract to be void.

(h)   The protesting party may appeal a determination of a protest by the General Counsel to the Executive Director.  An appeal of the General Counsel's determination must be in writing and received in the office of the Executive Director no later than 10 working days from the date notice of the determination was sent.  The protesting party's appeal must contain a certified statement that a copy of the appeal was sent to all interested parties. The scope of the appeal shall be limited to a review of the General Counsel's determination.

(i)   The Executive Director may refer the matter to the Commission for consideration or may issue a written decision regarding the appeal.

(j)   The following requirements shall apply to a formal protest that the Executive Director refers to the Commission:

(1)   The Executive Director shall deliver copies of the appeal and any responses by interested parties to each Commissioner.

(2)   The Commission may consider any documents that Commission staff or interested parties have submitted.

(3)   The Commission shall issue a written letter of determination of the appeal to the protesting party and all interested parties which shall be final.

(k)   A formal protest or an appeal of a determination that is not filed timely shall not be considered unless good cause for delay is shown or the General Counsel determines that an appeal raises issues that are significant to Commission procurement practices or procedures in general.

(l)   A determination issued by either the Executive Director or the Commission shall be the final administrative action of the Commission.

(m)   The Commission shall maintain all documentation on the purchasing process that is the subject of a formal protest or appeal in accordance with the records retention schedule of the Commission.

This agency hereby certifies that the proposal has been reviewed by legal counsel and found to be within the agency's legal authority to adopt.

Filed with the Office of the Secretary of State on July 15, 2010.

TRD-201003919
Patrick Tyler
General Counsel
Commission on State Emergency Communications
Earliest possible date of adoption: August 29, 2010
For further information, please call: (512) 305-6930

♦   ♦   ♦

# TITLE 28.  INSURANCE

# PART 1.   TEXAS DEPARTMENT OF INSURANCE

## CHAPTER 5.   PROPERTY AND CASUALTY INSURANCE
## SUBCHAPTER E.   TEXAS WINDSTORM INSURANCE ASSOCIATION
## DIVISION 3.   LOSS FUNDING, INCLUDING CATASTROPHE RESERVE TRUST FUND, FINANCING ARRANGEMENTS, AND PUBLIC SECURITIES

**28 TAC §§5.4161 - 5.4167, 5.4171 - 5.4173, 5.4181 - 5.4192**

The Texas Department of Insurance (Department) proposes new §§5.4161 - 5.4167, 5.4171 - 5.4173, and 5.4181 - 5.4192 to implement legislative changes to the Insurance Code Chapter 2210 under House Bill (HB) 4409, 81st Legislature, 2009 Regular Ses-

ACCEPTED
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
6/26/2020 2:22 PM
STATE OFFICE OF
ADMINISTRATIVE HEARINGS
Donnie Roland, CLERK

FILED
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
6/26/2020 2:16 PM
STATE OFFICE OF
ADMINISTRATIVE HEARINGS
Donnie Roland, CLERK

TWIA EXH. 66B"   TDI CC102276B"   (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.E) TWIA 0527

sion, and amend the plan of operation of the Texas Windstorm Insurance Association (Association). These sections set forth procedures for making and collecting member assessments and procedures for making and assessing premium surcharges under Chapter 2210, Insurance Code.

Under §2210.001 of the Insurance Code, the Legislature has determined that the provision of windstorm and hail insurance is necessary for the economic welfare of the state and its inhabitants; and that the lack of such insurance in the state's seacoast territories would severely impede the orderly growth and development of the state. The Association was created by the Legislature and serves as a residual insurer of last resort for windstorm and hail insurance coverage (insurance coverage) in the catastrophe area designated by the Commissioner under the Insurance Code §2210.005. The catastrophe area is underserved for insurance coverage and consists of the 14 Texas coastal counties and parts of Harris County. Persons seeking insurance coverage from the Association are unable to obtain comparable insurance coverage in the voluntary insurance market. The ability to obtain insurance coverage that will provide coverage for losses resulting from windstorm and hail is crucial to the financial welfare of persons living and working in the designated catastrophe area. The absence of such coverage providing for the payment of losses results in the lack of an important element for economic stability in the region.

House Bill 4409 substantially amended how Association losses and operating expenses in excess of premium and other revenue are funded in new Subchapters B-1 and M, Chapter 2210, Insurance Code. In accordance with Chapter 2210 of the Insurance Code, compliance with these requirements is essential to assure the availability of Association insurance coverage for all eligible persons and properties. The proposed sections implement the legislative loss funding scheme. Thus, adoption of these proposed sections will affect the economic welfare of the state and its inhabitants, and positively impact the orderly growth and development of the state. Because of this need, if, prior to the adoption of these sections, an occurrence or series of occurrences is reasonably likely to impact the catastrophe area, all of these sections will be submitted for immediate effect as emergency rules.

The Association operates under a plan of operation which is adopted by rule. The Insurance Code §2210.151 provides that the Commissioner shall adopt by rule the Association's plan of operation to provide Texas windstorm and hail insurance in the catastrophe area. The Insurance Code §2210.152(a)(1) sets out the requirements of the plan of operation and specifies that the plan of operation must provide for the efficient, economical, fair and nondiscriminatory administration of the Association. Further, the Insurance Code §2210.152(a)(2)(G) provides that the plan of operation may include other provisions considered necessary by the Department to implement the purposes of Chapter 2210.

Historically the Association's plan of operation has been specified in §5.4001 of this subchapter (relating to Plan of Operation). Neither the Insurance Code §2210.151 nor §2210.152 require the Association's plan of operation to be in a single section of the Administrative Code. With the adoption of HB 4409 related requirements in §§5.4902 - 5.4908 and 5.4911 of this chapter (relating to Additional Requirements; Declination of Coverage; Flood Insurance, Minimum Retained Premium, Certificate of Compliance Approval Program, Certificate of Compliance Transition Program, Alter and Alteration; and Insurance Policy Forms, Endorsements, Manual Rules, Application Forms, and Underwriting Guidelines; respectively) the Department began to revise the format of the plan of operation into sections related to specific topics. Sections 5.4902 - 5.4908 and §5.4911 were adopted to control over conflicting provisions in §5.4001. Proposed §§5.4161 - 5.4167 and 5.4173 are proposed as part of the Association's plan of operation and have similar language with respect to controlling over §5.4001. However, references in this proposal to the plan of operation incorporate both §§5.4001, 5.4902 - 5.4908, and 5.4911, unless specified otherwise. Proposed §§5.4171, 5.4172 and 5.4181 - 5.4192 address requirements on property and casualty insurers generally, and are not proposed as part of the Association's plan of operation.

As stated, HB 4409 substantially amended how Association losses and operating expenses in excess of premium and other revenue are funded. It is necessary that these new requirements, which amend or augment the Association's existing plan of operation, be integrated into the plan of operation. To this end the Department has proposed §§5.4101, 5.4102, 5.4111 - 5.4114, 5.4121, 5.4131 - 5.4134, and 5.4141 - 5.4147 in the July 23, 2010, issue of the *Texas Register.* Those proposed sections address: (i) the catastrophe reserve trust fund; (ii) financing arrangements; (iii) issuance of public securities; (iv) use of public securities proceeds; and (v) payment of public security obligations. Proposed §5.4102 also sets forth definitions that will be used in this section.

It is further necessary to establish the procedures and requirements for determining and collecting member assessments and premium surcharges for the payment of class 2 public security obligations and class 3 public security obligations under the Insurance Code §2210.613 and §2210.6135. Compliance with these requirements is essential to assure the availability of Association insurance coverage for all eligible persons and properties.

Thus, it is necessary to amend the plan of operation to address the following: (i) Association member assessments under the Insurance Code §2210.613 and §2210.6135; and (ii) the procedure for assessing class 2 public securities under the Insurance Code §2210.613. It is further necessary to establish the procedures and requirements for determining and collecting premium surcharges for the payment of class 2 public securities under the Insurance Code §2210.613.

To effect these necessary amendments, the Department proposes for adoption §§5.4161 - 5.4167 and 5.4173 to become part of the Association's plan of operation. Proposed §§5.4161 - 5.4167 move existing provisions concerning member assessments that are currently in §5.4001(c)(2) of the plan of operation into this division. Except as required to comply with statutory changes, this proposal is intended to redesignate the existing provisions rather than to substantively change the existing requirements in §5.4001(c)(2). Including the Association's assessment procedure with other loss funding provisions will make it more accessible to interested persons. Finally, as necessary, the proposed section makes nonsubstantive updates and uses terminology more consistent with this proposal and current statutes and rules. Because §5.4001 addresses almost all aspects of the Association's operations, opening that section for direct amendment may result in unforeseen consequences that could adversely affect the Association's ability to fulfill its purpose under Chapter 2210. Thus, rather than amend §5.4001, proposed §§5.4161 - 5.4167 control over those provisions set forth in existing §5.4001 as provided in §5.4101.

TDI CC 0228     (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.E) TWIA 0528

Additionally, the Department proposes for adoption §§5.4181 - 5.4192, to establish the procedures and requirements for determining and collecting premium surcharges for the payment of class 2 public securities under the Insurance Code §2210.613.

This proposal explains in subsequent discussions each of the proposed sections in greater detail.

§5.4161. Member Assessments. Proposed §5.4161 reflects existing §5.4001(c)(2)(A) of this subchapter, which it would control over. Proposed §5.4161 is not intended to significantly alter existing procedural requirements, but it differs from the existing rule because the statutory funding scheme for excess losses was amended by HB 4409 and no longer relies on direct assessments to fund certain amounts. Rather, the Insurance Code, Chapter 2210, Subchapter B-1, now requires that losses in excess of the Association's premium and other revenue, the Catastrophe Reserve Trust Fund (CRTF), and available reinsurance proceeds, must be paid with the proceeds of class 1, class 2, and class 3 public securities. The Insurance Code §2210.613 and §2210.6135, provide that, if other funds are not available, up to 30 percent of the class 2 public security obligations and all of the class 3 public security obligations are payable from Association member company assessments. The Insurance Code §2210.608 requires the Texas Public Finance Authority (TPFA) to annually inform the Association of the amounts required to fund these public security obligations.

The Department has also proposed removing the requirement that the Association's board of directors determine the Assessment amount. This phrasing is more consistent with other proposals in this division and, under the funding system adopted in the Insurance Code Chapter 2210, the assessment will be in large part determined by the amount of public securities issued, the terms of those public securities, and the choices the Association's board of directors makes with regards to excess assessment revenue. Excess revenue is to be expected because the Department has been advised by the TPFA that lenders will likely require a contractual coverage provision, which is the minimum amount that the Association is required to deposit into the applicable public security obligation revenue fund as security for the payment of debt service on the public securities, administrative expenses on public securities, or other payments required to be paid by the Association in connection with public securities. The Department has proposed in §5.4145 and §5.4147 that these excess amounts be used to either reduce a future year's assessment or redeem outstanding class 2 or class 3 public securities.

As previously discussed, except as required by statute, §§5.4161 - 5.4167 are proposed to redesignate the existing requirements and incorporate them into this division. These sections will continue to be considered part of the Texas Windstorm Insurance Association's plan of operation and shall control over any conflicting provision in §5.4001 of this subchapter. This is set forth in proposed §5.4161(c).

§5.4162. Amount of Assessment. Proposed §5.4162 reflects existing §5.4001(c)(2)(B) of this subchapter, which it would control over. The section establishes member participation in the assessment and thus the proportionate amount each member shall be required to pay to the Association. Proposed §5.4162(a) incorporates the HB 4409 amendments to the Insurance Code §2210.052(e) which provides that the Association may not include in the assessment an insurer that became a member of the Association after September 1, 2009, and had not previously been a member of the Association, until after the second anniversary of the date on which the insurer first becomes a member of the Association. Because, the assessment period however, could run for up to ten years depending on the bond term, proposed §5.4162(a)(2) clarifies that the new member would be eligible for assessment after its second anniversary.

Proposed §5.4162(b) provides that the participation level shall be computed on a calendar year basis for the year in which the assessment is made. The participation level may thus vary over the term of the public security and will not be fixed in the year that the catastrophic event occurred. In preparing the proposal, the Department solicited comments from the public and industry concerning this concept. The Department received comments that computing the participation level on calendar year basis for the year in which the assessment is made could result in insurers attempting to game the system and financial uncertainty or hardship.

The systemic concern is that the insurers may determine that under a variable participation scheme it is best to stop writing wind and hail insurance coverage in the catastrophe area now and then return after the event to lower their participation percentage. The Department disagrees that insurers would reduce writings under this requirement as a general course of action. Since Hurricane Rita, insurers have reduced writing wind and hail insurance coverage in the catastrophe area to avoid exposure to catastrophic events without regard to the effect of even the potential of an unlimited assessment under former Insurance Code §2210.058. Assessments under the HB 4409 loss funding scheme set out in the Insurance Code §2210.613 and §2210.6135 would amount to an approximate maximum of $800 million, plus interest and administrative expenses, over an eight to eleven year period following catastrophic event depending on the date of issuance, term, covenants, and potential early repayment of the public securities. Thus, the annual assessment requirements necessary under Insurance Code §2210.613 and §2210.6135 would approximate, albeit probably greater than, the former $100 million assessment provision in the Insurance Code §2210.058(a)(1). Therefore, the Department does not believe that this provision will encourage insurers to leave the catastrophe area. Rather, the calendar year method may encourage insurers to reduce their participation level by writing in the catastrophe area either before of after a catastrophic event.

Further, even under a fixed participation level, participation levels would vary due to insolvencies and carriers leaving the Texas market. The Association rules already provide for reallocating an assessment based on insolvency. As for insurers leaving the Texas Market, the Department notes that the Insurance Code Chapter 2210, does not have a provision such as that in the Insurance Code §2211.209(e), relating to the FAIR Plan Association. Barring the departure of a large market share insurer, these variances should be slight, but under either the fixed or annual basis they may be unavoidable. Also, while it is possible that annually successive catastrophic events could affect the Association resulting in a large net assessment burden, the extended payment scheme may also reduce the need for some insurers to rely on reinsurance as they would no longer be subject to the possibility of the unlimited assessment. For these reasons the Department has determined that the calendar year method is most consistent with the requirements of the Insurance Code Chapter 2210.

Finally, because §5.4001 defines terms for use in §5.4001, it is necessary to incorporate the definition and calculation of "net direct premiums" into this section, which is provided for in proposed §5.4162(b).

**TDI CC 0229**     (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.E) TWIA 0529

Proposed §5.4162(c) incorporates the remainder of existing §5.4001(c)(2)(B) concerning member participation in the assessment. Proposed §5.4162(d) incorporates the Association's existing calendar year formula for determining participation levels that are set out in existing §5.4001(c)(2)(B)(i). The proposal also corrects an incomplete citation in the existing rule. The existing provision cites "subsection (a)(2)(i)(III) of this section." As all items within §5.4001(a)(2) have a following capital letter designation, the citation does not refer to any provision. The Department has determined that this provision referred to net direct premium as of 1988 using the citation (a)(2)(I)(i)(III). In subsequent revisions the "(I)" was inadvertently omitted. The Department is not aware of any time in which this alternative provision was used in determining participation levels. The proposed section restates citation as §5.4001(a)(2)(N)(i)(III) using the correct reference to "net written premium." This proposed section also incorporates Figure: 28 TAC §5.4162(d), which is the same as that adopted at §5.4001(c)(2)(B)(i).

Proposed §5.4162(e) is based on existing §5.4001(c)(2)(B)(ii) of this subchapter. Proposed §5.4162(f) is based on existing §5.4001(c)(2)(B)(iii) of this subchapter. Finally, as necessary, the proposed section makes nonsubstantive updates and uses terminology more consistent with this proposal and current statutes and rules.

§5.4163. Notice of Assessment. Proposed §5.4163 is based on existing §5.4001(c)(2)(C) of this subchapter. The proposed section divides the existing provision into three subsections to make it more accessible. As necessary, the proposed section makes nonsubstantive updates and uses terminology more consistent with this proposal and current statutes and rules.

§§5.4164 - 5.4167. Payment of Assessment, Failure to Pay Assessment, Contest after Payment of Assessment, and Inability to Pay Assessment by Reason of Insolvency. Proposed §§5.4164 - 5.4166 are based on existing §5.4001(c)(2)(D) of this subchapter. The proposed sections divide the existing provisions into three sections and various subsections to make them more accessible. Proposed §5.4167 is based on existing §5.4001(c)(2)(E) of this subchapter. As necessary, the proposed section makes nonsubstantive updates and uses terminology more consistent with this proposal and current statutes and rules.

§5.4171. Premium Surcharge Requirement. Proposed §5.4171(a) identifies insurers that are, and that are not, subject to the provisions proposed §§5.4171 - 5.4172 and 5.4181 - 5.4192.

§5.4172. Premium Surcharge Definitions. Proposed §5.4172 provides definitions used in this subdivision. The definitions are derived in part from Subchapter M, Chapter 2210 Insurance Code. The definition of "insurer" was expanded from the definition contained in Subchapter M, Chapter 2210 Insurance Code to include the Association and the Texas FAIR Plan Association (FAIR Plan). Insurance Code §2210.613 provides that premium surcharges also apply to Association and FAIR Plan policyholders that reside in, have insured property or operations in the catastrophe area. This proposed section also provides definitions for "insured property," "premises," and "operations," since these terms are not defined in Insurance Code §2210.613.

§5.4173. Determination of the Surcharge. Proposed §5.4173 establishes the procedure for the Association to request Commissioner approval of a premium surcharge in an amount that is sufficient to fund class 2 public security obligations, including

any required contractual coverage amounts that are reported to the Association by the TPFA.

§§5.4181 - 5.4183. Premiums to be Surcharged, Allocation Method for Specified Lines of Insurance, and Allocation Method For Other Lines of Insurance. Insurance policies can provide coverage for risks located in a single location, risks located in multiple locations, or even property in transit. Some insurance coverages, such as property insurance, are rated based on the specific location of the risk, and thus insurers can determine how much of the policy premium relates to insured property or operations located within the catastrophe area. Other lines of insurance may require an allocation calculation. Proposed §5.4181 sets forth which premium is to be surcharged. Proposed §5.4182 provides the method for determining the premium surcharge for certain lines of insurance, including fire, allied lines, multi-peril crop, farmowners, homeowners, commercial multi-peril, private passenger auto, and commercial auto policies rated based on the location of the vehicle(s). Proposed §5.4183 establishes the procedure for determining the premium surcharge for other lines of insurance, including those that are not rated based on the specific location of the risk.

§5.4184. Application of the Surcharges. Proposed §5.4184 provides that all applicable policies with effective dates on or after the date of the Commissioner's surcharge order are to be surcharged. It also makes clear that insurers are not responsible for collecting surcharges on policies that did not go into effect, or were cancelled as of the inception date, as well as provides instructions for surcharging policies that remain in effect for multiple years. Proposed §5.4184 further discusses how surcharges are to be determined when the policy is either cancelled mid-term or the premium is changed on the policy in the middle of the policy period. The Insurance Code §2210.613 states that premium surcharges are non-refundable, thus there is no refund for the "unexpired" portion of the surcharge when a policy is cancelled prior to the expiration date. Similarly, since premium surcharges are non-refundable, when the premium on the policy is changed in mid-term resulting in a *reduction* in the total policy premium, there is no commensurate refund of the surcharge, but there is a commensurate increase in the premium surcharge for mid-term changes resulting in an increase in the premium. Proposed §5.4184(f) addresses policies that are subject to premium audits, retrospective rating adjustments, or other similar adjustments that occur after policy expiration.

§5.4185. Premium Surcharges are Mandatory. Proposed §5.4185 provides that premium surcharges are mandatory, and are paid on a "first dollar" basis. Insurers may not pay the surcharge on behalf of the insured, and insurers must apply policyholder payments to the surcharge before applying any payments to premiums or other amounts owed to the insurer. This subsection also reiterates the provision in Insurance Code §2210.613(d) that failure to pay a premium surcharge constitutes failure to pay premium for the purposes of policy cancellation.

§5.4186. Remittance of Premium Surcharges. Proposed §5.4186 establishes the procedure for remitting collected premium surcharges to the Association and provides that insurers shall remit all surcharges paid by its insureds not later than the fifteenth day of the month following the month in which the surcharge was received.

§5.4187 and §5.4188. Offsets and Surcharges not Subject to Commissions or Premium Taxes. Proposed §5.4187 provides a method for crediting an insurer for surcharges previously paid

TDI CC 0230   (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.E) TWIA 0530

that were not due to the Association. Proposed §5.4188 provides that premium surcharges are neither subject to agents' commissions nor premium taxes. This reiterates the language contained in Insurance Code §2210.613(d), and prohibits an insurer from increasing the surcharge in order to pay agents' commissions or premium taxes on a surcharge, and prohibits an agent from collecting or charging a commission on a surcharge.

§5.4189. Notification Requirements. Proposed §5.4189 provides that insurers must provide insureds subject to a premium surcharge a notice that a premium surcharge has been applied to their policy. Proposed §5.4189(a) provides the text of the notice required for all policyholders subject to a premium surcharge, and §5.4189(b) requires that insurers provide to all policyholders subject to a premium surcharge the dollar amount of the premium surcharge. Proposed §5.4189(c) provides the additional information insurers that determine the premium surcharge under §5.4183(d) must provide to their insureds or applicants.

§5.4190 and §5.4191. Annual Premium Surcharge Report and Premium Surcharge Reconciliation Report. Proposed §5.4190 and §5.4191 specify the types of information insures are required to maintain for the purposes of determining compliance with §§5.4171 - 5.4173 and 5.4181 and 5.4188 of this proposal. Proposed §5.4190 requires insurers to provide an annual report to the Association which provides information regarding the amount of premium collected subject to surcharge, the amount of premium surcharges remitted to the Association, and the amount of premium surcharges collected by the insurer during the previous calendar year. These reports are required to be provided to the Association within 60 days after the end of a calendar year in which a surcharge is in effect. However, annual reports are not required if a surcharge has been in effect for less than 45 days in the applicable calendar year. Annual reports are required to be provided by annual statement line of business and by insurance company. Proposed §5.4191 requires insurers to maintain sufficient records in order to, within 10 days of a request, provide the Department with a reconciliation report for a time period specified in the request. These reports are proposed under the authority set forth in the Insurance Code §2210.008, as the reports are necessary to ensure compliance with this proposal and as such are necessary to the implementation of Chapter 2210.

§5.4192. Data Collection. Proposed §5.4192 requires each insurer to maintain sufficient records in order to report certain information to the Department. This information will provide the premium base available to be surcharged and thus is necessary to the implementation of the Insurance Code §2210.613. This section does not change, is not intended to change, and should not be construed as changing, any statistical plan reporting requirements established pursuant to the Insurance Code Chapter 38 or other requirement.

FISCAL NOTE. Marilyn Hamilton, Associate Commissioner of the Property and Casualty Program, has determined that for each year of the first five years the proposed sections will be in effect, there will be no fiscal impact to state and local governments as a result of the enforcement or administration of the proposal. There will be no measurable effect on local employment or the local economy as a result of the proposal.

PUBLIC BENEFIT/COST NOTE. Ms. Hamilton also has determined that for each year of the first five years the proposed sections are in effect, there will be public benefits resulting from the proposal and there will be costs to persons required to comply with the proposal.

Anticipated Public Benefits.

*Member Assessments.* The anticipated public benefit will be ability of the Texas Windstorm Insurance Association (Association) to collect member assessments in order to fund its public security obligations associated with the issuance of class 2 and class 3 public securities as prescribed in the Insurance Code §2210.613 and §2210.6135. In the absence of the Association's ability to collect member assessments to fund its class 2 and class 3 public security obligations, the Association would not be able to market these classes of public securities and thus would lack the proceeds of those public securities to pay the insured losses of the Association's policyholders if a substantial hurricane made landfall on the Texas coast. Additionally, moving the existing requirements related to member assessments from §5.4001(c)(2) to this division will make the item more accessible to interested persons.

*Premium Surcharges.* The anticipated public benefit will be the ability of the Association to collect premiums surcharges in order to fund debt obligations associated with the issuance of class 2 Public Securities as prescribed in the Insurance Code §2210.613. In the absence of the Association's ability to collect premium surcharges to fund its class 2 public security obligations, the Association would not be able to market the class 2 public securities and thus would lack the proceeds of those public securities to pay the insured losses of the Association's policyholders if a substantial hurricane made landfall on the Texas coast. In addition, the proposed rules provide procedures for the allocation of premium to the catastrophe area for policyholders who have insured property or operations both within and outside the catastrophe area. The proposed procedures provide the benefit of a more equitable system of cost-sharing than would be provided if these policyholders were fully surcharged or not surcharged at all. The reports required under the proposed rules provide the benefit of allowing the Department to ensure insurers are determining the surcharges correctly and allows the Association to determine whether insurers are remitting the required surcharges to the Association. The proposed rules also provide the benefit of guidance to insurers, agents, and policyholders, regarding how surcharges are to be determined in various circumstances. Such guidance is necessary to allow insurers to determine the applicable premium surcharge for individual policyholders.

Estimated Costs for Persons Required to Comply with the Proposal. The persons that will incur costs for compliance with the proposal are the Association and insurers.

Member Assessments.

*The Association.* It is not anticipated that the Association will incur any additional cost as a result of this proposal with respect to the member company assessments. Under the proposal the Association must determine that an assessment is necessary, calculate the amount of the assessment annually, notify insurers of the assessment, and collect the assessment. The Association performed each of these functions under the existing requirements. Costs associated with any requirement that the Association would be required to now assess annually for a period of years following the issuance of public securities, or that the Association may be required to issue separate assessments for class 2 and class 3 public security obligations do not result from this proposal, but from the statutory requirements of the Insurance Code §§2210.052, 2210.613, and 2210.6135.

TDI CC 0231                    (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.E) TWIA 0531

*Member Insurers.* It is not anticipated that Association member insurers will incur any additional cost as a result of this proposal with respect to the member company assessments. The requirement to pay the assessment arises from the statutory requirements of the Insurance Code §§2210.052, 2210.613, and 2210.6135. The Department further considers that no additional cost arises from the requirement that the Association determine the member's participation level each calendar year participation rather than fixing the participation level as of the year of the loss. Insurers would need to account for potential assessments under either basis as well as potential changes to those bases. Further, the proposed sections do not require or prohibit an insurer from purchasing reinsurance. Purchase of reinsurance is a business decision of the member insurer based on the law and its response to perceived risk.

Premium Surcharge.

*The Association.* It is anticipated that the Association will incur additional cost as a result of this proposal with respect to the premium surcharges, both in its capacity as an administrator of the program and a participant insurer. The anticipated costs to the Association as an administrator will result from proposed §5.4173 and §5.4190(g).

Proposed §5.4173 requires the Association to review information provided by TPFA concerning the class 2 public security obligation, determine if a premium surcharge is necessary to fund the class 2 public security obligation, and request the Commissioner to set the premium surcharge. The Department estimates that the cost factors involved in completing the requirements set forth in this procedure would include the labor of senior Association management, Association actuarial staff, Association legal staff, and Association staff as well as materials, printing and mailing costs. The Department does not have a specific estimate from the Association related to its probable cost in completing this function. The Department does however, have recent estimates from the Association that its probable costs to determine the need for the issuance of public securities and make a request to the Commissioner to issue such public securities would be approximately $800 per request event. The request described in proposed §5.4173 is similar in structure but smaller in scope than a request for public securities. Therefore the Department anticipates that the Association's estimated cost of compliance with proposed §5.4173 would be $800, or less, per request. It is anticipated that this cost would not change over the first five year period this proposal is to be in effect.

Proposed §5.4190(g) requires the Association to review insurer premium surcharge reports submitted under proposed §5.4190 for consistency with other premium reports, and report to the Department. The Association estimated the cost of this activity to be between $13, 500 for the first year and less in subsequent years for the first five years this proposal is to be in effect. The cost estimate is based on labor in the amount of $8,500, annually, and the onetime addition of an accounting receivables module for an estimated price of $5,500. In subsequent years the Association would only have the licensing expense for the receivables module, so annual cost would be reduced.

*Insurers.* In this cost analysis "insurer" has the same meaning as proposed in §5.4172 and thus refers to each property and casualty insurer authorized to engage in the business of property or casualty insurance in the State of Texas and an affiliate of such an insurer, as described by the Insurance Code §823.003, including an affiliate that is not authorized to engage in the business of property or casualty insurance in the State of Texas, the

Association, and the Texas Fair Access to Insurance Requirements Plan Association. The term specifically includes a county mutual insurance company, a Lloyd's plan, a reciprocal or interinsurance exchange.

The total probable economic cost to each insurer to comply with the requirements set forth in the Insurance Code §2210.613 and this proposal is expected to range from several hundred thousand dollars to several million dollars. Although for some insurers, the cost could reach millions of dollars, the department does not expect costs to reach this level for the large majority of insurers. These costs arise from requirements to identify policyholders with premises, operations, or insured property in the catastrophe area, allocate the policyholder's premium, assess the premium surcharge, collect the premium surcharge, remit the premium surcharge to the Association, notify the policy holder of the premium surcharge, and report premium and premium surcharge information to the Department and the Association. The actual cost to each insurer will vary based on a number of factors, including the size of the insurer, the quality of the insurer's data processing equipment, the quality of the insurer's data, the types of insurance written by the insurer, and whether the insurer writes large multi-location commercial risks, or small single-location risks.

*§§5.4181 - 5.4188.* Proposed §§5.4181 - 5.4188 address the requirements to identify policyholders with premises, operations, or insured property in the catastrophe area, allocate the policyholder's premium, assess the premium surcharge, collect the premium surcharge, remit the premium surcharge to the Association. Some of this cost is result of this proposal, and some of this cost would be borne in the absence of this proposal as a direct result of the enactment of the Insurance Code §2210.613. With respect to each section the difference may depend on the line of business and the business model of the insurer. Further, because each requirement is not required of each insurer, this cost analysis set forth those requirements that may apply to an insurer complying with the proposed sections.

A significant cost factor for insurers resulting from these sections may include the cost of establishing and programming their policy issuance systems, premium rating algorithms, and accounting systems to calculate the premium surcharges, any additional premium surcharges during the policy period, and refunds of surcharges as a result of premium audits, retrospective rating adjustments, or similar adjustments. Insurers may need to account for the premium surcharges separately from premiums in their accounting ledgers, ensure agents' commissions were not determined based on the surcharge, collect the surcharges, and remit the appropriate amount of surcharge to the Association. Insurers may also be required to program their billing systems to track each payment, how much of the payment is applied to premium, and how much of the payment is applied to the surcharge. Insurers may also program their data processing systems in order to track, collect, and use an allocation percentage which allocates premium to the catastrophe area. These systems may then prepare required reports to the Association and the Department under proposed §§5.4190 - 5.4192. Should the insurer not have these types of systems, or should they be inadequate, the insurer may need to invest in the necessary hardware or develop a manual procedure for compliance.

For certain property, automobile, multiple peril, and personal lines of insurance, insurers may be required to determine whether each risk on the policy was located within the catastrophe area. For most of these lines, there will be little additional

TDI CC 0232 (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.E) TWIA 0532

cost since most insurers already collect and code either county risk location or ZIP Code risk location for the purposes of determining the premium on the policy, or for the purposes for reporting under the Department's residential, commercial, or private passenger automobile statistical plans. For insurers that do not use risk location when determining policy premium for these lines of insurance, and are not required to report this data to one of the Department's designated statistical agents, there could be the additional cost of determining whether each risk on the policy is located within the catastrophe area and the corresponding exposures, or premium basis, for risks located within the catastrophe area. This may require obtaining the information, as well as programming data processing systems in order to capture and retain this information.

Additionally, insurers may be required to identify whether risks located in Harris County are located within the designated catastrophe area. For some risks insurers will need to determine whether the precise location is within certain ZIP Codes of Harris County and determine whether those risks are located within the catastrophe area. This could involve a manual process of entering addresses into geographic mapping software to determine the precise location of each risk.

For risks that have some operations within the catastrophe area and some operations outside of the catastrophe area, it may be necessary for insurers to annually obtain information regarding whether the insured had some, none, or all of its operations located within the catastrophe area. This requirement mostly affects insurers that write medium-sized or large commercial risks. In addition to the cost of obtaining this information, there could also be costs associated with insurers programming their electronic data processing systems in order to track, collect, and use this information. It may also be necessary for these insurers to program their electronic data processing systems in order to track, collect, and use, an allocation percentage which allocates premium to the catastrophe area. The proposal however, does not require insurers to obtain this information. Instead insurers may use a default premium allocation system.

Additionally, under §5.4183(d), insurers may be required to receive and review information provided by policyholders regarding whether a lesser allocation percentage is appropriate for the insured. The review would require an underwriter to review the information provided by the insured, and determine whether a lesser allocation percentage is warranted. Insurers would also be required to provide notice and explanation to the insured in cases where the application for a lesser percentage is denied by the insured. Some insurers may require their agents to perform these duties, but there is no requirement under the proposed rule that the agents perform these duties. These costs would not be borne until and unless an actual surcharge was in effect. Insurers may decide to collect detailed exposure information from their policyholders before there has been a catastrophic event or a premium surcharge, but there is no requirement in the rule that insurers do so.

The anticipated costs to comply with the described requirements in proposed §§5.4181 - 5.4188 are expected to include information technology services, underwriting services, accounting services, materials and postage, and computer hardware. Further, most of these costs would occur within the first months or year the proposal was in effect, because the significant portion of these costs involves laying the infrastructure necessary to identify policyholders with premises, operations, or insured property in the catastrophe area, allocate the policyholder's premium, and

then performing those tasks. It is necessary that this be done before the occurrence of a catastrophic event, because this information will be used to justify to the financial markets the Association's financial ability to promptly issue class 2 public securities for the payment of the Association's policyholder's insured losses as prescribed by the insurance Code §2210.073. This infrastructure is also necessary to comply with the reporting requirements set forth in proposed §§5.4190 - 5.4192. Therefore, the insurer must consider these additional requirements associated with extracting the data from the insurers accounting or policy systems and aggregating the data at the appropriate level of detail necessary to complete these reports in determining its system for compliance.

The cost for each of these functions will vary by the insurer's line of business, labor practices, and current systems. This analysis considers the cost of an insurance company to implement proposed §§5.4181 - 5.4188 in-house, because ultimately the insurance company is responsible for compliance with the proposed requirements and the in-house reporting method is available to every insurance company. This method is not required by the proposal and other methods of compliance may be available to the insurance company. The method of compliance and ultimate cost of compliance is a business decision of the insurance company and not a requirement of this proposal.

Proposed §§5.4181 - 5.4188 do not require an insurer to use an automated process. However, as most, if not all insurers do, the proposed sections will generate a need for information technology services. Such needs are expected to range from hundreds of person-hours to several thousands of person-hours of systems design, systems analysis, computer programming, and testing. Though each insurance company has the information needed to estimate its individual costs, the Department estimates that to analyze and adapt an insurance company's current information systems, the insurance company may incur costs related to information technology services, including the services of programmers, software engineers, database managers, and computer support specialists. While it is not feasible to determine the actual cost of such employees and the actual amount of time that will be needed for such employees for each insurance company, the Texas Workforce Commission's Labor Market and Career Information Department's *2009 Texas Statewide Wages, Occupational Employment Statistics Program* indicates that the average hourly wages for these professions are $38.52 for a computer programmer, $44.22 for a computer software applications engineer, $44.11 for computer software systems engineers, $37.45 for a database administrator, and $22.76 for a computer support specialist. However, the actual number, types, and cost of personnel will be determined by the insurance company's existing data systems and staffing.

Similarly, the insurer will need to account for these premium surcharges. To the extent the insurer uses an automated accounting system, upgrading that system would be included within the scope of the information technology services portion of this cost analysis. The insurer may also incur additional accounting labor costs, which may vary by insurer. Each insurance company has the information needed to estimate its individual costs with respect to accounting and the requirements in proposed §§5.4181 - 5.4188. While it is not feasible to determine the actual cost of such employees and the actual amount of time that will be needed for such employees for each insurance company, the Texas Workforce Commission's Labor Market and Career Information Department's *2009 Texas Statewide Wages, Occupational Employment Statistics Program* indicates that the average

TDI CC 0233

hourly wages for an accountant or auditor in Insurance Carriers and Related Activities is $33.33. However, the actual number, types, and cost of personnel will be determined by the insurance company's existing data systems and staffing.

Likewise, the insurer may incur additional underwriting costs to review information necessary to determine whether the policyholder has premises, operations or property in the catastrophe area. Insurers may also incur additional underwriting costs if they are required to review an insured's claim that an allocation percentage other than the default allocation percentage is appropriate. Each insurance company has the information needed to estimate its individual costs with respect to underwriting and the requirements in proposed §§5.4181 - 5.4188. While it is not feasible to determine the actual cost of such employees and the actual amount of time that will be needed for such employees for each insurance company, the Texas Workforce Commission's Labor Market and Career Information Department's *2009 Texas Statewide Wages, Occupational Employment Statistics* Program indicates that the average hourly wage for an insurance underwriter is $30.02. However, the actual number, types, and cost of personnel will be determined by the insurance company's existing data systems and staffing.

Materials and postage cost will vary but are primarily based on the review requirement set forth in proposed §5.4183(d). The Department estimates correspondence costs, including paper, ink, and postage at $1.00 per letter. The cost of preparing the letter will vary but in this analysis is considered to be included within the scope of underwriter labor costs. It is likely that each review will generate at least one letter either agreeing or disagreeing with the insured. Additional correspondence would be expected to vary.

As previously stated, proposed §§5.4181 - 5.4188 do not require the insurer to use an automated system. Thus, the method of compliance is a left to the insurer and the purchase of a system or the upgrade an existing system is a business decision of the insurer. Further, because proposed §§5.4181 - 5.4188 apply to almost every type of property and casualty insurer and line of property and casualty insurance, it is not feasible to determine the actual cost of such computer hardware.

Additionally, many insurance companies writing insurance in Texas and/or other states may only need to make minor modifications to their automated systems, accounting procedures, or underwriting practices to comply with proposed §§5.4181 - 5.4188 because these insurance companies currently outsource some portion of these functions to managing general agents (MGAs) or other contracted vendors, who may write policies or perform services on behalf of multiple insurance companies. As such, to the extent that insurance companies utilize MGAs or vendors to perform these functions and these MGAs or vendors make the necessary changes on behalf of all of their contracted insurance company clients, compliance costs associated with proposed §§5.4181 - 5.4188 may be minimized significantly. Use of an MGA or other contractor does not reduce or eliminate the insurer's responsibility for compliance with this proposal.

*§5.4189.* Proposed §5.4189 requires insurers to provide applicants and insureds with information about the premium surcharge and the actual dollar amount of the premium surcharge assessed on their policy. If the insured uses the default allocation method set forth in §5.4183(d), the insured must also provide the insured or applicant the additional information set forth in §5.4189(c) concerning the applicant or insured's ability to contest the allocation. The notices must be provided upon quot-

ing the policy, renewal of the policy, and within 10 days of any mid-policy term transition period, which is defined in proposed §5.4184(c) as a mid-term policy change that consists of all transactions on a policy occurring within a seven day period that result in a change in the premium. Depending on the line of business and the term of the policy, and the propensity of an insured to change coverage, the insurer may be required to send multiple notices during the course of the year.

It is anticipated that insurers may develop a means to generate and send the required notices. To the extent that this requires information technology services, the Department refers to its prior discussion of cost and wages related to information technology professionals. Implementing an automated notice system would be in addition to the requirements necessary to implement §§5.4181 - 5.4188. Further, this proposal does not require insurers to shift this delivery requirement to agents. Thus, to the extent that insurers may attempt to shift some or all of the cost to agents would not be a cost of compliance with this section but a matter of contract between the insurer and the agent. The Department estimates correspondence costs, including paper, ink and postage at $1.00 per notice. Costs associated with printing notices and mailing notices would not be borne until and unless an actual premium surcharge was in effect. The costs would then continue for the term of the public securities, which would be approximately the next 10 years.

*§§5.4190 - 5.4192.* Proposed §5.4190 and §5.4191 require insurers to prepare and submit reports to the Association or the Department. The costs associated with these reports are the costs for extracting the data from the insurers accounting or policy systems, aggregating the data into a report, and transmitting the report to the Association or the Department. The costs associated with these tasks in drafting and submitting the reports under proposed §5.4190 or §5.4191 would not be borne until and unless an actual premium surcharge is in effect. The costs associated with these tasks in drafting and submitting data under proposed §5.4192 could be borne annually. The anticipated costs to comply with the described requirements in proposed §§5.4190 - 5.4192 are expected to include information technology services, underwriting services, accounting services, materials and postage, and computer hardware. Further, the costs incurred in creating the infrastructure to make these reports relies and builds upon the systems created by the insurer for compliance with §§5.4181 - 5.4188. Costs associated with §5.4190 and §5.4191, as well would likely not be borne until and unless an actual premium surcharge was in effect. The costs would then continue for the term of the public securities, which would be approximately the next 10 years. Costs associated with creating a system to produce reports in compliance with §§5.4190 - 5.4192 could begin upon the adoption of this proposal, with system maintenance and §5.4192 reporting costs continuing in each subsequent year of the first five years this proposed requirement is in effect.

The cost for each of these functions will vary by the insurer's line of business, labor practices, and current systems. This analysis considers the cost of an insurance company to implement proposed §§5.4190 - 5.4192 in-house, because ultimately the insurance company is responsible for the compliance with the proposed requirements and the in-house reporting method is available to every insurance company. This method is not required by the proposal and other methods of compliance may be available to the insurance company. The method of compliance and ultimate cost of compliance is a business decision of the insurance company and not a requirement of this proposal.

TDI CC 0234 (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.E) TWIA 0534

Proposed §§5.4190 - 5.4192 do not require an insurer to use an automated process. However, as most, if not all insurers do, the proposed sections will generate a need for information technology services. As these sections build on the systems required to comply with §§5.4181 - 5.4188, it is anticipated that an insurer would have similar information technology services needs, cost factors, and labor needs in creating a system to prepare the required reports. In preparing the reports, insurers may also incur costs related to accounting services and underwriting. These costs could be for internal review, and if the system is not automated preparation of the report. Though each insurance company has the information needed to estimate its individual costs, the Department estimates that to analyze and adapt an insurance company's current information systems, the insurance company may incur costs related to information technology services, including the services of programmers, software engineers, database managers, computer support specialists, accountants and underwriters. While it is not feasible to determine the actual cost of such employees and the actual amount of time that will be needed for such employees for each insurance company, the average hourly wages for these professions would not differ from those figures previously provided with respect to §§5.4181 - 5.4188 analysis. However, the actual number, types, and cost of personnel will be determined by the insurance company's existing data systems and staffing.

The preferred method of delivering reports will be electronic. As this may not be available to all insurers the cost will be evaluated for materials and postage cost. These costs may vary but are primarily based on the submission of a one or two page report. The Department estimates that each report would be approximately one page in length and thus correspondence costs, including paper, ink and postage at $1.00 per report. As previously stated, proposed §§5.4181 - 5.4188 do not require the insurer to use an automated system. Thus, the method of compliance is left to the insurer, and the purchase of a system or the upgrade an existing system is a business decision of the insurer. Further, because proposed §§5.4190 - 5.4192 apply to almost every type of property and casualty insurer and line of property and casualty insurance, it is not feasible to determine the actual cost of such computer hardware.

Additionally, many insurance companies writing insurance in Texas and/or other states may only need to make minor modifications to their automated systems, accounting procedures, or underwriting practices to comply with proposed §§5.4190 - 5.4192 because these insurance companies currently outsource some portion of these functions to managing general agents (MGAs) or other contracted vendors, who may write policies or perform services on behalf of multiple insurance companies. As such, to the extent that insurance companies utilize MGAs or vendors to perform these functions and these MGAs or vendors make the necessary changes on behalf of all of their contracted insurance company clients, compliance costs associated with proposed §§5.4190 - 5.4192 may be minimized significantly. Use of an MGA or other contractor does not reduce or eliminate the insurer's responsibility for compliance with this proposal.

All other costs to the Association, insurers and others result from the legislative enactment of the Insurance Code Chapter 2210 and the amendments to Chapter 2210 in HB 4409 and are not a result of the adoption, enforcement, or administration of this proposal.

ECONOMIC IMPACT STATEMENT AND REGULATORY FLEXIBILITY ANALYSIS FOR SMALL AND MICRO BUSINESSES.

The Government Code §2006.002(c) provides that if a proposed rule may have an economic impact on small businesses, state agencies must prepare as part of the rulemaking process an economic impact statement that assesses the potential impact of the proposed rule on small businesses and a regulatory flexibility analysis that considers alternative methods of achieving the purpose of the rule. The Government Code §2006.001(2) defines "small business" as a legal entity, including a corporation, partnership, or sole proprietorship, that is formed for the purpose of making a profit, is independently owned and operated, and has fewer than 100 employees or less than $6 million in annual gross receipts. The Government Code §2006.001(1) defines "micro business" as a legal entity, including a corporation, partnership, or sole proprietorship, that is formed for the purpose of making a profit; is independently owned and operated; and has no more than 20 employees. The Government Code §2006.002(f) requires a state agency to adopt provisions concerning micro businesses that are uniform with those provisions outlined in the Government Code §2006.002(b) - (d) for small businesses.

The Department will consider the economic impact of (i) proposed sections §§5.4161 - 5.4167 concerning member assessment and (ii) §§5.4171 - 5.4173 and §§5.4181 - 5.4192 concerning premium surcharges separately.

Member Assessments.

As discussed in the Public Benefit/Cost Note section of this proposal, the Department does not anticipate that proposed §§5.4161 - 5.4167 will result in additional costs for the Association or its member insurers. Therefore, an analysis of the economic impact of proposed §§5.4161 - 5.4167 pursuant to the Government Code §2006.002(c) is not required.

Premium Surcharge.

*The Association.* As discussed in the Public Benefit/Cost Note section of this proposal, it is anticipated that the Association will incur additional cost as a result of this proposal with respect to the premium surcharges, both in its capacity as an administrator of the program and a participant insurer. The anticipated costs to the Association as an administrator will result from proposed §5.4173 and §5.4190(g). The Association does not meet the definition of a *small business* under Government Code §2006.001(2). The Association is an *association...composed of all property insurers authorized to engage in the business of property insurance in this state,* formed under the authority of Insurance Code §2210.051. It is not a corporation, partnership nor sole proprietorship. It is not formed for the purpose of making a profit, but to provide a method by which adequate windstorm and hail insurance may be made available in certain designated portions of this state, as mandated by Insurance Code §2210.001. Under Insurance Code §2210.056, the net earnings of the Association may not inure to the benefit of private shareholders or individuals; and the assets of the Association may not be used, except to satisfy claims on policies, make investments authorized under applicable law, pay reasonable and necessary administrative expenses, satisfy the obligations of the Association, including public securities, financial instruments and the purchase reinsurance, or prepare for or mitigate the effects of catastrophic natural events. Under Insurance Code §2210.452, the net gain from operations of the Association in excess of incurred losses and operating expenses, is paid to a catastrophe reserve trust fund or used to procure reinsurance. Further, under Insurance Code §2210.056 and §2210.452, upon dissolution of the Association, all assets revert to the state. The Association is

TDI CC 0235

(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.E) TWIA 0535

not *independently owned and operated.* In addition to not being owned by its members, under Insurance Code §2210.101 and §2210.102, the Association operates with a board of directors, which is responsible and accountable to the Commissioner. The Association provides windstorm and hail insurance according to a plan of operation as specified by Insurance Code §2210.152 and adopted by the Commissioner by rule pursuant to Insurance Code §2210.151. Further, the Association has approximately 150 employees (including employees who are providing services by contract to the FAIR Plan) and net receipts well over $6 million. Therefore, based on these factors, the Association does not meet the definition of a small or micro business under the Government Code §2006.001(1) and (2), and an analysis of the economic impact of this proposal on the Association pursuant to the Government Code §2006.002(c) is not required.

*Insurers.* As discussed in the Public Benefit/Cost Note section of this proposal, it is anticipated that insurers subject to proposed §§5.4171 - 5.4173 and §§5.4181 - 5.4192 would be subject to additional costs arising from the adoption and enforcement of those proposed sections. The costs would generally arise from the requirements under proposed §§5.4181 -5.4188 to identify policyholders with premises, operations, or insured property in the catastrophe area, allocate the policyholder's premium, assess the premium surcharge, collect the premium surcharge, remit the premium surcharge to the Association; proposed §5.4189 to notify the insurer of the assessment and of options the insured may have concerning the assessment allocation under proposed §5.4183(d); and proposed §§5.4190 - 5.4192, concerning reporting requirements.

As provided in the Public Benefit/Cost Note section of this proposal, in this analysis "insurer" has the same meaning as proposed in §5.4172 and thus refers to each property and casualty insurer authorized to engage in the business of property or casualty insurance in the State of Texas and an affiliate of such an insurer, as described by the Insurance Code §823.003, including an affiliate that is not authorized to engage in the business of property or casualty insurance in the State of Texas, the Association, and the Texas Fair Access to Insurance Requirements Plan Association. The term specifically includes a county mutual insurance company, a Lloyd's plan, a reciprocal or interinsurance exchange.

*§§5.4181 - 5.4188.* Proposed §§5.4181 - 5.4188 address the requirements to identify policyholders with premises, operations, or insured property in the catastrophe area, allocate the policyholder's premium, assess the premium surcharge, collect the premium surcharge, and remit the premium surcharge to the Association. Costs associated with these sections will be significant both as to developing systems to handle the information and the ongoing integration of new policyholders into that system.

In accordance with the Government Code §2006.002(c-1), the Department has determined that even though proposed §§5.4181 - 5.4188 may have an adverse economic effect on insurers operating as small or micro businesses, that these entities are required to comply with the premium surcharge requirements set forth in the Insurance Code §2210.613 and thus the Department is not required to prepare a regulatory flexibility analysis as required in §2006.002(c)(2) of the Government Code for the following reasons. First, insurers operating as small or micro businesses are not required by statute or by this proposed rule to sell insurance coverage in the catastrophe area. Therefore, those small and micro businesses that sell insurance coverage do so at their own choice, and as a result, agree to bear the additional costs required for compliance with this proposal. The costs outlined in the Public Benefit/Cost Note section of this proposal provide sufficient cost information for insurers operating as small or micro businesses to make an informed business decision on whether to sell insurance coverage in the catastrophe area.

Secondly, §2006.002(c)(2) of the Government Code requires a state agency, before adopting a rule that may have an adverse economic effect on small or micro businesses, to prepare a regulatory flexibility analysis that includes the agency's consideration of alternative methods of achieving the purpose of the proposed rule. Section 2006.002(c-1) of the Government Code requires that the regulatory analysis "consider, if consistent with the health, safety, and environmental and economic welfare of the state, using regulatory methods that will accomplish the objectives of applicable rules while minimizing adverse impacts on small businesses." Therefore, an agency is not required to consider alternatives that, while possibly minimizing adverse impacts on small and micro businesses would not be protective of the health, safety, and environmental and economic welfare of the state.

As specified in §2210.001 of the Insurance Code, the Legislature has determined that the provision of windstorm and hail insurance is necessary for the economic welfare of the state and its inhabitants; and that the lack of such insurance in the state's seacoast territories would severely impede the orderly growth and development of the state. The Association was created by the Legislature and serves as a residual insurer of last resort for windstorm and hail insurance coverage in the catastrophe area designated by the Commissioner under the Insurance Code §2210.005. The Insurance Code §2210.613 premium surcharge requirement ensures that the Association has access to class 2 public security funding to pay loss claims.

As a means of implementing these requirements, the Insurance Code §2210.613 requires the insurer to assess policies insuring premises, operations and insured property in the catastrophe area. The statutory requirements in the Insurance Code §2210.613 and the requirements in proposed §§5.4181 - 5.4188 are integral to implementing the Legislature's determination that the provision of windstorm and hail insurance is necessary for the economic welfare of the state and its inhabitants; and that the lack of such insurance in the state's seacoast territories would severely impede the orderly growth and development of the state. Therefore, the Department has determined, in accordance with §2006.002(c-1) of the Government Code, that because the purpose of the Insurance Code §2210.613 and proposed §§5.4181 - 5.4188 is to protect the economic welfare of the state and its inhabitants, there are no additional regulatory alternatives to proposed §§5.4181 - 5.4188 that will sufficiently protect the economic welfare of the state and its inhabitants.

*§5.4189.* Proposed §5.4189 sets forth a requirement to notify insureds of the premium surcharge, their premium surcharge amount, the insureds ability to question an allocation under proposed §5.1483(d). These notices are intended to provide consumers with information and add transparency to the process. These notification requirements create a cost for insurers. Therefore, the Department, in accordance with the Government Code §2006.002(c-1), has considered the following alternative method of achieving the purpose of the proposed rule while reducing costs to insurers operating as small and micro businesses: reduce or eliminate the notice requirement.

TDI CC 0236   (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.E) TWIA 0536

The Department has determined that the alternative to reduce or eliminate the notice requirement for small or micro businesses is not practical because it would have a discriminatory affect on those consumers that are insured by insurers operating as small and micro businesses.

*§§5.4190 - 5.4192.* Proposed §§5.4190 - 5.4192 address the reporting requirements related to the collection of premium surcharge assessments. These proposed sections are intended to ensure that insurers fulfill the requirements to identify policyholders with premises, operations, or insured property in the catastrophe area, allocate the policyholder's premium, assess the premium surcharge, collect the premium surcharge, remit the premium surcharge to the Association. Costs associated with these §§5.4190 - 5.4192 will involve developing systems to generate the reports and making the reports.

In accordance with the Government Code §2006.002(c-1), the Department has determined that even though proposed §§5.4190 - 5.4192 may have an adverse economic effect on insurers operating as small or micro businesses, that these entities are required to comply with the premium surcharge requirements set forth in the Insurance Code §2210.613 and thus the Department is not required to prepare a regulatory flexibility analysis as required in §2006.002(c)(2) of the Government Code for the following reasons. First, insurers operating as small or micro businesses are not required by statute or by this proposed rule to sell insurance coverage in the catastrophe area. Therefore, those small and micro businesses that sell insurance coverage do so at their own choice, and as a result, agree to bear the additional costs required for compliance with this proposal. The costs outlined in the Public Benefit/Cost Note section of this proposal provide sufficient cost information for insurers operating as small or micro businesses to make an informed business decision on whether to sell insurance coverage in the catastrophe area.

Secondly, §2006.002(c)(2) of the Government Code requires a state agency, before adopting a rule that may have an adverse economic effect on small or micro businesses, to prepare a regulatory flexibility analysis that includes the agency's consideration of alternative methods of achieving the purpose of the proposed rule. Section 2006.002(c-1) of the Government Code requires that the regulatory analysis "consider, if consistent with the health, safety, and environmental and economic welfare of the state, using regulatory methods that will accomplish the objectives of applicable rules while minimizing adverse impacts on small businesses." Therefore, an agency is not required to consider alternatives that, while possibly minimizing adverse impacts on small and micro businesses would not be protective of the health, safety, and environmental and economic welfare of the state.

As specified in §2210.001 of the Insurance Code, the Legislature has determined that the provision of windstorm and hail insurance is necessary for the economic welfare of the state and its inhabitants; and that the lack of such insurance in the state's seacoast territories would severely impede the orderly growth and development of the state. The Association was created by the Legislature and serves as a residual insurer of last resort for windstorm and hail insurance coverage in the catastrophe area designated by the Commissioner under the Insurance Code §2210.005. The Insurance Code §2210.613 premium surcharge requirement and this proposal ensure that the Association has access to class 2 public security funding to pay loss claims.

As a means of implementing these requirements, the Insurance Code §2210.613 requires the insurer to assess policies insuring premises, operations and insured property in the catastrophe area. To be meaningful requirements, the determination of these amounts, both as to establishing the premium base to be surcharged and the amounts to be collected must be subject to later verification. The statutory requirements in the Insurance Code §2210.613 and the requirements in proposed §§5.4181 - 5.4188 and §§5.4190 - 5.4192 are integral to implementing the Legislature's determination that the provision of windstorm and hail insurance is necessary for the economic welfare of the state and its inhabitants; and that the lack of such insurance in the state's seacoast territories would severely impede the orderly growth and development of the state. Therefore, the Department has determined, in accordance with §2006.002(c-1) of the Government Code, that because the purpose of the Insurance Code §2210.613 and proposed §§5.4181 - 5.4188 is to protect the economic welfare of the state and its inhabitants, there are no additional regulatory alternatives to proposed §§5.4181 - 5.4188 that will sufficiently protect the economic welfare of the state and its inhabitants.

TAKINGS IMPACT ASSESSMENT. The Department has determined that no private real property interests are affected by this proposal and that this proposal does not restrict or limit an owner's right to property that would otherwise exist in the absence of government action and, therefore, does not constitute a taking or require a takings impact assessment under the Government Code §2007.043.

REQUEST FOR PUBLIC COMMENT. To be considered, written comments on the proposal must be submitted no later than 5:00 p.m. on August 30, 2010, to Gene C. Jarmon, General Counsel and Chief Clerk, Mail Code 113-2A, Texas Department of Insurance, P.O. Box 149104, Austin, Texas 78714-9104. An additional copy of the comment must be simultaneously submitted to Marilyn Hamilton, Associate Commissioner, Property and Casualty Program, Mail Code 104-PC, Texas Department of Insurance, P.O. Box 149104, Austin, Texas 78714-9104.

The Commissioner will consider the adoption of the proposed new sections in a public hearing under Docket No. 2718, scheduled for August 24, 2010, at 9:30 a.m., in Room 100 of the William P. Hobby, Jr., State Office Building, 333 Guadalupe Street, Austin, Texas. Written and oral comments presented at the hearing will be considered.

STATUTORY AUTHORITY. The sections are proposed under the Insurance Code §§2210.008, 2210.052, 2210.053, 2210.071, 2210.072, 2210.073, 2210.074, 2210.151, 2210.152, 2210.609, 2210.613, 2210.6135, and 36.001. Section 2210.008(b) authorizes the Commissioner to adopt reasonable and necessary rules in the manner prescribed in Subchapter A, Chapter 36, Insurance Code. The Insurance Code §2210.052(a) requires that a member company share in the losses and/or expenses of the Association based on the proportion that the net direct premiums of that member during the preceding calendar year bears to the aggregate net direct premiums by all members of the Association. Under the Insurance Code §2210.052(c), a member company's share of the losses and/or expenses of the Association is required to be determined annually and in the manner provided by the plan of operation. In the determination of a member company's share of the losses and/or expenses of the Association, the Insurance Code §2210.052(d) specifies that members are entitled to a credit for insurance voluntarily written in the catastrophe areas. The Insurance Code §2210.052(d)

**TDI CC 0237**  (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.E) TWIA 0537

also requires that the method for calculating the credit be contained in the plan of operation.  Section 2210.052(e) provides an exemption from participation in any insured losses and operating expenses of the Association in excess of premium and other revenue of the Association until the second anniversary of the date on which the insurer first becomes a member of the Association for an insurer that becomes a member of the association and that has not previously been a member of the Association. The Insurance Code §2210.053(b) encourages the Department to develop a program designed to create incentives for insurers to write voluntary windstorm and hail insurance in the catastrophe areas.  Section 2210.071(a) provides that if an occurrence or series of occurrences in a catastrophe area results in insured losses and operating expenses of the Association in excess of premium and other revenue of the Association, the excess losses and operating expenses shall be paid as provided by Subchapter B-1, Chapter 2210, Insurance Code. Section 2210.072(a) provides that losses not paid under the Insurance Code §2210.071 shall be paid as provided by this section from the proceeds from class 1 public securities. Section 2210.072(b) authorizes class 1 public securities to be issued in a principal amount not to exceed $1 billion per year.  Section 2210.072(c) requires class 1 public securities to be repaid in the manner prescribed by Subchapter M, Chapter 2210, Insurance Code, from Association premium revenue.  Section 2210.073 provides that losses not paid under Insurance Code §2210.072 shall be paid as provided by this section from the proceeds from class 2 public securities issued in accordance with Subchapter M, Chapter 2210, Insurance Code. Section 2210.073(b) authorizes class 2 public securities to be issued in a principal amount not to exceed $1 billion per year and requires class 2 public securities to be repaid in the manner prescribed by Subchapter M, Chapter 2210, Insurance Code.  Section 2210.074(a) provides that losses not paid under Insurance Code §2210.072 and §2210.073 shall be paid as provided by this section from the proceeds from class 3 public securities issued in accordance with Subchapter M, Chapter 2210, Insurance Code.  Section 2210.074(b) authorizes class 3 public securities to be issued in a principal amount not to exceed $500 million per year and requires class 3 public securities to be repaid in the manner prescribed by Subchapter M, Chapter 2210, Insurance Code. Section 2210.151 authorizes the Commissioner to adopt the Association's plan of operation to provide Texas windstorm and hail insurance coverage in the catastrophe area by rule. Section 2210.152 provides that the Association's plan of operation provide for the efficient, economical, fair, and nondiscriminatory administration of the Association and include both underwriting standards and other provisions considered necessary by the Department to implement the purposes of this chapter. The Insurance Code §2210.152(a)(2)(A) requires the plan of operation to include a plan for the equitable assessment of the members of the Association to defray losses and expenses.  Section 2210.609 provides that the Association shall repay all public security obligations from available funds, and if those funds are insufficient, revenue collected in accordance with the Insurance Code §§2210.612, 2210.613, and 2210.6135. Section 2210.609 further provides that the Association shall deposit all revenue collected under §§2210.612, 2210.613, and 2210.6135 in the public security obligation revenue fund and further provide for the payment of the public security obligations and the public security administrative expenses by irrevocably pledging revenues received from premiums, premium surcharges, and amounts on deposit in the public security obligation revenue fund, together with any public security reserve fund.  Section 2210.613 provides that the Association shall pay class 2 public securities issued under §2210.073 with premium surcharges and member assessments as provided by §2210.613.  Section 2210.6135 provides that the Association shall pay class 3 public securities issued under Section §2210.074 as provided by §2210.6135 through member assessments.  Section 36.001 provides that the Commissioner of Insurance may adopt any rules necessary and appropriate to implement the powers and duties of the Texas Department of Insurance under the Insurance Code and other laws of the state.

CROSS REFERENCE TO STATUTE. The following statutes are affected by this proposal:  Insurance Code §§2210.052, 2210.071, 2210.072, 2210.073, 2210.074, 2210.151,2210.152, 2210.608, 2210.609, 2210.613, and 2210.6135.

*§5.4161.    Member Assessments.*

(a)    The Association shall determine if a member assessment is necessary to fund the Association's outstanding class 2 and class 3 public security obligations, including any required contractual coverage amount (required obligations) based upon the evaluation of information that is provided to the Association by the Texas Public Finance Authority.

(b)    Pursuant to the Insurance Code, Chapter 2210 and the Association's plan of operation, if the Association determines that a member assessment is required to fulfill the Association's required obligations the Association shall assess the members of the Association in an amount the Association determines to be reasonable and necessary to fully provide for the Association's required obligations.

(c)    Sections 5.4161 - 5.4167 of this division are a part of the Texas Windstorm Insurance Association's plan of operation and shall control over any conflicting provision in §5.4001 of this subchapter (relating to Plan of Operation).

*§5.4162.    Amount of Assessment.*

(a)    The Association shall determine which members of the Association shall participate in any assessment to provide for the Association's required obligations as determined under §5.4161 of this division (relating to Member Assessments).

(1)    The Association may not include in the assessment an insurer that became a member of the Association after September 1, 2009, and had not previously been a member of the Association, until after the second anniversary of the date on which the insurer first becomes a member of the Association. The anniversary date shall be the date the insurer is authorized by the department to engage in the business of property insurance in this state.

(2)    The Association shall include in the assessment an insurer described under paragraph (1) of this subsection after the second anniversary of the date on which the insurer first becomes a member of the Association without regard as to whether the catastrophic event that gave rise to the class of public securities occurred prior to the second anniversary of the date on which the insurer first became a member of the Association.

(b)    This determination shall be computed on a calendar year basis for the year in which the assessment is made. This determination shall not be based on the year in which the catastrophic event occurred, except for an assessment made during that year.  Net direct premiums shall be determined as provided under §5.4001 of this subchapter (relating to Plan of Operation).

(c)    The designated members of the Association shall participate in any assessment levied in the proportion that the net direct premiums of such member written in this state during the preceding calendar year bears to the aggregate net direct premiums written in this

TDI CC 0238                                        (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.E) TWIA 0538

state by all members of the Association as furnished to the Association by the department after review of annual statements, other reports, and required statistics; provided, however, that if at the time of such assessment the department has not furnished to the Association information necessary to compute a member's participation during the preceding calendar year, then each member's participation shall be based upon information furnished to the Association from the last calendar year in which such information is available and, upon obtaining the necessary information from the department, the Association shall reassess or refund to each member such amounts as are necessary to properly reflect such member's participation; provided, further, that a member shall be entitled to receive the following credit for insurance, similar to catastrophe insurance, written in such catastrophe areas.

(d)    The Figure:  28 TAC §5.4162(d) graphically depicts the Texas Windstorm Insurance Association Procedure For Calculating Member Assessment Percentages Including Credit For Voluntary Writings.  All premiums are for the most recent preceding calendar year ending December 31, as furnished by the department.  Column 1(a): Statewide net direct premiums for extended coverage and other allied lines. Column 1(b): Statewide net direct premiums for extended coverage and other allied lines portion of the multiple peril line. Column 1(c):  Statewide net direct premiums for homeowners and farm and ranch owners. Column 2: The sum of the statewide net direct premiums at 90% of the extended coverage and other allied lines, and 50% of the homeowners and farm and ranch owner's, or such percentage as may be determined in accordance with §5.4001(a)(2)(N)(i)(III) of this subchapter (90% of Column 1(a) plus 90% of Column 1(b) plus 50% of Column 1(c)). Column 3: Each company's percentage of the net direct premiums as described in Column 2, which is the basis for indicating normal required participation in the Association prior to credits for voluntary writings in the designated areas. Column 4: Total windstorm and hail premiums in the designated areas (Association premiums plus voluntary premiums).  Column 5:  Normal company quota of total windstorm and hail premiums (Column 3 x Column 4). Column 6: Each company's voluntary writings in the designated areas multiplied by the same percentages as shown in Column 2.  Note: Maximum credit shall be limited to company's normal quota. Column 7:  Each company's maximum possible allocation after applying credits for voluntary writings (Column 5 minus Column 6). Negative allocation to be shown as zero.  Column 8:  Percentage participation of each member company in the Association, prior to application of offset.  Note:  The offset figure measures the excess premiums developed by the maximum credit in Column 6.  Column 9:  Percentage participation of each member company in the Association.
Figure:  28 TAC §5.4162(d)

(e)    The department shall furnish to the Association the amount of net direct premiums of each member company written on property in this state and the aggregate net direct premiums written on property in this state by all member companies during the preceding calendar year as reported by member companies to the department.  Within a reasonable time after the receipt of same from the department, the Association shall notify each member company, in writing, sent by certified mail, the amount of the net direct premiums written on property in this state during the preceding calendar year by the member company to whom notice is given, including the net direct premiums of similar insurance voluntarily written in the catastrophe areas, upon which such company's percentage of participation will be determined.  Such notice shall state that such notification, and the content thereof, is an act, ruling, or decision of the Association and that the member company to whom such notice is given shall be entitled to appeal such act, ruling, or decision within 30 days from the date shown on the notice in accordance with the Insurance Code §2210.551. Thereafter, the Association shall determine the percentage of participation for each mem-

ber company in the manner provided in this section and shall notify each member company thereof, in writing, sent by certified mail. Such notice shall state that such notification, and the content thereof, is an act, ruling, or decision of the Association insofar as the mathematical determination of the percentage of participation is concerned and that the member company to whom such notice is given shall be entitled to appeal therefrom within 30 days from the date of such act, ruling, or decision as shown on said notice in accordance with the Insurance Code §2210.551.

(f)    To assist the Association in determining each member insurer's percentage of participation as soon as possible in the calendar year, each member insurer shall furnish to the Association on or before March 1 of each year a copy of its Exhibit of Premiums and Losses (Statutory Page 14) for the State of Texas that is filed annually with the department as part of the insurer's Texas Property and Casualty Annual Statement.

§5.4163.    Notice of Assessment.

(a)    Notice of assessment shall be sent to each member, within 30 days after the Association levies the assessment, by certified mail, return receipt requested, addressed to the office of such member as it appears on the books of the Association.  Such notice shall state the member's allocated amount of assessment and shall inform each member of the sanctions imposed by §5.4165 of this division (relating to Failure to Pay Assessment) for the failure to pay such assessment within the time prescribed by this section.

(b)    Such notice shall also state that such notification, and the content thereof, is an act, ruling, or decision of the Association insofar as the amount of the assessment for such company is concerned and that a member company to whom such notice is given shall be entitled to appeal therefrom within 30 days from the date of such act, ruling, or decision as shown on said notice, in accordance with the Insurance Code §2210.551; provided, however, that the right of appeal provided for herein shall not include the subject matter of any act, ruling, or decision of the Association determining the amount of net direct premiums of such member company or the percentage of participation for such member company when notice of the amount of such net direct premiums or such percentage of participation has previously been given by the Association in accordance with §5.4162 of this division (relating to Amount of Assessment).

(c)    The time period for an appeal of an act, ruling, or decision of the Association respecting net direct premiums or percentage of participation is computed from the date of the act, ruling, or decision of the Association respecting same.

§5.4164.    Payment of Assessment.

Each member shall remit to the Association payment in full of its assessed amount of any assessment levied by the Association within 30 days of receipt of notice of assessment.

§5.4165.    Failure to Pay Assessment.

(a)    If the Association has not received payment in full of a member's allocated amount of assessment within 40 days of notice of the receipt by the member of the notice of assessment, then the Association shall report to the commissioner the fact that such assessment has not been paid, and the commissioner shall immediately issue an order suspending such member's certificate of authority to transact the business of insurance in the State of Texas until such time as the Association certifies to the commissioner that such assessment has been paid in full.

(b)    Removal of a member's certificate of authority to transact business in the State of Texas by the commissioner shall in no way

TDI CC 0239

(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.E) TWIA 0539

affect the right of the Association to proceed against such member in any court of law or equity in the United States for any remedy provided by law or contract to the Association, including, but not limited to, the right to collect such member's assessment.

(c)  In addition to any other remedy provided herein, the Association may offset assessments due from a member against any amounts in any account of such delinquent member.

§5.4166.  *Contest After Payment of Assessment.*

(a)  A member does not waive any right it may have to contest the computation of its allocated assessment amount by mailing or otherwise delivering payment of its allocated assessment amount to the Association, as provided herein.

(b)  Such contest shall not, however, toll the time within which assessments must be paid or the report to be made to the commissioner or the action to be taken by the commissioner upon receipt of such report, all as set out in §5.4165 of this division (relating to Failure to Pay Assessment).

§5.4167.  *Inability to Pay Assessment by Reason of Insolvency.*

In the event a member of the association is placed in temporary or permanent receivership under order of a court of competent jurisdiction based upon a finding of insolvency, and such member has been designated an impaired insurer by the commissioner, and in the event it is necessary to obtain additional funds to provide for operating expenses and losses in the year the insurer is declared impaired, the aggregate net amount not recovered from such insolvent insurer shall be reallocated among the remaining members of the association in accordance with the method of determining participation as determined in the plan of operation.

§5.4171.  *Premium Surcharge Requirement.*

(a)  Following a catastrophic event, insurers may be required to assess a premium surcharge under the Insurance Code §2210.613(b) and §2210.613(c) on all policyholders with property and casualty insurance policies that provide coverage on premises, operations, or insured property located in a catastrophe area.  This requirement applies to admitted insurers, the Association, the Texas FAIR Plan Association, Texas Automobile Insurance Plan Association policies, affiliated surplus lines insurers, and includes policies independently procured from affiliated insurers.

(b)  Sections 5.4171 - 5.4173 and 5.4181 - 5.4192 of this division (relating to Premium Surcharge Requirement, Premium Surcharge Definitions, Determination of the Surcharge, Premiums to be Surcharged, Allocation Method for Specified Lines of Insurance, Allocation Method for Other Lines of Insurance, Application of the Surcharges, Premium Surcharges are Mandatory, Remittance of Premium Surcharges, Offsets, Surcharges not Subject to Commissions or Premium Taxes, Notification Requirements, Annual Premium Surcharge Report, Premium Surcharge Reconciliation Report, and Data Collection, respectively) do not apply to policies written and reported under the following annual statement lines of business:  federal flood; medical malpractice; group accident and health; all other accident and health; workers' compensation; and excess workers' compensation.

(c)  Sections 5.4181 - 5.4192 of this division do not apply to:

(1)  a farm mutual insurance company operating under the Insurance Code Chapter 911;

(2)  a nonaffiliated county mutual fire insurance company described by the Insurance Code §912.310 that is writing exclusively industrial fire insurance policies as described by the Insurance Code §912.310(a)(2); or

(3)  a mutual insurance company or a statewide mutual assessment company engaged in business under Chapter 12 or 13, Title 78, Revised Statutes, respectively, before those chapters' repeal by §18, Chapter 40, Acts of the 41st Legislature, 1st Called Session, 1929, as amended by Section 1, Chapter 60, General Laws, Acts of the 41st Legislature, 2nd Called Session, 1929, that retains the rights and privileges under the repealed law to the extent provided by those sections.

§5.4172.  *Premium Surcharge Definitions.*

The following words and terms when used in §§5.4171 - 5.4173 and 5.4181 - 5.4192 of this division (relating to Premium Surcharge Requirement, Premium Surcharge Definitions, Premiums to be Surcharged, Allocation Method for Specified Lines of Insurance, Allocation Method for Other Lines of Insurance, Application of the Surcharges, Premium Surcharges are Mandatory, Remittance of Premium Surcharges, Offsets, Surcharges not Subject to Commissions or Premium Taxes, Determination of the Surcharge, Notification Requirements, Annual Premium Surcharge Report, Premium Surcharge Reconciliation Report, and Data Collection, respectively) shall have the following meanings unless the context clearly indicates otherwise:

(1)  Affiliated insurer--An insurer that is an affiliate, as described by the Insurance Code §823.003, of an insurer authorized to engage in the business of property or casualty insurance in the State of Texas.  Affiliated insurer includes an insurer not authorized to engage in the business of property or casualty insurance in the State of Texas.

(2)  Affiliated surplus lines insurer--An eligible surplus lines insurer that is an affiliate, as described by the Insurance Code §823.003, of an insurer authorized to engage in the business of property or casualty insurance in the State of Texas.

(3)  Exposure--The basic unit of risk that is used by an insurer to determine the insured's premium.

(4)  Insured property--Real property, or tangible or intangible personal property, including automobiles, covered under an insurance policy issued by an insurer.

(5)  Insurer--Each property and casualty insurer authorized to engage in the business of property or casualty insurance in the State of Texas and an affiliate of such an insurer, as described by the Insurance Code §823.003, including an affiliate that is not authorized to engage in the business of property or casualty insurance in the State of Texas, the Association, and the Texas Fair Access to Insurance Requirements Plan Association.  The term specifically includes a county mutual insurance company, a Lloyd's plan, and a reciprocal or interinsurance exchange.

(6)  Operations--A person's interest in property, or activities, that may result in, or give rise to, a loss that is insurable under a property or casualty insurance policy, including the use of a motor vehicle; ownership, lease, or occupancy of a residence or other real property; and activities performed by a person in connection with the manufacture, distribution, or sale of goods or services.  A person is considered to have operations in the catastrophe area if the person resides in or maintains a physical location in the catastrophe area, regardless of whether that location is owned, leased, rented, or occupied by the person.

(7)  Premises--A physical location where a person resides, or owns, leases, rents, or occupies real property, or has operations.

(8)  Premium surcharge percentage--The percentage amount determined by the commissioner under §5.4173 of this division (relating to the Determination of the Surcharge).

§5.4173.  *Determination of the Surcharge.*

TDI CC 0240

(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.E) TWIA 0540

(a) The Association shall review information provided by the Texas Public Finance Authority (TPFA) concerning the amount of the class 2 public security obligations and estimated amount of the class 2 public security administrative expenses, including any required contractual coverage amount, to determine whether the Association has sufficient available funds to pay the public security obligations and public security administrative expenses, if any, including any contractual coverage amount, or whether a premium surcharge under the Insurance Code §2210.613 is required. The Association may consider all of the Association's outstanding obligations and sources of funds to pay those obligations.

(b) If the Association determines that it is necessary to collect revenue specified in the Insurance Code §2210.613, the Association shall submit a written request to the commissioner to approve a premium surcharge on policyholders with premises, operations, or insured property in the catastrophe area as authorized under the Insurance Code §2210.613. The Association's request must specify:

(1) the total amount of the class 2 public security obligations and estimated amount of the class 2 public security administrative expenses, including any required contractual coverage amount, provided in the TPFA notice;

(2) the amount to be collected from insurers through a member assessment, which may not exceed 30 percent of the amount specified in the TPFA notice;

(3) the amount to be collected from catastrophe area policyholders through premium surcharges, which may not exceed 70 percent of the amount specified in the TPFA notice; and

(4) the date upon which the premium surcharge is to commence and the date the premium surcharge for the noticed amount is to end.

(c) On approval by the commissioner each insurer shall assess a premium surcharge in a percentage amount set by the commissioner to the insurer's policyholders. The premium surcharge percentage shall be applied to the premium attributable to premises, operations, and insured property located in the catastrophe area on policies that become effective, or on multi-year policies that become effective or have an anniversary date, during the premium surcharge period when the premium surcharge percentage will be in effect, as specified in §§5.4181 - 5.4188 of this division (relating to Premiums to be Surcharged, Allocation Method for Specified Lines of Insurance, Allocation Method for Other Lines of Insurance, Application of the Surcharges, Premium Surcharges are Mandatory, Remittance of Premium Surcharges, Offsets, and Surcharges not Subject to Commissions or Premium Taxes, respectively).

(d) This section is part of the Texas Windstorm Insurance Association's plan of operation and shall control over any conflicting provision in §5.4001 of this subchapter (relating to Plan of Operation).

§5.4181. *Premiums to be Surcharged.*

(a) The premium surcharge percentage shall be applied to:

(1) amounts reported as premium for the purposes of reporting under the Annual Statement, Exhibit of Premiums and Losses (Statutory Page 14), Texas; and

(2) if not reported as described in paragraph (1) of this subsection, those additional amounts collected that are subject to premium taxation by the comptroller, including policy fees not reported as premium, surplus lines premium taxes, and independently procured premium tax.

(b) Premium surcharges do not apply to fees that are neither reported as premium in the Annual Statement, Exhibit of Premiums and Losses (Statutory Page 14), Texas, nor subject to premium taxation by the comptroller.

§5.4182. *Allocation Method for Specified Lines of Insurance.*

(a) The methods addressed in subsections (b) and (c) of this section shall apply to all:

(1) policies written and reported under the following annual statement lines of business: fire; allied lines; multi-peril crop; farmowners; homeowners; commercial multi-peril (property); commercial multi-peril (liability); private passenger liability, personal injury protection (PIP), and physical damage; and commercial auto liability, PIP, and physical damage for policies where the premium is determined based on the geographic location of the exposures, or where the vehicles are principally garaged;

(2) personal and residential policies, including boat owners, personal liability, personal umbrella, and personal inland marine policies; and

(3) personal and commercial risks assigned by the Texas Automobile Insurance Plan Association (TAIPA) pursuant to the Insurance Code Chapter 2151.

(b) If the policy is rated based on the geographic location of the insured's premises, operations, or insured property, the premium surcharge shall be determined by applying the premium surcharge percentage to the policy premium determined in §5.4181 of this division (relating to Premiums to be Surcharged), attributable to premises, operations, or insured property located in the catastrophe area.

(c) In cases where the policy is not rated based on the geographic location of the insured's premises, operations, or insured property, the insurer shall allocate premium to the catastrophe area based on the proportion the exposure in the catastrophe area bears to the total exposure on the policy. The premium surcharge percentage shall apply to that portion of the policy premium allocated to the catastrophe area.

§5.4183. *Allocation Method for Other Lines of Insurance.*

(a) For lines of insurance not specified in §5.4182 of this division (relating to Allocation Method for Specified Lines of Insurance) the insurer must determine if the insured has:

(1) no premises, operations, or insured property in the catastrophe area and is thus not subject to premium surcharge;

(2) all premises, operations, or insured property in the catastrophe area; or

(3) premises, operations, or insured property located both in and outside of the catastrophe area.

(b) For policies only covering premises, operations, or insured property within the catastrophe area, the premium surcharge amount is determined by applying the premium surcharge percentage to the policy premium described in §5.4181 of this division (relating to Premiums to be Surcharged).

(c) For policies covering premises, operations, or insured property located both in and outside of the catastrophe area, where, as part of its normal underwriting, rating, or data collection processes, the insurer has sufficient information to determine the premium or exposure for each location, or can otherwise reasonably allocate premium to the catastrophe area, the insurer shall use the direct allocation methods set forth in §5.4182 of this division, and determine the premium surcharge amount by applying the premium surcharge percentage to the premium attributable or allocated to the catastrophe area.

(d) For policies covering premises, operations, or insured property located both in and outside of the catastrophe area, where, as

TDI CC 0241

(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.E) TWIA 0541

part of its normal underwriting, rating, or data collection processes, the insurer does not have premium or exposure data by location, or cannot otherwise reasonably allocate premium to the catastrophe area, insurers shall determine the premium surcharge by applying the premium surcharge percentage and the allocation percentage to the premium determined under §5.4181 of this division. The allocation percentage shall be determined as follows:

(1) Initial phase. For policies subject to a premium surcharge percentage that have an effective date in the first year the commissioner orders a premium surcharge following the effective date of these rules, and that cover both catastrophe area and non-catastrophe area premises, operations, or insured property, insurers shall use a default allocation percentage of 15 percent of the premium to determine the premium attributable to the catastrophe area.

(2) Subsequent phases. The default allocation percentage shall be increased by three percentage points each year for the five years following the year a surcharge is first ordered by the commissioner until the default allocation percentage equals 30 percent.

(3) Subsequent percentages. The default allocation percentage for policies subject to a surcharge percentage that are first effective after the calendar year a surcharge first becomes effective shall be as follows:

(A) all policies subject to a surcharge percentage first effective in the second year, 18 percent;

(B) all policies subject to a surcharge percentage first effective in the third year, 21 percent;

(C) all policies subject to a surcharge percentage first effective in the fourth year, 24 percent;

(D) all policies subject to a surcharge percentage first effective in the fifth year, 27 percent; and

(E) all policies subject to a surcharge percentage first effective in the sixth year and thereafter, 30 percent.

(4) Use of Other Allocation Percentages.

(A) The insurer shall provide the insured or applicant a period of not less than 30 days after receiving a notice required under §5.4189 of this division (relating to Notification Requirements) in which to provide additional information to the insurer indicating that the insured's actual percentage of catastrophe area exposure is less than the default allocation percentage.

(B) Insurers are not required to audit the additional information provided by the insured pursuant to subparagraph (A) of this paragraph; however, insurers shall review the information provided to determine if the information is reasonably consistent with other information the insurer has in its files and records used for underwriting or rating, if the insurer collects such comparable information as part of its normal underwriting or rating processes.

(C) Within 20 days of the date the insurer receives information submitted pursuant to subparagraph (A) of this paragraph, the insurer shall either:

(i) recalculate the insured's or applicant's premium surcharge to reflect the allocation percentage supported by the information provided by the insured, and refund to the insured any excess surcharge paid, and such revised premium surcharge shall be effective as of the inception date of the policy; or

(ii) provide the insured with a written statement indicating the reasons why the additional information provided by the insured does not reasonably support a lesser allocation percentage.

(e) For the purposes of this section, for determining and applying the default allocation percentage applicable, the anniversary date of a multi-year policy shall be considered to be an effective date.

§5.4184. Application of the Surcharges.

(a) When assessed under the Insurance Code §2210.613, the premium surcharges shall apply to all policies with premises, operations, or insured property in the catastrophe area that are issued or renewed with effective dates in the assessment period specified in the commissioner's order, with two exceptions:

(1) insurers shall not surcharge policies, and are not responsible for collecting premium surcharges on policies, that did not go into effect or were cancelled as of the inception date of the policy; and

(2) for multi-year policies, the premium surcharge in effect on the effective date of the policy, or the anniversary date of the policy, shall be applied to the 12-month premium for the applicable policy period.

(b) Premium surcharges are non-refundable under the Insurance Code §2210.613. If the policy is cancelled, a pro-rata portion of the surcharge is not returned to the policyholder.

(c) A mid-term policy change consists of all transactions on a policy occurring within a seven day period that result in a change in the premium.

(d) If a mid-term policy change increases the premium on the policy, insureds must pay an additional surcharge for the increased premium attributable to premises, operations, or insured property in the catastrophe area which shall be determined as follows:

(1) For policies where the premium surcharge is determined under §5.4182 or §5.4183(b) of this division (relating to Allocation Method for Specified Lines of Insurance and Allocation Method for Other Lines of Insurance) where all premises, operations, or insured property are located within the catastrophe area, the additional premium surcharge is determined by applying the applicable premium surcharge percentage to that portion of the additional premium attributable to premises, operations or insured property located in the catastrophe area.

(2) For policies where the premium surcharge is determined under §5.4182 or §5.4183(c) of this division and covering premises, operations, or insured property located both in and outside of the catastrophe area, the additional premium surcharge is determined by applying the premium surcharge percentage to that portion of the additional premium attributable to premises, operations, or insured property within the catastrophe area.

(3) For policies where the premium surcharge is determined under §5.4183(d) of this division, the additional premium surcharge is determined by applying the premium surcharge percentage and the default allocation percentage, or the allocation percentage if a different percentage is used pursuant to §5.4183(d)(3) of this division, to the additional premium.

(e) If a mid-term policy change decreases the premium, there shall be no corresponding decrease in the surcharge or refund of the surcharge.

(f) Surcharges or refunds shall apply to all premium changes due to exposure or premium audits, retrospective rating adjustments, or other similar adjustments that occur after policy expiration. Upon policy inception, the premium surcharge shall be collected on the deposit premium paid. If after exposure or premium audit, retrospective rating adjustment, or similar adjustment after policy expiration, an additional premium is required, an additional surcharge shall be paid. If after exposure or premium audit, retrospective rating adjustment, or

TDI CC 0242 (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.E) TWIA 0542

other similar adjustment after policy expiration, the deposit premium exceeds the actual premium, the excess surcharge shall be refunded to the insured, and the insurer may credit any refund paid to the Association through the offset process described in §5.4187 of this division (relating to Offsets). Additional surcharges and refunds shall be determined as follows:

(1) For policies where the premium surcharge is determined under §5.4182 or §5.4183(b) of this division, where all premises, operations, or insured property are located within the catastrophe area, the additional premium surcharge (or refund) is determined by applying the premium surcharge percentage in effect on the inception date of the policy, or the anniversary date of the policy in the case of multi-year policies, to the additional premium (or return premium).

(2) For policies where the premium surcharge is determined under §5.4182 or §5.4183(c) of this division, and covering premises, operations, or insured property located both in and outside of the catastrophe area, the additional premium surcharge (or refund) is determined by applying the premium surcharge percentage in effect on the inception date of the policy, or the anniversary date in the case of multi-year policies, to that portion of the additional premium (or return premium) attributable to the catastrophe area.

(3) For policies where the premium surcharge is determined under §5.4183(d) of this division, the additional premium surcharge (or refund) is determined by applying the premium surcharge percentage in effect on the inception date of the policy, or the anniversary date in the case of multi-year policies, and the default allocation percentage, or the allocation percentage if a different percentage is used pursuant to §5.4183(d)(4) of this division, to the additional premium (or return premium).

(g) Notwithstanding whether a surcharge was in effect on the inception date of the policy, or the anniversary date in the case of multi-year policies, no additional premium surcharges or refunds shall apply to premium changes resulting from exposure or premium audits, retrospective rating adjustments, or other similar adjustments that occur when there is no premium surcharge in effect.

§5.4185. *Premium Surcharges are Mandatory.*

(a) Insurers may not pay the surcharges in lieu of surcharging their policyholders; however, an insurer may remit a surcharge prior to collecting the surcharge from its policyholder.

(b) Insurers shall apply any money received from the insured to the premium surcharge prior to applying the funds to premium or any other obligation or debt owed to the insurer.

(1) Premium surcharges may not be allocated pro-rata or otherwise mixed with premium over installment plan payments. All money received under an installment plan shall be applied first to the premium surcharge prior to applying the money to premium or any other obligation or debt owed to the insurer.

(2) Premium surcharges may not be refunded to a premium finance company.

(c) Pursuant to the Insurance Code §2210.613(d), the failure of a policyholder to pay the premium surcharge constitutes failure to pay premium for the purposes of policy cancellation.

§5.4186. *Remittance of Premium Surcharges.*

(a) Insurers shall remit to the Association the aggregate amount of surcharges paid by its policyholders; however, an affiliated surplus lines insurer may allow a surplus lines agent to remit premium surcharges to the Association on its behalf in accordance with any pro-

cedures established by the Association relating to premium surcharge remissions from surplus lines agents.

(b) Insurers, or surplus lines agents allowed by affiliated surplus lines insurers to remit surcharges pursuant to subsection (a) of this section, shall remit all surcharges paid by its insureds not later than the fifteenth day of the month following the month in which the surcharge was received.

(c) Insurers and agents may not allow, or require, policyholders to make separate payments for the surcharge amounts which are payable to the Association.

(d) Subsection (b) of this section applies to all insurers regardless of whether the insured paid the premium surcharge through an agent of the insurer or the insured paid the premium surcharge directly to the insurer.

(e) An affiliated surplus lines insurer who allows an agent to remit premium surcharges to the Association pursuant to subsection (a) of this section may be held liable by the department for the failure of its agent to remit the premium surcharges or timely remit the premium surcharges, pursuant to subsection (b) of this section.

§5.4187. *Offsets.*

(a) An insurer may credit a premium surcharge amount on its next remission to the Association if the insurer has already remitted the amount to the Association for:

(1) the portion of the surcharge the insurer was not able to collect from the insured prior to the collection of any funds for premium or any other obligation or debt owed to the insurer;

(2) the portion of a surcharge paid to the Association in excess of a deposit premium as described in §5.4184 of this division (relating to Application of the Surcharges);

(3) the portion of a surcharge paid to the Association in excess of a surcharge where the insurer granted the insured a lesser surcharge pursuant to §5.4183(d)(4) of this division (relating to Allocation Method for Other Lines of Insurance).

(b) An agent may not offset payment of a premium surcharge to the insurer for any reason. However, a surplus lines agent allowed by an affiliated surplus lines insurer to remit surcharges to the Association on its behalf under §5.4186(a) of this division (relating to Remittance of Premium Surcharges), may offset as provided in this section.

§5.4188. *Surcharges not Subject to Commissions or Premium Taxes.*

(a) As provided by the Insurance Code §2210.613(d), premium surcharges are not subject to either premium taxes or agents' commissions.

(b) Insurers may not increase the premium surcharges for premium taxes or commissions, and agents, including a surplus lines agent, may not collect or charge commissions for the premium surcharges.

§5.4189. *Notification Requirements.*

(a) Insurers shall provide written notice to policyholders receiving a premium surcharge that their policy contains a surcharge. The notice shall read: "Your policy is subject to a non-refundable premium surcharge. Your surcharge was determined pursuant to 28 TAC §§5.4171 - 5.4173 and 5.4181 - 5.4192 and is authorized by Insurance Code §2210.073 and §2210.613. Your surcharge will be used by the Texas Windstorm Insurance Association to pay the debt service for public securities that were issued to pay catastrophe insurance claims of the Association. Insurance Code §2210.613(d) provides that the failure to pay the surcharge constitutes failure to pay premium for the purposes of policy cancellation."

TDI CC 0243

(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.E) TWIA 0543

(b)   Insurers shall provide written notice to applicants and policyholders of the dollar amount of the premium surcharge.

(c)   In addition to the notices required in subsections (a) and (b) of this section, insurers that determine the premium surcharge in accordance with §5.4183(d) of this division (relating to Allocation Method for Other Lines of Insurance) shall provide each applicant or policyholder with the following additional information:

(1)   the allocation percentage used to determine the premium surcharge;

(2)   that the allocation percentage represents the percentage of the insured's exposure assigned to coverage within the catastrophe area;

(3)   a description of the catastrophe area;

(4)   that, within 30 days of receipt of the notice, the applicant or policyholder may provide additional information to the insurer, as provided in §5.4183(d)(4) of this division, that the percentage of the insured's exposure within the catastrophe area is less than the allocation percentage used;

(5)   a description of the information the insured would need to provide; and

(6)   that upon receiving such information, the insurer will, within 20 days of the receipt of the information, either recalculate the premium surcharge accordingly, or provide the insured with a written explanation as to why the information provided did not support a lesser allocation percentage.

(d)   Notices required under subsections (a) and (b) of this section shall:

(1)   be provided at the time the policy is quoted, in the case of new business;

(2)   be provided with the renewal notice, in the case of renewal business;

(3)   be provided within 10 days of the end of the transaction period as specified in §5.4184(c) of this division (relating to Application of the Surcharges) for any mid-term change in the premium surcharge; and

(4)   use at least 12 point font and either be contained on a separate page or shown in a conspicuous location on the declarations page.

(e)   Notices required under subsection (c) of this section:

(1)   shall be provided at the time the policy is quoted, in the case of new business;

(2)   shall be provided with the renewal notice, in the case of renewal business;

(3)   shall be provided within 10 days of the end of the transaction period as specified in §5.4184(c) of this division for any mid-term change in the premium surcharge;

(4)   shall be contained on separate page; and

(5)   may be combined with notices required under subsections (a) and (b) of this section.

### §5.4190.   Annual Premium Surcharge Report.

(a)   This section does not apply to an insurer that, during the calendar year, exclusively wrote any or all of the following lines of insurance: federal flood insurance; medical malpractice insurance; accident and health insurance; or workers' compensation insurance.

(b)   No later than 60 days following the end of a calendar year in which a premium surcharge was in effect, each insurer shall provide the Association with an annual premium surcharge report for the calendar year.  However, an annual premium surcharge report for a given year is not required if premium surcharges were in effect for less than 45 days within the calendar year.

(c)   Annual premium surcharge reports shall provide information for each insurance company writing property or casualty insurance in the State of Texas, including affiliated surplus lines insurers, and affiliated insurers not authorized to engage in the business of insurance that issued independently procured insurance policies covering premises, operations, or insured property in the State of Texas.

(d)   Annual premium surcharge reports shall provide information for each annual statement line of business for which the insurer reported premium for the applicable calendar year.

(e)   Annual premium surcharge reports shall provide the following information:

(1)   the name and contact information of the individual responsible for submitting the report;

(2)   the five-digit NAIC number of the insurance company;

(3)   the name of the insurance company;

(4)   for policies with effective dates, or multi-year policies with anniversary dates, within the calendar year, separately for each surcharge period in effect during the calendar year, and within each surcharge period in effect during the calendar year separately by the applicable line or lines of business, as shown in the Annual Statement, Exhibit of Premium and Losses (Statutory Page 14), Texas:

(A)   For policies where the premium surcharge was determined under §§5.4182, 5.4183(b), or (c) of this division (relating to Allocation Method for Specified Lines of Insurance and Allocation Method for Other Lines of Insurance):

(i)   the total written premium allocated to premises, operations, or insured property in the catastrophe area; and

(ii)   the total written premium allocated to premises, operations, or insured property outside the catastrophe area;

(B)   For policies where the premium surcharge was determined under §5.4183(d) of this division and the default allocation percentage was used to calculate the premium surcharge:

(i)   the total written premium allocated to premises, operations, or insured property in the catastrophe area; and

(ii)   the total written premium allocated to premises, operations, or insured property outside the catastrophe area;

(C)   For policies where the premium surcharge was determined under §5.4183(d) of this division and an allocation percentage other than the default allocation percentage was used to calculate the premium surcharge:

(i)   the total written premium allocated to premises, operations, or insured property in the catastrophe area; and

(ii)   the total written premium allocated to premises, operations, or insured property outside the catastrophe area; and

(D)   the total written premium for policies not subject to a premium surcharge because the insured had no premises, operations, or insured property in the catastrophe area;

(5)   for policies effective in portions of the calendar year when no surcharge period was in effect, or in the case of multi-year

TDI CC 0244                    (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.E) TWIA 0544

policies with an anniversary date in portions of the calendar year when no surcharge was in effect, the total written premium separately by the applicable line or lines of business, as shown in the Annual Statement, Exhibit of Premiums and Losses (Statutory Page 14), Texas;

(6) the total amount of premium surcharges collected during the applicable calendar year; and

(7) the total amount of premium surcharges remitted to the Association during the applicable calendar year.

(f) The Association shall:

(1) review the reports submitted under this section as necessary to determine:

(A) the consistency of premium surcharges actually remitted to the Association with premium surcharges shown in the reports as collected and the premium surcharges shown in the reports as remitted to the Association; and

(B) the consistency of premiums shown in the reports as attributable to the catastrophe area with premium surcharges shown in the reports as collected by the insurer, given the requirements regarding the determination of premium surcharges in this division;

(2) inform the department of any insurer the Association believes may not be in compliance with the rules established under this division; and

(3) before July 1 on each year reports are required to be submitted to the Association, provide an aggregate summary of the reports to the department.

§5.4191. Premium Surcharge Reconciliation Report.

(a) This section does not apply to an insurer that, during an applicable calendar year, exclusively wrote any or all of the following lines of insurance: federal flood insurance; medical malpractice insurance; accident and health insurance; or workers' compensation insurance.

(b) Upon the written request of the department, an insurer shall provide the department with a premium surcharge reconciliation report for the year specified by the Association or the department in its request.

(c) Reconciliation reports shall be provided to the department within 10 working days after the date the request is received by the insurer.

(d) Reconciliation reports shall consist of the following information concerning premiums written and surcharges collected, separately for each line of business and applicable surcharge period, including periods in which no premium surcharges were in effect, within the specified year:

(1) premium written at policy issuance for policies effective within the year, including anniversary dates within the year on multi-year policies, separately for:

(A) premium subject to a premium surcharge, including premium allocated to the catastrophe area on policies having premises, operations, or insured property both in and outside of the catastrophe area; and

(B) premium not subject to a premium surcharge, including premium not allocated to the catastrophe area on policies having premises, operations, or insured property both in and outside of the catastrophe area; and

(2) premium written due to mid-term coverage changes occurring within the specified time period separately for:

(A) premium increases subject to a premium surcharge, including premium allocated to the catastrophe area on policies having premises, operations, or insured property both in and outside of the catastrophe area; and

(B) premium not subject to a premium surcharge, including premium increases not allocated to the catastrophe area on policies having premises, operations, or insured property both in and outside of the catastrophe area and premium refunds, whether related to coverage within or without the catastrophe area; and

(3) total premium due to post-term premium changes occurring within the specified time period, including adjustments due to premium or exposure audits, retrospective rating adjustments, or other similar adjustments that occur after policy expiration, separately for:

(A) premium subject to a premium surcharge, including premium allocated to the catastrophe area on policies having premises, operations, or insured property both in and outside of the catastrophe area; and

(B) premium not subject to a premium surcharge, including premium not allocated to the catastrophe area on policies having premises, operations, or insured property both in and outside of the catastrophe area; and

(4) separately for paragraphs (1)(A), (2)(A), and (3)(A) of this subsection, the amounts of premium surcharges collected; and

(5) the total amount of written premium for policies written in the State of Texas as reported in the Annual Statement, Exhibit of Premiums and Losses (Statutory Page 14), Texas, for each of the applicable lines of insurance.

(e) Nothing in this section limits the department's authority to obtain information from insurers under the Insurance Code.

(f) A report provided to the department under this section may be provided to the Association.

§5.4192. Data Collection.

(a) The department may request from each insurer the information necessary to enable the department to determine the premium surcharge percentage applicable to insureds with premises, operations, or insured property located in the catastrophe area.

(b) For policies with effective dates on or after October 1, 2010, each insurer shall maintain sufficient records to report the following information to the department:

(1) for policies where the premium surcharge was, or would be determined under §§5.4182, 5.4183(b), or (c) of this division (relating to Allocation Method for Specified Lines of Insurance and Allocation Method for Other Lines of Insurance), the total written premium attributable to the catastrophe area for policies with premises, operations, or insured property located in the catastrophe area;

(2) for policies where the premium surcharge was, or would be determined under §5.4183(d) of this division and the default allocation percentage was, or would be applied in order to determine the premium surcharge, the total written premium for policies with any premises, operations, or insured property located in the catastrophe area; and

(3) for policies where the premium surcharge was determined under §5.4183(d) of this division and an allocation percentage other than the default allocation percentage was used to determine the premium surcharge, the total premium allocated to the catastrophe area based on the allocation percentage used to determine the premium surcharge.

TDI CC 0245

(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.E) TWIA 0545

(c) For periods of time when no surcharge is in effect, insurers may report all premium for policies where a premium surcharge would be determined under §5.4183(d) of this division as premium for policies where the default allocation percentage would be applied.

(d) When possible, and practical, the department will obtain information from the Texas Surplus Lines Stamping Office prior to requesting information from affiliated surplus lines insurers.

(e) Nothing in subsection (d) of this section should be read to mean that subsections (a) - (c) of this section do not apply to affiliated surplus lines insurers.

(f) Nothing in this section limits the department's authority to obtain information from insurers under the Insurance Code.

This agency hereby certifies that the proposal has been reviewed by legal counsel and found to be within the agency's legal authority to adopt.

Filed with the Office of the Secretary of State on July 19, 2010.

TRD-201003956
Gene C. Jarmon
General Counsel and Chief Clerk
Texas Department of Insurance
Earliest possible date of adoption: August 29, 2010
For further information, please call: (512) 463-6327



# TITLE 34. PUBLIC FINANCE

# PART 1. COMPTROLLER OF PUBLIC ACCOUNTS

## CHAPTER 9. PROPERTY TAX ADMINISTRATION
## SUBCHAPTER C. APPRAISAL DISTRICT ADMINISTRATION

### 34 TAC §9.419

The Comptroller of Public Accounts proposes an amendment to §9.419, concerning procedures for determining property tax exemption for motor vehicles leased for personal use. This section is being amended to increase administrative efficiency by providing for comptroller revision of applicable forms that are not required to be adopted by rule, to improve general readability, and to delete unnecessary language regarding appraisal review boards. The proposed amendment is a result of a rule review of Texas Administrative Code, Title 34, Part 1, Chapter 9, Subchapter C, conducted by the comptroller. The rule review was performed pursuant to Government Code, §2001.039 and resulted in a determination that the reasons for initially adopting §9.419 continue to exist.

John Heleman, Chief Revenue Estimator, has determined that for the first five-year period the rule will be in effect, there will be no significant revenue impact on the state or units of local government.

Mr. Heleman also has determined that for each year of the first five years the rule is in effect, the public benefit anticipated as a result of enforcing the rule will be by improving the administration of local property valuation and taxation. The proposed amendment would have no fiscal impact on small businesses. There is no significant anticipated economic cost to individuals who are required to comply with the proposed rule.

Comments on the amendment may be submitted to Deborah Cartwright, Director, Property Tax Assistance Division, P.O. Box 13528, Austin, Texas 78711-3528.

This amendment is proposed pursuant to Government Code, §2001.039(c), which authorizes the readoption of a rule with amendments upon agency assessment, in conducting a rule review, of whether the reasons for initially adopting the rule continue to exist.

This amendment implements Tax Code, §11.252 and §11.43.

*§9.419. Procedures for Determining Property Tax Exemption for Motor Vehicles Leased for Personal Use.*

(a) Effective Date. This section is effective for motor vehicles that are leased on or after January 2, 2001.

(b) Definitions. The following words and terms, when used in this section, shall have the following meanings, unless the context clearly indicates otherwise.

(1) Lease--An agreement whereby an owner of a motor vehicle for consideration gives exclusive use of a motor vehicle to another for a period that is longer than 180 days.

(2) Lessee--A person who enters into a lease for a specific motor vehicle primarily for the personal use of the lessee or the lessee's family.

(3) Lessor--A person who owns a motor vehicle that is leased to another person.

(4) Lessee's Affidavit--A sworn statement that a lessee executes to attest that the lessee does not hold the leased motor vehicle for the production of income and does not primarily use the leased motor vehicle for the production of income.

(5) Motor vehicle--A passenger car or truck with a shipping weight of 9,000 pounds or less.

(6) Reasonable date and/or time--A work weekday, Monday through Friday, and a time that is after 8:00 a.m. and before 5:00 p.m., unless the appraisal district and the lessor agree otherwise.

(c) The comptroller will make available model forms that are adopted by reference in paragraph (1) of this subsection. Copies of the forms can [form are available for inspection at the office of the Texas Register or may] be obtained from the Comptroller of Public Accounts' Property Tax Assistance Division [Accounts, P.O. Box 13528, Austin, Texas 78711. Copies may also be requested by calling our toll-free number, 1-800-252-9121. In Austin, call (512) 305-9999].

(1) The comptroller adopts by reference the following model forms:

(A) Lessee's Affidavit of Primarily Non Income Producing Vehicle Use (Form 50-285); and

[(B) Lessor's Application for Personal Use Lease Automobile Exemptions (Form 50-286); and]

(B) [(C)] Lessor's Rendition or Property Report for Leased Automobiles (Form 50-288).

(2) A chief appraiser or lessor must use the comptroller's [comptroller] model forms that are adopted by reference in paragraph (1) of this subsection, unless the non-model form:

(A) [for Lessee's Affidavit of Primarily Non Income Producing Vehicle Use, for Lessor's Application for Personal Use

TDI CC 0246

(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.E) TWIA 0546

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Shawn Pettyjohn on behalf of Mike Wilson
Bar No. 21704810
spettyjohn@perkinslawtx.com
Envelope ID: 96078403
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Appellee TWIA's Brief
Status as of 1/10/2025 12:02 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Wade Crosnoe | 783903 | wcrosnoe@thompsoncoe.com | 1/10/2025 11:45:54 AM | SENT |
| Rosalind Hunt | 24067108 | Rosalind.Hunt@oag.texas.gov | 1/10/2025 11:45:54 AM | SENT |
| Cory Scanlon | 24104599 | cory.scanlon@oag.texas.gov | 1/10/2025 11:45:54 AM | SENT |
| Michael Wilson | | mwilson@perkinslawtx.com | 1/10/2025 11:45:54 AM | SENT |
| Nancy Villarreal | | nancy.villarreal@oag.texas.gov | 1/10/2025 11:45:54 AM | SENT |
| Jay A.Thompson | | jthompson@mwlaw.com | 1/10/2025 11:45:54 AM | SENT |
| Terri M.Abernathy | | terri.abernathy@oag.texas.gov | 1/10/2025 11:45:54 AM | SENT |
| Shawn Pettyjohn | | spettyjohn@perkinslawtx.com | 1/10/2025 11:45:54 AM | SENT |
| Adrienne Barclay | | abarclay@perkinslawtx.com | 1/10/2025 11:45:54 AM | SENT |